George J. Kovacevich, SBN 48125
Caio A. Arellano, SBN 262168
**ATCHISON, BARISONE, CONDOTTI & KOVACEVICH**
A Professional Corporation
333 Church Street
Santa Cruz, CA 95060
Telephone:   (831) 423-8383
Facsimile:    (831) 576-2269

Attorneys for Plaintiff
SANDRA J. FEE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA J. FEE,<br><br>  Plaintiff,<br><br>vs.<br><br>STATE OF CALIFORNIA, et al.,<br><br>  Defendants. | **CASE NO. C08-01549-RMW**<br><br>**DECLARATION OF SANDRA J. FEE IN OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION OF ISSUES AND CAUSES OF ACTION**<br><br>Date         September 4, 2009<br>Time         9:00 am.<br>Courtroom    6<br>Judge        The Hon. Ronald M. Whyte |

I, Sandra J. Fee, declare:

1. I am the Plaintiff in the above-entitled action and as such have personal knowledge of and am familiar with the facts contained herein.

2. On May 3, 2007, I lived at 1200 Graham Hill Road in Santa Cruz, California. It was there that the incident underlying this lawsuit occurred. I moved to that property in 2003.

3. Before I became aware that any officers were at my property, I was in my pajamas and conducting my business over the phone which I typically did starting early in the morning. I was on the phone in my family room which I used as my office.

4. The door to the front entrance of my house is located to the left of the garage as one faces the garage from the road. This is the door by and through which the public and guests would seek entry to my house. That door is depicted in Exhibit D to Rioux's declaration. The door clearly has the

-1-

1 appearance of a front door to a house, and has a security door viewer ("peephole"), a door knob, a
2 deadbolt and a latch. A doorbell is situated immediately to the right of the door as one faces the door.
3 Closer views of the door and doorbell are contained in Exhibits 1, 2, and 3 attached to my declaration.
4 On the date in question, this door was locked. Entry through this door leads to a small courtyard across
5 from which my house sits along with the point of entry.

6    5.   My doorbell at that property was sufficiently loud so that I could hear it inside my house,
7 including at the location I was shortly before the officers arrived. I heard no doorbell on this occasion.

8    6.   The fence and Door to the left of the garage is approximately eight feet high.

9    7.   To the right of the garage is a wooden gate. That gate is the gate depicted in Exhibit C
10 and E of the Declaration of Officer B. Rioux. That gate is situated at the southerly end of my property.
11 The fence and Gate are approximately 7½ fee high.

12   8.   This gate leads to a side yard of my residence which is completely enclosed by fencing
13 and a hedge. Access to this area from the front part of my premises which fronts on Graham Hill Road
14 is through a wooden gate situated to the right of my garage.

15   9.   As one can see in Exhibits 4 and 5 attached to my declaration, when facing my house, the
16 roof of my house to the left of the garage can be seen above this door. On the other hand, no roofing or
17 structure exists beyond the plane of the gate as there is only a yard there.

18   10.  The gate is not used as the means for the public or guests to access my home. The gate is
19 locked all but three days a month. It is not locked on those dates in order to allow a PG&E employee to
20 read the electrical meter which is located right behind the gate but for no other purpose. One of those
21 three days was May 3, 2007. However, the gate was closed on that occasion before any officers arrived.

22   11.  The gate and adjoining fencing to the right thereof sit approximately seven and one-half
23 feet high. Once inside the gate, the ground is lower than on the outside of the gate. Once inside the
24 gate, the southerly boundary of the enclosed yard consists of a very high hedge of approximately nine
25 feet. The easterly end of this yard is also enclosed with a fence/gate of approximately 5-3/4 feet high
26 extending from the hedge to the house. See Exhibit 6 attached hereto. Beyond this fence/gate is a large
27 lawn area and beyond that a high rod iron fence at the perimeter of the property.

28 ///

-2-
DECLARATION OF SANDRA J. FEE IN OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION
OF ISSUES AND CAUSES OF ACTION – C08-01549-RMW

12. Approximately half way inside this area there is a 32 inch single French back door with glass panes preceded by three wooden steps. See Exhibit 7 attached hereto. That door enters into an approximately five foot hallway of the house beyond which is the utility room. See Exhibit 8 attached hereto. This door was not immediately visible after entry through the gate.

13. Because this yard is considered very private to me, I had no reason to expect, nor do I expect, any person to enter that area from the gate without my permission.

14. For this reason, as well as the hour of the day which was approximately 8:45 a.m. and the fact I was in my pajamas, and in the privacy of my home, I was perplexed when I heard a sound which appeared to be a loud knocking at the back door. I proceeded from the family room through the kitchen and into the utility room from where I looked to my door and saw no one there. I returned to my family room. I then heard more knocking and retraced my previous steps and still did not see anybody so I thought that it was a neighbor making some noise. During this time, I was on the phone with Mathew Wilkins, an account executive whom I managed. I then heard a much louder "bam, bam, bam" noise at my back door and this time I went to the utility room and saw an officer outside the door at the base of the stairs. I came to learn this was Officer Rioux. He was fully dressed in his uniform with a badge and a gun on his hip.

15. Startled and surprised by anyone being in my yard, let alone a police officer, I partially opened the door at which time I was still speaking with Mr. Wilkin on the phone. I had the phone in my left hand and a pen in my right.

16. I temporarily interrupted my call to speak to Officer Rioux. He asked if the trailer in front of my house was my trailer. I told him it was not but it was my son's. He asked if he was home and I said he wasn't. He then asked me if it was my house and I said no and then he asked whether I lived there and I said I did. Rioux told me he was investigating the trailer as stolen property and asked if my son was home. I told him that I didn't know anything about that but I explained my son was a general contractor and had a lot of trailers. I also told him I could call my son at work and he would come and clear the matter up. I then demonstrated the phone and said I was on the phone and would be happy to help him but I asked to first finish my call. At that point, Officer Rioux demanded that I step outside of my home. I again requested that I be allowed to end the call and that I would then come out

-3-

to talk. Officer Rioux kept repeating the statement, "Are you resisting me," to which I replied that I was not but that I just wanted to end the phone call first.

17. In view of the fact the situation was escalating, I informed Mr. Wilkins that I needed to get off the phone and at that time, I reached to a table behind me to set the phone down. As I was attempting to do this, Officer Rioux charged up the steps, (one of which I later learned he broke in the process, as Exhibit 9 attached hereto illustrates), forcibly pushed the door with his shoulder while he grabbed a hold of me, while screaming at me repeatedly, "Are you resisting?"

18. Throughout this whole time, I had been standing completely inside my home. I was not in the threshold but approximately a foot and a half to two feet inside my home. When I reached back to set the phone down, I retreated even more into my home. When Officer Rioux came to grab me, he clearly had a good portion of his body inside my residence.

19. Until Officer Rioux charged into my house, the door was always less than half opened and part of my body was behind it. I purposefully kept the door only partially opened because I had been really caught off guard and startled by the officers' presence and the fact that I was in the clothes I slept in and I felt my privacy had been violated so I was trying to be as protective of it as I could under the circumstances.

20. At the time Officer Rioux made his charge into my house, he also had his can of pepper spray and proceeded to spray me. I was still completely in my house when he began to pepper spray. He then pulled me out of my house as he continued to pepper spray me.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 14th, 2009, at Santa Cruz, California.

SANDRA J. FEE