1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4


5
        SANDRA FEE,                    )  C-08-01549 RMW
6                                      )
                        PLAINTIFF,     )  SAN JOSE, CALIFORNIA
7                                      )
               VS.                     )  MAY 26, 2010
8                                      )
        STATE OF CALIFORNIA,           )  VOLUME 6
9       CALIFORNIA HIGHWAY             )
        PATROL, OFFICER B. RIOUX,      )  PAGES 925-937
10      OFFICER VOORHEES,              )          970-984
                                       )          990-1098
11                      DEFENDANTS.    )
        _____)
12

13
                  PARTIAL TRANSCRIPT OF PROCEEDINGS
14           BEFORE THE HONORABLE RONALD M. WHYTE
                  UNITED STATES DISTRICT JUDGE
15

16      A P P E A R A N C E S:

17      FOR THE PLAINTIFF:   ATCHISON, BARISONE,
                             CONDOTTI & KOVACEVICH
18                           BY:  GEORGE J. KOVACEVICH
                             333 CHURCH STREET
19                           SANTA CRUZ, CALIFORNIA  95060

20


21      FOR THE DEFENDANT:   OFFICE OF THE ATTORNEY GENERAL
                             BY:  JEFFREY RICHARD VINCENT
22                           1515 CLAY STREET, 20TH FLOOR
                             OAKLAND, CALIFORNIA  94612
23


24      OFFICIAL COURT REPORTER: LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595
25


                                                            925

1

2                    INDEX OF WITNESSES

3    DEFENDANT'S

4    **ADAM VOORHEES**
          CROSS-EXAM BY MR. KOVACEVICH (RES.) P. 970
5         REDIRECT EXAM BY MR. VINCENT      P. 983

6

7    **BRANDON RIOUX**
          DIRECT EXAM BY MR. VINCENT        P. 990
8         CROSS-EXAM BY MR. KOVACEVICH      P. 1043
          REDIRECT EXAM BY MR. VINCENT      P. 1075
9         RECROSS-EXAM BY MR. KOVACEVICH    P. 1078

10

11   **JARED ZWICKEY**
          AS-ON CROSS-EXAM BY MR. KOVACEVICH  P. 1080
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                   926

1    SAN JOSE, CALIFORNIA              MAY 26, 2010

2                    P R O C E E D I N G S

3              (WHEREUPON, THE FOLLOWING PROCEEDINGS

4    WERE HELD OUT OF THE PRESENCE OF THE JURY:)

5              THE COURT:  GOOD MORNING.  WHAT'S UP?

6              MR. KOVACEVICH:  YOUR HONOR, I HAVE

7    SEVERAL THINGS I NEED TO BRING TO THE COURT'S

8    ATTENTION.

9              FIRST OF ALL, AT SOME POINT HERE SOONER

10   RATHER THAN LATER, I THINK WE NEED TO DEAL WITH

11   THIS ISSUE OF WHETHER THEY'VE OPENED THE DOOR.  YOU

12   KNOW, WE HAD THE MOTION IN LIMINE REGARDING

13   MR. RIOUX'S, OR OFFICER RIOUX'S BROTHER'S

14   SITUATION.

15             I THINK MS. KERAM, OR DR. KERAM MADE A

16   VERY EMPHATIC STATEMENT THAT SHE'S NEVER, EVER SEEN

17   ANYONE TAKE THIS LONG, YOU KNOW, TO RECOVER.  AND I

18   WON'T GO INTO THE REST OF WHAT SHE SAID, BUT I

19   THINK THE IMPLICATIONS THERE WERE VERY CLEAR THAT

20   SHE WAS TRYING TO MAKE.

21             THE OTHER PROBLEM HAS TO DO WITH THE

22   SECONDARY GAIN, AND LET ME JUST TELL YOU, I MEAN,

23   TECHNICALLY I COULD PROBABLY START THE QUESTIONING,

24   BUT I ANTICIPATE THAT THERE WILL BE AN OBJECTION,

25   SO I WANT TO JUST APPRISE THE COURT BEFOREHAND OF

                                                   927

1       THAT, AND I'M NOT TRYING TO SANDBAG ANYBODY.

2                   THIS IS WHAT HAPPENED.  MY CLIENT

3       CONTACTED ME INITIALLY FOR CRIMINAL DEFENSE BECAUSE

4       SHE FELT SHE WAS GOING TO BE CHARGED, AND IN THE

5       PROCESS, SHE WAS CRYING, YOU KNOW, QUITE A BIT ON

6       THE PHONE AND SO I SAID, "WELL, YOU NEED TO GET

7       SOME HELP ALSO."

8                   AND I COULDN'T DO CRIMINAL DEFENSE, I WAS

9       A PROSECUTOR FOR 18 YEARS, SO THAT WAS NOT AN

10      ISSUE.

11                  BUT -- SO THAT'S THE ORIGINAL CONTEXT

12      WITHIN WHICH IT CAME UP.

13                  BUT THE REASON SHE CONTACTED ME IS

14      BECAUSE THE SCENARIO GOES SHE WAS IN THE JAIL AND

15      THE O.R. OFFICER WAS INTERVIEWING HER, WENT OVER TO

16      THE JUDGE, CAME BACK AND INFORMED HER THAT

17      JUDGE ATACK TOLD HIM THAT -- TOLD HER TO TELL HER

18      THAT HER CIVIL RIGHTS WERE VIOLATED AND SHE SHOULD

19      SEE AN ATTORNEY.

20                  SHE WENT HOME AND SHE DIDN'T WANT TO HAVE

21      ANYTHING TO DO WITH THIS, WITH THAT.  SHE WANTED TO

22      JUST TRY AND HEAL AND GET ON WITH HER LIFE.

23                  AND SHE HAD MENTIONED TO HER DAUGHTER

24      ABOUT WHAT THIS PERSON HAD TOLD HER AT THE JAIL,

25      AND HER DAUGHTER SAYS, "WELL, MOM, YOU'VE GOT TO DO

1   SOMETHING. YOU KNOW, YOU'RE AN HONEST PERSON.

2   THEY'LL BELIEVE YOU."

3           AND THIS IS IN KERAM'S REPORT, THIS PART

4   OF IT IS IN KERAM'S REPORT, THAT THE COPS COULD

5   STILL KEEP DOING THAT.

6           AND SO THOSE ARE THE CIRCUMSTANCES.

7           THE COURT: WHAT'S YOUR CONCERN?

8           MR. KOVACEVICH: WELL, MY CONCERN IS,

9   PART OF IT IS THE STATEMENT ATTRIBUTED TO A JUDGE

10  COMING THROUGH THE O.R. SPECIALIST TELLING MS. FEE

11  THAT HER CIVIL RIGHTS WERE VIOLATED, YOU SHOULD

12  CONTACT AN ATTORNEY.

13          I MEAN, SHE WAS NOT THINKING TO DO THIS,

14  AND SHE EVEN WASN'T GOING TO DO THAT HERSELF.

15          BUT THAT'S WHY HER DAUGHTER KEPT

16  STRESSING ON HER, "WELL, I MEAN, THE JUDGE THINKS

17  SO. YOU'VE GOT TO DO SOMETHING. AND BESIDES, THE

18  COPS ARE GOING TO STILL REPEAT THEIR BEHAVIOR

19  UNLESS YOU DO SOMETHING."

20          THE COURT: WELL, WHY CAN'T SHE -- CAN'T

21  WE LIMIT IT TO SOMEONE AT THE JAIL RECOMMENDED THAT

22  SHE SEE AN ATTORNEY?

23          MR. KOVACEVICH: I LIKE THAT. I MEAN,

24  THAT'S FINE. THAT'S WHY I'M BRINGING IT TO THE

25  COURT'S ATTENTION.

929

1          MR. VINCENT:  I THINK THAT'S STILL

2     HEARSAY.

3          THE COURT:  WELL, IT EXPLAINS WHY SHE

4     WANTED TO GET AN ATTORNEY.

5          MR. VINCENT:  THE PLAINTIFF HAS RESTED

6     THEIR CASE.  IF -- YOU KNOW, SHE COULD HAVE

7     TESTIFIED TO THAT ON DIRECT EXAM.

8          THE COURT:  WELL, SHE COULD HAVE, BUT YOU

9     BROUGHT OUT -- YOU'VE MADE A POINT OF THE FACT THAT

10    MR. KOVACEVICH --

11         MR. VINCENT:  THIS WAS A REFERRAL --

12    DR. KERAM TESTIFIED ABOUT A REFERRAL FROM

13    MR. KOVACEVICH TO DIANE COHAN, NOT ABOUT MS. FEE

14    CONTACTING MR. KOVACEVICH.  THAT WAS WHAT HER

15    TESTIMONY WAS.

16         MR. KOVACEVICH:  NO.  HER TESTIMONY WAS

17    ABOUT SECONDARY GAIN, AND THIS GOES TO SHOW THAT MY

18    CLIENT'S MOTIVE WASN'T, "AH HA, I'M GOING TO GO

19    MAKE SOME MONEY.  I'M GOING TO GO RUN AND GET ME AN

20    ATTORNEY."

21         MR. VINCENT:  SECONDARY GAIN IS THE

22    LAWSUIT, REGARDLESS OF WHAT HER MOTIVE WAS FOR

23    FILING IT.

24         THE COURT:  I DON'T SEE WHAT THE PROBLEM

25    IS WITH HER BEING ASKED IF SOMEONE RECOMMENDED TO

930

1    MS. FEE THAT SHE GET A LAWYER.

2              MR. VINCENT:  I'M NOT -- I GUESS I DON'T

3    FOLLOW.  WHAT QUESTION DOES THE COURT PROPOSE THAT

4    COUNSEL BE LIMITED TO?

5              THE COURT:  DID SOMEONE AT THE JAIL

6    RECOMMEND YOU SEE A LAWYER?

7              MR. VINCENT:  WELL, HE'S ASKING THIS

8    QUESTION TO DR. KERAM, NOT MS. FEE.

9              MR. KOVACEVICH:  NO.  I'M TALKING ABOUT

10   PUTTING MY CLIENT BACK ON IN DIRECT.

11             THE COURT:  WELL, THAT WOULD BE IN YOUR

12   REBUTTAL CASE.

13             MR. KOVACEVICH:  IT WOULD BE, BUT I

14   ANTICIPATE THE TESTIMONY IS GOING TO BE AT MOST TWO

15   HOURS BETWEEN US, SO WE'RE ALMOST THERE.  THAT'S

16   WHY I WANTED TO BRING IT UP AT THIS POINT.

17             MR. VINCENT:  I DON'T SEE THAT THAT'S

18   REBUTTAL TO ANYTHING THAT DR. KERAM HAS SAID.

19             THE COURT:  I'M INCLINED TO THINK, AND

20   WE'LL TAKE IT UP BEFORE YOU DO YOUR REBUTTAL CASE,

21   ASSUMING YOU HAVE TIME LEFT, BUT I DON'T SEE A

22   PROBLEM WITH HER SAYING THAT SOMEONE RECOMMENDED

23   THAT SHE SEE A LAWYER MERELY FOR THE FACT -- FOR

24   THE PURPOSE OF SHOWING WHY SHE SOUGHT A LAWYER.

25             MR. VINCENT:  WELL, I'M GOING TO OBJECT

931

1    TO ANY REFERENCE TO THE O.R. OFFICER AT THE JAIL OR

2    THE JUDGE.

3             THE NOTICE --

4             THE COURT:  I AGREE WITH YOU THAT

5    REFERENCING A JUDGE WOULD BE UNNECESSARY AND --

6             MR. VINCENT:  OR ANY PERSON BY NAME.

7             MR. KOVACEVICH:  WELL, SHE DOESN'T KNOW

8    THE NAMES OF THE JUDGES.

9             MR. VINCENT:  OR POSITION.  IF SHE WANTS

10   TO -- IF SHE SAYS "SOMEBODY AT THE JAIL TOLD ME I

11   SHOULD SEE A LAWYER," THAT'S FINE, BUT I DON'T

12   THINK SHE SHOULD BE ALLOWED TO GO BEYOND THAT.

13            MR. KOVACEVICH:  WELL, I WILL SAY --

14            THE COURT:  WHAT ELSE DO YOU HAVE?  I

15   DON'T WANT TO KEEP THE JURY WAITING.

16            MR. KOVACEVICH:  OKAY.  IN TERMS OF THE

17   TIME, AND, YOU KNOW, I'VE NEVER BEEN IN THIS

18   SITUATION AND I DON'T LIKE BEING IN THIS SITUATION

19   WITH RESPECT TO A JUDGE IN ANY CASE, BUT IN THIS

20   ONE IN PARTICULAR BECAUSE MY -- YOU KNOW, I DIDN'T

21   KNOW YOU KEPT TIME.

22            I TOLD MY ASSISTANT, PARALEGAL, TO NOTE

23   THE TIME FROM BEGINNING TO STOP ACROSS THE BOARD,

24   AND SHE HAS BEEN DOING THAT.  SHE CALCULATED

25   YESTERDAY, BASED ON WHAT YOU GAVE US, AND SHE HAS A

                                                    932

1    60 MINUTE DISCREPANCY FROM YOU, AND A THREE MINUTE

2    DISCREPANCY FROM WHAT YOU ATTRIBUTED TO THEM.

3              THE COURT:  WELL, IF SHE SHOWS ME HER --

4              MR. KOVACEVICH:  AND SHE HAS THEM IN THE

5    COLUMN.

6              THE COURT:  IF SHE SHOWS ME THE

7    COMPUTATION, I'LL CHECK.  I MAKE MISTAKES.

8              MR. KOVACEVICH:  OKAY.  AND THEN THIRDLY,

9    YOU KNOW, WE HAVE THIS ISSUE OF MR. ZWICKEY.

10             THE ARRANGEMENT I ALREADY KIND OF

11   MENTIONED TO THE COURT IS I TALKED WITH HIM ON THE

12   PHONE, HE WAS SUBPOENAED TO COME ON THE FIRST DAY

13   OF TRIAL, AND, YOU KNOW, I TOLD HIM THE OPTIONS ARE

14   HE COME DOWN AND THE COURT ORDER HIM BACK, OR MAYBE

15   I WOULD WORK IT OUT WITH MR. VINCENT.

16             I SAID, "IS MR. VINCENT CALLING YOU?"

17             HE SAID "YES."

18             I SAID, "MAYBE WE CAN DEAL WITH IT WHEN

19   MR. VINCENT CALLS YOU, BUT I DON'T KNOW.  I'LL TALK

20   WITH MR. VINCENT AND ONE OF US WILL BE IN TOUCH

21   WITH YOU."

22             SO AS THINGS WERE KIND OF DEVELOPING, MY

23   PARALEGAL CALLED HIM TWO DAYS AGO AND LEFT

24   MESSAGES, SENT HIM AN E-MAIL, AND HE'S NOT

25   RESPONDING.

933

1          SO -- AND AT THIS POINT, YOU KNOW, I --

2     IT REALLY IS ONLY TO IMPEACH OFFICER RIOUX.

3          OFFICER RIOUX HASN'T TESTIFIED.  I DON'T

4     KNOW -- I THINK THERE'S GOING TO BE ONE CRITICAL

5     AREA THAT I DOUBT OFFICER RIOUX IS GOING TO

6     ACKNOWLEDGE AT THIS POINT, SO I'VE GOT THAT

7     PROBLEM.

8          I DON'T KNOW WHETHER THE COURT WOULD

9     ENTERTAIN SEEING IF MR. VINCENT CAN CONTACT THE

10    INDIVIDUAL, BUT HE'S NOT RESPONDING TO US.

11         THE COURT:  DO YOU KNOW ANYTHING ABOUT

12    THAT?

13         MR. VINCENT:  HE'S AVAILABLE.  HE CAN BE

14    CONTACTED BY TELEPHONE.  I TALKED TO HIM YESTERDAY.

15    HE IS --

16         THE COURT:  OKAY.

17         MR. VINCENT:  HE UNDERSTANDS HE'S UNDER

18    SUBPOENA, AND HE MAY BE CALLED AS A REBUTTAL

19    WITNESS.

20         THE COURT:  OKAY.  IT SOUNDS LIKE IT'S

21    TAKEN CARE OF.

22         MR. KOVACEVICH:  EXCEPT WE'RE GOING TO

23    NEED HIM HERE SHORTLY AND WE CAN'T REACH HIM -- I

24    MEAN, I ASSUME IN TWO HOURS OR SO.

25         SO CAN YOU MAKE CONTACT WITH HIM,

934

1    MR. VINCENT?

2              MR. VINCENT: WELL, AGAIN, I THINK WE

3    NEED AN OFFER OF PROOF AS TO WHAT YOU'RE GOING TO

4    CALL HIM FOR.

5              THE COURT: LET'S --

6              MR. VINCENT: I DON'T UNDERSTAND --

7              THE COURT: I DON'T THINK WE'RE GOING TO

8    GET TO HIM TODAY, ARE WE?

9              MR. KOVACEVICH: YOUR HONOR, BASED ON

10   WHAT YOU TOLD ME YESTERDAY, I'VE REDUCED MY

11   CROSS-EXAMINATION CONSIDERABLY, SO I DON'T THINK

12   IT'S GOING TO TAKE THAT LONG NOW, QUITE FRANKLY. I

13   THINK WE'RE GOING TO BE DONE IN TWO AND A HALF

14   HOURS.

15             THE COURT: WELL, I THINK YOU'VE GOT A

16   CHOICE. IF YOU WANT TO GIVE ME AN OFFER OF PROOF,

17   WE CAN ORDER HIM NOW. IF YOU WANT TO WAIT, WE'LL

18   JUST CALL HIM AFTER WE SEE IF HE'S NEEDED.

19             MR. KOVACEVICH: WELL, UNFORTUNATELY, I

20   THINK OFFICER RIOUX IS GOING TO BE ABOUT THE LAST

21   WITNESS, SO THAT WOULDN'T LEAVE A LOT OF TIME,

22   BECAUSE HE'S UP IN OAKLAND OR SOMEWHERE.

23             MR. VINCENT: HE'S IN STOCKTON.

24             MR. KOVACEVICH: OH.

25             THE COURT: WE CAN HAVE HIM HERE FIRST

935

1    THING TOMORROW MORNING IF NECESSARY.

2              MR. KOVACEVICH:  OKAY.

3              MR. VINCENT:  ON THE ISSUE OF

4    OFFICER RIOUX'S FAMILY, COUNSEL STATED HE WANTED TO

5    BRING THAT UP IN CROSS-EXAMINATION AGAIN.

6              MR. KOVACEVICH:  OH, YEAH, I FORGOT.

7              MR. VINCENT:  I DON'T THINK THAT'S

8    APPROPRIATE IN THIS CASE.

9              THE COURT:  WHAT IS IT TO --

10             MR. KOVACEVICH:  WELL, BECAUSE OF -- I

11   FORGOT TO CONTINUE ADDRESSING THAT ONE.

12             BECAUSE OF THE LENGTH OF TIME OF

13   RECOVERY -- AND, YOU KNOW, IF YOU WANT TO HEAR FROM

14   MY CLIENT, YOU CAN HEAR THE OFFER OF PROOF AS TO

15   HOW THIS HAS AFFECTED HER RECOVERY AND THE RECOVERY

16   TIME.

17             THE COURT:  DOES KERAM KNOW ANYTHING

18   ABOUT THAT?

19             MR. KOVACEVICH:  I'M SORRY?

20             THE COURT:  DOES DR. KERAM KNOW ANYTHING

21   ABOUT THAT?

22             MR. VINCENT:  NO.

23             MR. KOVACEVICH:  I GUESS NO.

24             THE COURT:  OKAY.  WELL, THAT'S --

25             MR. KOVACEVICH:  I WASN'T PLANNING ON

                                                      936

1    CROSS-EXAMINING DR. KERAM ABOUT THAT.

2              I WAS PLANNING ON BRINGING MY CLIENT

3    AND --

4              THE COURT:  LET'S WAIT UNTIL MR. VINCENT

5    IS DONE WITH HIS CASE AND WE'LL SEE.

6              MR. KOVACEVICH:  OKAY.

7              THE COURT:  EVERYBODY READY?

8              MR. VINCENT:  YES, YOUR HONOR.

9              THE COURT:  WITH THE PROVISO,

10   MR. KOVACEVICH, THAT IF THERE'S A MISTAKE IN IT,

11   I'LL CORRECT IT, BUT I DID DO THE TIMES AS OF NOW.

12             WHICH DAY IS IT THAT SHE HAS A DIFFERENCE

13   ON?

14             MR. KOVACEVICH:  ARE YOU DOING IT BY

15   WITNESS?  WHY DON'T YOU JUST MAKE A LIST OF ALL THE

16   TIMES?

17             SHE'LL DRAW UP HER LIST, YOUR HONOR.

18             THE COURT:  OKAY.

19             MR. KOVACEVICH:  I MEAN, SHE HAS IT DOWN

20   ON HER PAPERS, BUT SHE'LL DO A SEPARATE ACCOUNTING.

21             THE COURT:  OKAY.

22   ///

23   ///

24

25

937

1    ///

2    ///

3              THE COURT:  ALL RIGHT.  ARE WE READY TO

4    COMPLETE OFFICER VOORHEES?

5              MR. VINCENT:  YES, YOUR HONOR.

6              THE COURT:  ALL RIGHT.  YOU WANT TO COME

7    BACK, AND I'LL REMIND YOU YOU'RE STILL UNDER OATH.

8              THE WITNESS:  YES, YOUR HONOR.

9                        **ADAM VOORHEES,**

10   BEING CALLED AS A WITNESS ON BEHALF OF THE

11   DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

12   EXAMINED AND TESTIFIED AS FOLLOWS:

13                 **CROSS-EXAMINATION (RESUMED)**

14   BY MR. KOVACEVICH:

15   Q    OFFICER VOORHEES, I NEED TO GET CLEAR FROM

16   WHAT YOU SAID THE OTHER DAY.  DO YOU -- DO YOU

17   REMEMBER ANYTHING ABOUT THIS INCIDENT OUTSIDE OF

18   WHAT YOU READ IN YOUR REPORT?

19   A    I JUST RECALL -- EXCUSE ME -- THE GENERAL

20   SEQUENCE OF EVENTS.  I DON'T RECALL SPECIFICS.

21   Q    OKAY.  WELL -- OKAY.  I WANT TO MAKE SURE WE

22   TIE DOWN THE SEQUENCE TO THIS EXTENT.

23            WOULD IT BE CORRECT TO SAY, FROM YOUR

24   RECOLLECTION, THAT OFFICER RIOUX INSTRUCTED MS. FEE

25   TO COME OUT OF THE HOUSE SEVERAL TIMES BEFORE THERE

                                              970

1    WAS ANY PHYSICAL CONTACT BETWEEN THEM?

2          MR. VINCENT:  I'M GOING TO OBJECT.  IF

3    HE'S READING FROM A DEPOSITION, I THINK WE OUGHT TO

4    HAVE THAT --

5          THE COURT:  HE'S JUST ASKED A QUESTION.

6          THE WITNESS:  I DON'T RECALL IF I WOULD

7    SAY IT WAS SEVERAL TIMES.  I KNOW HE ASKED HER A

8    COUPLE TIMES TO ANSWER QUESTIONS AND -- ABOUT THE

9    TRAILER.

10   BY MR. KOVACEVICH:

11   Q   OKAY.  WELL, LOOK AT YOUR DEPOSITION

12   TRANSCRIPT, PAGE 18, STARTING WITH LINE 23 OVER TO

13   PAGE 19, MAYBE IT'S LINE 3.

14         BASICALLY -- OR LINE 9.

15         MR. VINCENT:  WHAT ARE YOU HAVING HIM

16   READ?  WHICH LINES?

17         MR. KOVACEVICH:  18, LINE 23 TO 19, LINE

18   9.

19         THE WITNESS:  OKAY.  WOULD YOU LIKE ME TO

20   READ THAT?

21         MR. VINCENT:  THERE'S NO -- THERE'S NO

22   QUESTION THAT YOU'RE READING.

23         MR. KOVACEVICH:  OKAY.  THE QUESTION IS,

24   "YEAH, BECAUSE I CAN JUST SAY AND THEN AND THEN AND

25   THEN.

1      Q    BUT YOU --

2           YOUR HONOR, THE WITNESS IS JUST GIVING A

3      LONG ANSWER EXPLAINING THE CIRCUMSTANCES.

4           THE COURT:  WELL, ALL YOU'VE DONE AT THIS

5      POINT IS ASK HIM TO READ IT.  ARE YOU ASKING HIM TO

6      READ IT TO HIMSELF OR OUT LOUD?

7           MR. KOVACEVICH:  WELL, MR. VINCENT I

8      THINK WANTS HIM TO READ IT OUT LOUD, SO LET'S JUST

9      READ IT OUT LOUD, YEAH.

10          THE COURT:  I'M NOT SURE WHAT MR. VINCENT

11     IS REQUESTING.

12          MR. VINCENT:  I'M TRYING TO UNDERSTAND

13     WHAT THE QUESTION THAT WAS ASKED IN THE DEPOSITION

14     WAS.

15          THE COURT:  THERE'S A --

16          MR. KOVACEVICH:  WELL, LET'S GO BACK TO

17     LINE 14, THEN, TO GET TO SOME QUESTION.

18          CAN I READ IT, MR. VINCENT?

19          MR. VINCENT:  YES, GO AHEAD.

20          MR. KOVACEVICH:  "QUESTION:  YEAH, BUT

21     RIOUX IS KNOCKING AT THE TOP.

22          "ANSWER:  YES.

23          "QUESTION:  AND YOU WERE AT THE BOTTOM.

24     AND WHAT HAPPENS?

25          "ANSWER:  HE KNOCKS.  A LADY COMES AND

1    ANSWERS THE DOOR.

2              "AND YOU JUST WANT ME TO CONTINUE

3    NARRATIVELY?

4              "QUESTION:  YEAH, BECAUSE I CAN SAY AND

5    THEN AND THEN AND THEN."

6              "MR. VINCENT:  IT'S NOT LIKE IN COURT.

7    YOU CAN GO AHEAD.

8              "THE WITNESS:  "HE KNOCKS.  MS. FEE

9    ANSWERS.  HE EXPLAINS THAT WE ARE THERE FOR THE

10   STOLEN TRAILER IN THE FRONT YARD AND THAT WE'D LIKE

11   TO, YOU KNOW, ASK HER ABOUT IT.

12             "SHE SAYS SHE HAS NO IDEA, SHE DOESN'T

13   KNOW ANYTHING ABOUT THE TRAILER.

14             "AND OFFICER RIOUX AGAIN ASKED HER TO

15   COME OUT SO WE CAN TALK.  SHE ATTEMPTS TO CLOSE THE

16   DOOR ON OFFICER RIOUX.

17             "OFFICER RIOUX STOPPED THE DOOR FROM

18   CLOSING.  HE AGAIN ADVISED HER TO STEP OUT, ASKING

19   US TO COME BACK LATER OR SOMETHING TO THAT EFFECT,

20   AND AGAIN BEGAN TO TRY TO PUSH THE DOOR SHUT ON

21   OFFICER RIOUX."

22   Q    OKAY?  IS THAT FAIR AND ACCURATE TO THE BEST

23   OF YOUR ABILITY AS YOU SIT HERE NOW?

24   A    ON LINE 19, I DON'T -- I DIDN'T HEAR YOU

25   MENTION, ON PAGE 19, LINE 6, SHE SAID SOMETHING

1    ABOUT BEING ON THE PHONE, AND THEN SHE ASKED US TO

2    COME BACK.

3    Q    WELL, I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

4         BUT LATER, THE NEXT QUESTION IS, "OKAY,

5    STOP THERE FOR A SECOND.  DID YOU HAVE ANY

6    INDEPENDENT EVIDENCE THAT SHE WAS ON THE PHONE

7    OTHER THAN HER STATEMENTS?"

8         BUT -- OH, YOUR QUESTION IS ON LINE 6,

9    "BUT SHE SAID SOMETHING ABOUT BEING ON THE PHONE?"

10   A    YOU LEFT THAT OUT IN YOUR READING.

11   Q    I'M SORRY.  OFFICER RIOUX.  I DIDN'T MEAN TO

12   LEAVE THAT OUT.  THANK YOU.  THANK YOU FOR BRINGING

13   THAT TO ATTENTION.

14        SO YOU DO RECITE THERE A NUMBER OF TIMES

15   THAT OFFICER RIOUX TOLD HER TO STEP OUTSIDE; RIGHT?

16   A    YES.

17   Q    OKAY.  AND THEN SHE TRIED TO CLOSE THE DOOR

18   TWICE BASED ON WHAT YOU JUST SAID THERE; RIGHT?

19   A    YES.

20   Q    AND OFFICER RIOUX STOPPED IT EACH TIME?

21   A    YES.

22   Q    AND DID SHE STILL HAVE THE PHONE IN HER HAND

23   WHEN SHE WAS TRYING TO CLOSE THE DOOR?

24   A    I ONLY RECALL THE PHONE IN HER HAND WHEN SHE

25   FIRST CAME TO THE DOOR.  I DON'T KNOW AT WHAT POINT

974

1    SHE HAD DROPPED IT OR PUT IT DOWN.

2    Q    WELL, LOOK AT 11 TO 14.

3    A    ON WHAT PAGE?  19?

4    Q    YEAH.

5         "QUESTION:  OKAY, STOP THERE FOR A

6    SECOND.  DID YOU HAVE ANY INDEPENDENT EVIDENCE THAT

7    SHE WAS ON THE PHONE, OTHER THAN HER STATEMENTS?

8         "ANSWER:  SHE HAD A PHONE IN ONE OF HER

9    HANDS.  I DON'T RECALL WHICH ONE."

10   A    YES.  WHEN SHE CAME TO THE DOOR, THERE WAS A

11   PHONE IN HER HANDS.

12   Q    OKAY.  BUT I'M ASKING, WHEN SHE'S TRYING TO

13   CLOSE THE DOOR, YOU SAID, IN ANSWER TO THAT

14   QUESTION, BUT SHE SAID SOMETHING ABOUT BEING ON THE

15   PHONE.

16        AND I ASKED YOU IF YOU HAD ANY

17   INDEPENDENT EVIDENCE SHE WAS ON THE PHONE, AND YOU

18   SAID SHE HAD ONE IN HER HAND?

19   A    YES, WHEN SHE ANSWERED THE DOOR.

20   Q    OKAY.  OKAY.  THEN AFTER THIS ATTEMPTED

21   CLOSING AND OFFICER RIOUX STOPPING THAT, DID HE USE

22   A CONTROL HOLD ON HER?

23   A    YES.

24   Q    OKAY.  WHAT TYPE OF CONTROL HOLD WAS THAT?

25   A    HE JUST GRIPPED HER, I'M SORRY, HER RIGHT ARM

1    BETWEEN HER WRIST AND ELBOW.

2    Q    OKAY.  IN YOUR BUSINESS, YOU HAVE TWO TYPE OF

3    CONTROL HOLDS; RIGHT?  A WRIST LOCK AND A BENT

4    WRIST?

5    A    YES.

6    Q    OKAY.  WHICH ONE WAS IT?

7    A    HE HAD STARTED BY GRIPPING HER WRIST AND FROM

8    THERE YOU WOULD MOVE INTO -- PART OF THE TECHNIQUE

9    WOULD BE TO MOVE INTO ONE OF THOSE BENT WRIST OR

10   TWIST LOCKS.

11   Q    OKAY.

12   A    HE HAD ONLY GRIPPED HER WRIST AT THAT POINT.

13   Q    ALL RIGHT.  AND AT THIS POINT HE'S AT THE TOP

14   OF THE STAIRS THERE, RIGHT, AT THE DOOR?

15   A    YES.

16   Q    ALL RIGHT.  AND THEN DID HE TELL HER AFTER HE

17   GRABBED HER AGAIN TO STEP OUTSIDE?

18   A    YES.  HE ASKED HER TO STOP RESISTING AND COME

19   OUTSIDE.

20   Q    OKAY.  COME OUTSIDE.

21        NOW, WHAT I WANT TO GET INTO IS YOUR

22   DESCRIPTION OF HOW MS. FEE WAS TRYING TO CLOSE THE

23   DOOR ON OFFICER RIOUX.

24        AND IF THIS WOULD REFRESH YOUR MEMORY, I

25   COULD POINT YOU TO YOUR DEPOSITION TRANSCRIPT, OR

1    DO YOU RECALL?

2    A    GO AHEAD.  WHAT PAGE?

3    Q    20, LINE 20 -- OR 20, LINE 16 TO 20.  OR

4    LINES.

5    A    GO AHEAD.  I'M SORRY.  DID YOU HAVE A

6    QUESTION?

7    Q    YEAH.  WELL, I ASKED YOU HOW SHE DID THAT,

8    RIGHT?

9    A    YES.

10   Q    AND YOU SAID, "SHE HAD KIND OF -- THERE WAS,

11   WHAT DO YOU CALL IT, BASICALLY THE DOOR FRAME AT

12   THE BOTTOM OF THE FLOOR.  SHE HAD PRESSED HER FEET

13   KIND OF AGAINST IT AND WAS PRESSING ON THE DOOR

14   TRYING TO SHUT IT WHILE OFFICER RIOUX HAD AHOLD OF

15   HER ARM, I BELIEVE."

16   A    YES.  SHE HAD --

17   Q    CAN YOU DEMONSTRATE THAT FOR US?

18   A    WOULD YOU LIKE ME TO DEMONSTRATE HOW SHE

19   WAS --

20   Q    WHAT YOU WERE JUST DESCRIBING VERBALLY THERE.

21   A    OKAY.  SHE HAD HER ARM AGAINST THE DOOR FRAME

22   (INDICATING).

23   Q    OKAY.

24   A    HER FOOT WAS KIND OF PROPPED AGAINST THE DOOR

25   SILL AT THE BOTTOM OF THE FLOOR, AND SHE -- THE

1    REST OF HER PERSON WAS AGAINST THE DOOR PUSHING UP

2    AGAINST IT ATTEMPTING TO CLOSE IT (INDICATING), AND

3    WHILE OFFICER RIOUX HAD AHOLD OF HER ARM.

4    Q    OKAY.  AND WHERE -- SO WHERE IS THE DOOR?  WHY

5    DON'T YOU JUST STAND UP FOR US, PLEASE?

6              MAY I ASK HIM TO STAND UP, YOUR HONOR?

7              THE COURT:  SURE.

8    BY MR. KOVACEVICH:

9    Q    SO JUST GIVE US WHERE THE DOOR IS IN RELATION

10   TO MS. FEE'S BODY, ASSUMING YOU'RE MS. FEE?

11   A    OKAY.  ASSUMING THIS WOULD BE THE DOOR SILL,

12   WHERE YOU CAN'T SEE MY FOOT, BUT WHERE MY FOOT IS

13   (INDICATING).

14   Q    OKAY.

15   A    HER HAND WOULD BE UP HERE, HER -- I'M SORRY,

16   HER LEFT HAND WOULD BE AGAINST THE DOOR, AND THEY

17   WERE STRUGGLING BACK AND FORTH BY THE DOOR

18   (INDICATING).

19   Q    OKAY.  WHERE IS HER BODY -- WHAT SIDE OF THE

20   DOOR IS HER BODY ON?

21   A    LIKE I SAID, SHE WAS KIND OF STRADDLING IT.

22   Q    OKAY.

23   A    HER FOOT WAS AGAINST THE DOOR SILL.

24   Q    ALL RIGHT.  IN HER EFFORTS TO CLOSE THE DOOR,

25   HOW CLOSE DID THE DOOR GET TO BEING CLOSED AT ANY

978

1    POINT IN TIME?

2    A    FROM MY VANTAGE POINT, IT APPEARED TO BE ABOUT

3    ONE TO TWO FEET.

4    Q    ALL RIGHT.  DID YOU SEE MS. FEE EVER SLAMMING

5    THE DOOR ON OFFICER RIOUX'S WRIST AND SLAMMING IT

6    IN BETWEEN THE DOORJAMB AND THE DOOR ITSELF?

7    A    NO, I DID NOT.  I COULD NOT SEE THAT.

8    Q    ALL RIGHT.  YOU NEVER CLOSED -- HOW FAR AWAY

9    FROM THE DOOR WERE YOU STANDING DURING THIS?

10   A    UM, WELL, I WAS ON THE PATH THAT LED UP TO THE

11   DOOR.

12   Q    GIVE ME SOME FOOTAGE.

13   A    I WOULD SAY -- I'M TRYING TO RECALL.  FIVE,

14   SIX FEET I'D GUESS.

15   Q    ALL RIGHT.  AND YOU NEVER CLOSED IN TO ASSIST

16   IN ANY RESPECT, DID YOU?

17   A    NO, I DID NOT.

18   Q    AND YOU HAD NO WORRY THAT RIOUX WAS GOING TO

19   GET INJURED, DID YOU?

20            MR. VINCENT:  OBJECTION.  CALLS FOR

21   SPECULATION.

22            THE COURT:  HE CAN ASK WHAT HIS STATE OF

23   MIND WAS AS TO WHETHER HE THOUGHT RIOUX WAS GOING

24   TO BE HURT.

25            MR. VINCENT:  I'M GOING TO OBJECT THAT

979

1     IT'S IRRELEVANT, STATE OF MIND.

2             THE COURT:  I THINK IT'S RELEVANT TO WHAT

3     HE DID OR DID NOT DO.

4             THE WITNESS:  I DID NOT SEE OFFICER RIOUX

5     IN ANY GROSS PHYSICAL HARM.

6     BY MR. KOVACEVICH:

7     Q    WHAT DO YOU DESCRIBE AS "GROSS"?

8     A    HIM IN A POSITION WHERE HE NEEDED TO CALL FOR

9     HELP.

10    Q    WELL, WHAT IF HE WAS GETTING HURT?  WOULD YOU

11    CONSIDER THAT A SITUATION WHERE AN OFFICER COULD BE

12    GETTING -- SUFFERING HARM?

13            MR. VINCENT: OBJECTION.  VAGUE.

14            THE COURT:  COULD YOU REPHRASE THAT?

15            MR. KOVACEVICH:  YEAH.

16    Q    IF HE WAS GETTING HIS WRIST JAMMED AND

17    HAMMERED BY A DOOR AGAINST THE DOORJAMB, WOULD YOU

18    CONSIDER THAT A SITUATION WHERE YOU MIGHT NEED TO

19    INTERVENE?

20            MR. VINCENT:  OBJECTION.  SPECULATION.

21    HE SAID HE DIDN'T SEE IT.

22            THE COURT:  HE DID SAY HE DIDN'T SEE

23    ANYTHING LIKE THAT.

24            MR. KOVACEVICH:  I'M TRYING TO GET A

25    DEFINITION OF "GROSS."  THAT'S RIGHT.  THAT'S THE

                                                    980

1    APPROPRIATE QUESTION.

2    Q    WOULD THAT BE CONSIDERED GROSS HARM?

3    A    A DOOR BEING SLAMMED ON HIM?

4    Q    YEAH, ON HIS WRIST?

5    A    OF IT BEING SLAMMED JUST A FOOT, NO, I

6    WOULDN'T SEE THAT AS BEING GROSS HARM.

7    Q    NOT A FOOT.  I MEAN, SO THAT IT'S ACTUALLY

8    PINNED BETWEEN THE TWO, REPEATEDLY (INDICATING).

9           MR. VINCENT:  I'LL OBJECT.  IT CALLS FOR

10   SPECULATION.  IT'S NOT RELEVANT.

11          THE COURT:  I THINK WHAT HE'S ASKING IS

12   WHAT DOES OFFICER VOORHEES MEAN BY "GROSS INJURY"

13   OR "GROSS HARM"?

14          THE WITNESS:  WHAT DO I MEAN BY "GROSS

15   HARM"?

16   BY MR. KOVACEVICH:

17   Q    YEAH.

18   A    IF HIS ARM WAS IN THE DOOR AND THE DOOR WAS

19   OPENED SEVERAL FEET AND THEN SLAMMED SHUT, I WOULD

20   DESCRIBE THAT TO BE GROSS HARM.

21   Q    OKAY.  SO ARE YOU TELLING US THAT IF YOU

22   SUSPECT A FELLOW OFFICER IS GOING TO BE HARMED IN

23   ANY WAY, THAT YOU WOULDN'T INTERVENE UNLESS IT WAS

24   GROSS HARM?

25   A    NO.  IF SOMEONE IS BEING HARMED, YES, I WOULD

                                                    981

1    INTERVENE.

2              BUT I SAW, I'M SORRY, NO HARM.

3    Q    OKAY.  AND YOU SAW NO, NO WORRY FOR MS. FEE

4    GETTING INJURED; RIGHT?

5    A    NO.

6    Q    AND YOU NEVER ATTEMPTED TO ASSIST MS. FEE IN

7    ANY RESPECT, DID YOU?

8    A    NO, I DID NOT.

9    Q    AND YOU UNDERSTAND AS AN OFFICER THAT IF YOU

10   FEEL THAT A PERSON IS BEING TREATED EXCESSIVELY OR

11   UNREASONABLY BY A FELLOW OFFICER THAT YOU SHOULD

12   INTERVENE VERBALLY OR PHYSICALLY; RIGHT?

13   A    YES.

14   Q    NOW, WHEN OFFICER RIOUX PEPPER SPRAYED MY

15   CLIENT, HOW FAR AWAY FROM HIM -- FROM HER WAS HIS

16   BODY?

17   A    HIS BODY, I WOULD SAY, WAS PROBABLY FOUR TO

18   FIVE FEET.

19   Q    AND HOW FAR AWAY WAS THE CANISTER FROM HER

20   FACE?

21   A    HE WAS HOLDING IT OUT IN FRONT OF HIM, SO

22   THREE TO FOUR FEET.

23   Q    AND IN RELATION TO WHEN SHE WAS PEPPER

24   SPRAYED, DID YOU SEE THAT SHE WAS PLACED UNDER

25   ARREST BEFORE OR AFTER?

1           MR. VINCENT:  OBJECTION.  RELEVANCE.

2           THE COURT:  OVERRULED.

3           THE WITNESS:  BEING PLACED UNDER ARREST

4    AS BEING HANDCUFFED?

5    BY MR. KOVACEVICH:

6    Q    WELL, YOU BASICALLY TESTIFIED IN YOUR DEPO

7    THAT SHE WAS ARRESTED AFTER SHE WAS PEPPER SPRAYED,

8    SO I DON'T KNOW WHAT YOU MEAN BY "ARRESTED," SO WHY

9    DON'T YOU JUST EXPLAIN THAT FOR ME?

10   A    WHEN I USED THE TERM "ARRESTED," I GENERALLY

11   MEAN THAT YOU'VE MADE THE DECISION TO PLACE THEM

12   UNDER ARREST AND YOU'VE PLACED HANDCUFFS ON THEM.

13          MR. KOVACEVICH:  OKAY.  THANK YOU, SIR.

14          THE COURT:  OKAY.  ANYTHING FURTHER?

15          MR. VINCENT:  JUST A COUPLE QUESTIONS,

16   YOUR HONOR.

17                  **REDIRECT EXAMINATION**

18   BY MR. VINCENT:

19   Q    FROM YOUR POSITION ON THE PATH A FEW FEET

20   BEHIND OFFICER RIOUX, CAN YOU SAY WHAT YOUR -- HOW

21   MUCH OF THE DOOR YOU CAN SEE WITH HIS BODY IN FRONT

22   OF YOU?

23   A    I HAD A LIMITED VIEW.  HE WAS STANDING RIGHT

24   THERE IN FRONT OF THE DOOR, SO WHAT I SAW WAS

25   AROUND HIS BODY.

1    Q    OKAY.  COULD YOU SEE THE, THE FULL DOOR?

2    A    NO, I COULD NOT.

3    Q    OKAY.  SO WHEN YOU SAY -- WHEN YOU ESTIMATE

4    THAT IT WAS OPEN A FOOT, IS THAT JUST AN ESTIMATE

5    BASED ON SOMETHING YOU SAW AROUND HIS BODY?

6    A    YES.

7         MR. VINCENT:  OKAY.  THAT'S ALL I HAVE.

8    THANK YOU.

9         MR. KOVACEVICH:  NOTHING FURTHER, YOUR

10   HONOR.

11        THE COURT:  ALL RIGHT.  YOU MAY STEP

12   DOWN.  THANK YOU.

13   ///

14   ///

15

16

17

18

19

20

21

22

23

24

25

984

1     ///

2     ///

3               THE COURT:  ALL RIGHT.  MR. VINCENT.

4               MR. VINCENT:  THE DEFENSE CALLS OFFICER

5     BRANDON RIOUX.

6               THE COURT:  OKAY.

7               THE CLERK:  RAISE YOUR RIGHT HAND.

8                       **BRANDON RIOUX,**

9     BEING CALLED AS A WITNESS ON BEHALF OF THE

10    DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

11    EXAMINED AND TESTIFIED AS FOLLOWS:

12              THE WITNESS:  I DO.

13              THE CLERK:  COULD YOU STATE YOUR NAME,

14    PLEASE, AND SPELL IT.

15              THE WITNESS:  BRANDON KEITH RIOUX, THE

16    LAST IS SPELLED R-I-O-U-X.

17                     **DIRECT EXAMINATION**

18    BY MR. VINCENT:

19    Q    GOOD MORNING.

20    A    GOOD MORNING.

21    Q    WHERE DO YOU WORK?

22    A    I WORK WITH THE CALIFORNIA HIGHWAY PATROL.

23    Q    HOW LONG HAVE YOU BEEN EMPLOYED THERE?

24    A    TWELVE YEARS ABOUT.

25    Q    CAN YOU TELL US WHAT YOUR EDUCATIONAL

1    BACKGROUND IS?

2    A    HIGH SCHOOL DIPLOMA, AND I WENT TO COMMUNITY

3    COLLEGE, A LOCAL COMMUNITY COLLEGE IN STOCKTON FOR

4    ABOUT SIX MONTHS FOR FIRE SCIENCE.

5    Q    AND DO YOU HAVE ANY MILITARY EXPERIENCE?

6    A    YES.

7    Q    CAN YOU DESCRIBE THAT?

8    A    I WAS IN THE ARMY RESERVE, SIX YEARS IN ACTIVE

9    RESERVE, TWO YEARS INACTIVE RESERVE.

10   Q    WHAT TYPE OF WORK DID YOU DO IN THE ARMY?

11   A    I WAS A WATER CRAFT ENGINEER.

12   Q    OKAY.  WHEN DID YOU ATTEND THE CALIFORNIA

13   HIGHWAY PATROL ACADEMY?

14   A    SUMMER OF '98.

15   Q    AND WHEN DID YOU GRADUATE?

16   A    JANUARY OF '99.

17   Q    WE'RE HERE TO TALK ABOUT THIS INCIDENT THAT

18   HAPPENED ON MAY 3RD OF 2007.

19        HOW DID YOU -- WHAT HAPPENED ON MAY 3RD,

20   2007 THAT RELATED TO THIS INCIDENT?  WHAT WAS THE

21   FIRST THING THAT HAPPENED?

22   A    MY PARTNER AND I, OFFICER VOORHEES, RECEIVED A

23   CALL OVER THE RADIO OF A PARTY WHO WANTED TO REPORT

24   HIS -- OR ACTUALLY HAD FOUND HIS STOLEN TRAILER AT

25   A RESIDENCE OFF OF GRAHAM HILL ROAD.

1    Q    WHAT DID YOU DO?

2    A    WE DROVE UP TO THE SCENE.

3    Q    OKAY.  DID YOU PARK -- WHERE DID YOU PARK WHEN

4    YOU GOT THERE?

5    A    WE PARKED ACROSS THE STREET FROM THE ADDRESS.

6    BASICALLY HER HOUSE IS ON, WE'LL CALL IT THE SOUTH

7    SIDE OF THE ROADWAY.  ON THE NORTH SIDE OF THE

8    ROADWAY IS WHERE MR. POLLASTRINI, THE VICTIM, HAD

9    PARKED HIS VEHICLE ON A T-INTERSECTION TYPE

10   ROADWAY.  HE WAS WAITING INSIDE HIS TRUCK.

11   Q    OKAY.  DID YOU SPEAK TO MR. POLLASTRINI?

12   A    YES.

13   Q    AND YOU RECOGNIZED MR. POLLASTRINI WHEN HE

14   TESTIFIED HERE?

15   A    YES.

16   Q    WHAT DID HE TELL YOU?

17   A    HE HAD SOME PAPERWORK WITH HIM AND HE SAID

18   "THAT IS MY TRAILER," AND HE POINTED DIRECTLY AT

19   IT, "AND MATTER OF FACT, THAT IS MY TRAILER."

20          AND WE LOOKED AT THE PAPERWORK.  OF

21   COURSE I CAN'T JUST TAKE HIS WORD FOR IT AT THIS

22   POINT, SO WE HAD TO CONFIRM THAT THE REGISTRATION

23   INFORMATION HE HAS WITH HIM CORRESPONDS WITH WHAT

24   OUR DISPATCH CENTER HAS FOR THE STOLEN VEHICLE.

25          SO WE RAN THE PAPERWORK HE HAD WHILE WE

1    HAD IT IN OUR HAND THROUGH OUR DISPATCH CENTER AND

2    THEY CONFIRMED THAT THAT VEHICLE HAD BEEN REPORTED

3    STOLEN, AT LEAST AS IT MATCHED THE PAPERWORK AT

4    THAT POINT.

5    Q    OKAY.  AND THEN WHAT DID YOU DO?

6    A    I ASKED MR. POLLASTRINI TO STAY IN HIS TRUCK.

7    OFFICER VOORHEES AND I WALKED ACROSS THE STREET AND

8    LOOKED AT THE TRAILER.

9         MR. POLLASTRINI HAD SAID THAT HE HAD

10   ADDED SOME NEW WORK TO THE FRONT OR THE TONGUE AREA

11   OF THE TRAILER, AND IT WAS OBVIOUS -- I MEAN,

12   EVERYTHING HE DESCRIBED MATCHED UP PERFECTLY WITH

13   THIS TRAILER.

14        I HAD OFFICER VOORHEES CHECK THE VIN

15   NUMBER, WHICH IS THE VEHICLE IDENTIFICATION NUMBER,

16   MANY DIGITS, IT HAS LETTERS AND NUMBERS IN IT, AND

17   THAT CORRESPONDED TO IDENTIFY THAT TRAILER.

18        SO OFFICER VOORHEES LOOKED AT THE

19   TRAILER, THE TONGUE, AND CONFIRMED IT, AND ALSO I

20   DID, TOO.  IT WAS A PERFECT MATCH.

21   Q    OKAY.  WERE THERE ANY LICENSE PLATES ON THE

22   TRAILER?

23   A    NO.

24   Q    AND IN YOUR EXPERIENCE AS A HIGHWAY PATROL

25   OFFICER, DOES THAT -- IS THAT SIGNIFICANT THAT A

993

1    VEHICLE DOESN'T HAVE LICENSE PLATES ON IT?

2    A    IT COULD MEAN SEVERAL HUNDRED THINGS.  I DON'T

3    KNOW WHAT THE SPECIFIC QUESTION WOULD BE.

4    Q    OKAY.  IN TERMS OF A VEHICLE BEING STOLEN, IS

5    IT COMMON TO HAVE THE PLATES REMOVED?

6    A    EXTREMELY COMMON TO REMOVE THE PLATES IF IT'S

7    STOLEN.

8    Q    OKAY.  DID MR. POLLASTRINI TELL YOU HOW MUCH

9    THE TRAILER WAS WORTH?

10   A    HE SAID ABOUT EIGHT THOUSAND BUCKS.

11   Q    OKAY.  AND DO YOU HAVE ENOUGH KNOWLEDGE OF

12   VEHICLES AND TRAILERS TO ESTIMATE YOURSELF HOW MUCH

13   THAT TRAILER WAS WORTH?

14   A    IT WAS DEFINITELY WORTH ABOUT THAT MUCH MONEY.

15   IT WAS A VERY NICE TRAILER.  IT HAD A DUMP ABILITY,

16   DOUBLE GATES, SIDE WALLS, VERY STURDY FRAME.

17   Q    AND THE THEFT OF A TRAILER OF THAT VALUE WOULD

18   BE WHAT SORT OF CRIME?

19   A    THAT'S A FELONY.

20   Q    OKAY.  IS THERE ANY DOUBT IN YOUR MIND THAT

21   THERE WAS A FELONY CRIME THAT HAD BEEN COMMITTED AT

22   THAT POINT?

23   A    NO DOUBT AT ALL.

24   Q    OKAY.  AND DO YOU KNOW SPECIFICALLY WHAT --

25   HOW THAT WOULD BE CHARGED, WHAT POTENTIAL CRIMES

1    THAT WOULD BE UNDER THE PENAL CODE OR THE VEHICLE

2    CODE?

3    A    VEHICLE THEFT AND POSSESSION OF STOLEN

4    PROPERTY, STOLEN VEHICLE.

5    Q    OKAY.

6    A    BOTH FELONIES.

7    Q    OKAY.  WHAT DID YOU DO AFTER CONFIRMING THAT

8    THE VIN NUMBER MATCHED?

9    A    BECAUSE WE WERE DEALING WITH A FELONY, I

10   MOTIONED FOR MR. POLLASTRINI TO STAY ACROSS THE

11   STREET.  I DIDN'T KNOW IF THE PEOPLE INSIDE THE

12   HOUSE, IF THERE WERE ANY PEOPLE THAT HAD BEEN

13   INVOLVED IN THE CRIME OR NOT.

14         BUT I WANTED TO CONTACT, OR ATTEMPT TO

15   MAKE CONTACT WITH ANYBODY WHO MIGHT BE IN THE HOME

16   TO ASK THEM QUESTIONS ABOUT THE TRAILER.

17   Q    WHY DID YOU HAVE HIM STAY ACROSS THE STREET?

18   A    IT WOULD BE DANGEROUS FOR A CITIZEN IF

19   SOMETHING DID HAPPEN, IF SOMEBODY WERE IN THE HOUSE

20   WITH WEAPONS OR IF THERE WERE MULTIPLE SUBJECTS IN

21   THE HOUSE.  I JUST WANTED HIM TO BE SAFE ON THE

22   OTHER SIDE OF THE STREET.

23   Q    OKAY.  SO YOU -- AND YOU WANTED TO MAKE

24   CONTACT WITH WHOEVER WAS IN THE HOUSE.

25         WHAT DID YOU DO NEXT?

1    A     INITIALLY WE WERE AT THE -- THIS IS A VERY

2    LARGE DRIVEWAY.  THE TRAILER WAS AT THE VERY NORTH

3    END OF THE DRIVEWAY.

4           BASICALLY THIS HOUSE IS A T-SHAPE, SO THE

5    GARAGE IS IN THE FRONT AND THEN EXTENDS BACK AND

6    THEN THE HOUSE IS BACK HERE (INDICATING).

7           SO THE TOP OF THE T WOULD BE WHERE THE

8    HOUSE IS AND THE GARAGE KIND OF EXTENDS OUT LIKE

9    THIS (INDICATING).

10          OFFICER VOORHEES AND I WERE AT THE, THE

11   NORTH SIDE, OR IF YOU'RE FACING THE HOUSE, ON THE

12   LEFT SIDE OF THE GARAGE.  THAT'S WHERE THE TRAILER

13   WAS.

14          WE WALKED OVER TO THE GARAGE, WE WERE

15   LOOKING FOR SOME WAY TO CONTACT WHOEVER WAS INSIDE

16   THE HOUSE.

17          THERE'S A DOORWAY ON THE SOUTH EDGE THAT

18   WE FIND THAT WE MAKE ACCESS THROUGH THERE AND THEN

19   KNOCK ON A DOOR THAT'S ON THE SIDE OF THE HOUSE, ON

20   THE FAR RIGHT SIDE.

21   Q    OKAY.  AND I THINK WE HAVE MARKED AS AN

22   EXHIBIT A PHOTOGRAPH AND WE HAVE A BLOW UP.

23          DOES THAT SHOW THE DOOR (INDICATING)?

24   A    YES.

25   Q    THAT'S WHERE YOU KNOCKED?

996

1    A    CORRECT.

2    Q    HOW DID YOU KNOCK?

3    A    BASICALLY, LIKE I SAID, WHEN YOU'RE STANDING

4    IN THE DOORWAY THERE, IN POLICE TERMS WE CALL THAT

5    THE FATAL FUNNEL.  A LOT OF TIMES OFFICERS GET SHOT

6    WHEN A SUSPECT IS INSIDE A HOUSE AND CAN SEE THE

7    OFFICER OUTSIDE.

8         SO WHAT WE'RE TAUGHT TO DO IS TO REACH

9    UP, KNOCK, AND THEN RETREAT TO A POSITION OF COVER

10   TO WHERE YOU CAN KIND OF SEE IN, BUT PEOPLE LOOKING

11   OUT WOULDN'T NORMALLY BE ABLE TO SEE YOU INITIALLY,

12   SO YOU'D BE ABLE TO SEE THEM FIRST.

13   Q    SO WHERE ARE YOU STANDING WHEN YOU KNOCK?  IS

14   IT SHOWN IN THIS PICTURE?

15   A    I'M STANDING OFF -- I DON'T KNOW EXACTLY WHERE

16   I'M STANDING AT THIS POINT, BUT WHEN I REACH UP AND

17   KNOCK, IT'S MY ARM FULLY EXTENDED (INDICATING).

18        I'M SOMEWHERE TO THE BASE -- I'M AT THE

19   BASE OF THE STAIRS TO THE LEFT A LITTLE BIT, BUT

20   MAYBE TOWARDS THE CENTER OF THE STAIRS, SOMEWHERE

21   IN THAT AREA (INDICATING).

22   Q    OKAY.  AND THEN AFTER YOU KNOCK, YOU MOVE

23   BACK?

24   A    I MOVE BACK.

25   Q    OKAY.  WHAT HAPPENED AFTER YOU KNOCKED?

997

1  A   I KNOCKED A FEW TIMES AND I COULD HEAR

2  SOMEBODY WALKING AROUND AND MOVING AROUND IN THE

3  HOUSE.

4  Q   OKAY. WHAT WERE YOU THINKING? WHAT WERE YOU

5  THINKING WHEN YOU COULD HEAR SOMEBODY MOVING AROUND

6  THE HOUSE?

7  A   AT THE TIME I THOUGHT -- WELL, SINCE THEY

8  DIDN'T INITIALLY ANSWER THE DOOR, I WONDERED IF

9  THEY HAD SEEN MY PATROL CAR ALREADY, IF THEY WERE

10 TRYING TO, YOU KNOW, HUNKER DOWN IN THE HOUSE.

11         BUT EVENTUALLY I DID SEE MRS. FEE COME TO

12 THE DOORWAY, AND SHE KIND OF CAME FROM -- IF YOU

13 LOOK IN THAT PICTURE, THERE'S A DOOR THAT'S OFF TO

14 THE LEFT THERE, SHE KIND OF CAME OUT OF THAT AREA

15 AND LOOKED OUT TO ME (INDICATING). AND SHE WAS ON

16 THE PHONE.

17 Q   OKAY. AND SHE LOOKED AT YOU. AND WE CAN'T

18 SEE IT IN THE PICTURE HERE, BUT THAT'S -- THAT DOOR

19 IS GLASS; RIGHT?

20 A   THE DOOR THAT I INITIALLY KNOCKED ON?

21 Q   YES.

22 A   YES.

23 Q   SO IT'S CLOSED. THERE'S NO COVERING OVER THE

24 GLASS, IS THERE?

25 A   NOT AT ALL.

998

1    Q    SO SHE -- YOU'RE SAYING SHE COULD SEE YOU FROM

2    INSIDE?

3    A    YEAH.  SHE COULD SEE ME PEERING IN AS SHE'S

4    PEERING OUT.

5    Q    OKAY.  AND THEN WHAT HAPPENED?

6    A    SHE CAME TO THE DOOR AND SHE -- AS SHE OPENED

7    THE DOOR, SHE TOLD THE PERSON ON THE PHONE, IT'S A

8    CORDLESS PHONE, "HEY, CAN YOU HOLD ON FOR A

9    SECOND," OR SOMETHING TO THAT EFFECT.  I DON'T KNOW

10   HER EXACT WORDS.

11         AND THEN SHE PUTS THE PHONE AND CUPS IT

12   TOWARD HER SHOULDER.  IT'S ACTUALLY LEANING TO

13   WHERE THE MOUTH PIECE AND THE SPEAKER ARE ON HER

14   SHOULDER (INDICATING).

15   Q    AND YOU'RE USING YOUR LEFT HAND TO DEMONSTRATE

16   THAT.  DO YOU RECALL THAT IT WAS HER LEFT HAND?

17   A    IT WAS HER LEFT HAND.

18   Q    OKAY.  WHAT DID YOU TELL HER AT THAT POINT?

19   A    WELL, THIS IS WHAT OCCURS OUT THERE.  IF YOU

20   MAKE CONTACT WITH SOMEBODY AND --

21         MR. KOVACEVICH:  I'M GOING TO OBJECT.

22   NONRESPONSIVE.

23         THE COURT:  THE QUESTION REALLY WAS, WHAT

24   DID YOU SAY TO HER?

25         THE WITNESS:  I -- I TOLD HER SOMETHING

999

1    TO THE EFFECT OF, "HELLO, MA'AM, WE'RE

2    INVESTIGATING AN INCIDENT THAT HAPPENED IN THE

3    NEIGHBORHOOD.  DO YOU HAVE SOME TIME TO TALK WITH

4    US?" SOMETHING TO THAT EFFECT.

5    BY MR. VINCENT:

6    Q    OKAY.  AND WHAT DID SHE TELL YOU?

7    A    SHE -- SHE SAID YES, THAT'S FINE, JUST -- AND

8    SHE KEPT THE PHONE JUST IN THE SAME POSITION IT WAS

9    (INDICATING).

10   Q    OKAY.  AND CAN YOU DESCRIBE THE CONVERSATION?

11   A    I WAS JUST TRYING TO GET INFORMATION FROM HER

12   ABOUT THE TRAILER WITHOUT KIND OF TILTING MY HAND

13   ABOUT ME KIND OF SUSPECTING THAT MAYBE SOMETHING

14   WAS GOING ON WITH THE HOUSE.

15           I ASKED HER IF SHE LIVED AT THE

16   RESIDENCE.  SHE SAID YES.

17           I ASKED HER IF SHE WAS THE ONLY PERSON

18   WHO LIVED THERE.  SHE SAID NO, HER SON ALSO LIVED

19   WITH HER.

20           I ASKED HER IF SHE RENTED OR OWNED THE

21   PLACE.  SHE SAID SHE RENTED.

22           DO YOU WANT ME TO GO ON?

23   Q    YEAH, GO ON.

24   A    I ASKED HER HOW LONG SHE'D BEEN THERE, AND SHE

25   SAID SHE'D BEEN THERE FOR A WHILE LIVING THERE.

1          I ASKED HER IF SHE'D BEEN OUTSIDE THE

2     HOUSE IN THE LAST COUPLE OF DAYS.  SHE SAID YES.

3          I SAID, HAVE YOU DRIVEN YOUR CAR IN THE

4     LAST COUPLE DAYS?  SHE SAID YES.

5          I SAID, HAVE YOU GONE TO WORK OR TO THE

6     MARKET OR ANYTHING?  SHE SAID YES.

7     Q    WHY ARE YOU ASKING HER ALL THESE QUESTIONS?

8     A    WELL, I DON'T WANT -- I DON'T WANT HER TO -- I

9     WANT HER TO BE OPEN AND HONEST WITH ME.  IF I ASK

10    HER QUESTIONS LIKE -- IF I GO UP THERE IMMEDIATELY

11    AND ASK HER ABOUT, "HEY, DO YOU KNOW ANYTHING ABOUT

12    THAT STOLEN TRAILER," SHE MIGHT NOT ANSWER THE

13    QUESTIONS AS FULLY AS I WOULD HOPE.

14         SOME OF THE QUESTIONS ARE JUST TO MAKE

15    HER FEEL MORE RELAXED WITH ME, LIKE I'M NOT

16    SUSPECTING HER.  THAT'S WHY YOU DON'T SAY "I'M

17    INVESTIGATING A CRIME THAT OCCURRED AT YOUR HOUSE."

18    YOU GO UP TO THE HOUSE AND YOU SAY "I'M

19    INVESTIGATING AN INCIDENT THAT HAPPENED IN THE

20    NEIGHBORHOOD."

21         SO THAT'S WHY I'M ASKING A LOT OF

22    QUESTIONS, BUT THEY'RE ALL COMING TO A POINT TO

23    WHERE I'M GETTING INFORMATION ABOUT IS THIS LADY

24    LIKELY TO HAVE KNOWN THAT THERE'S A TRAILER IN HER

25    FRONT YARD ?  IS IT LIKELY THAT THIS LADY IS

1    INVOLVED BASED UPON ALL THE ANSWERS SHE'S GIVING

2    ME?

3            I'M TAKING BABY STEPS TO TRY TO GET TO

4    THE POINT WHERE I ASK HER THE QUESTION WHERE --

5    ABOUT THE TRAILER.

6    Q    OKAY.

7    A    THE STOLEN TRAILER.

8    Q    SO YOU'VE ASKED HER THESE QUESTIONS ABOUT

9    WHETHER SHE'S BEEN OUTSIDE, WHETHER SHE'S DRIVEN.

10            AND WHAT HAPPENS NEXT?

11   A    SHE ANSWERS TO ALL THESE QUESTIONS.

12   Q    SHE ANSWERS, WHAT, YES?

13   A    WELL, TO ALL THE QUESTIONS SHE'S ANSWERING

14   "YES, I LIVE HERE.  I'VE DRIVEN IN THE LAST COUPLE

15   DAYS.  I'VE DRIVEN MY CAR.  I'VE GONE OUT MY FRONT

16   DRIVEWAY."  ALL THOSE QUESTIONS SHE'S ANSWERING IN

17   THOSE MANNERS, AND SHE'S ANSWERING CALMLY.

18   Q    OKAY.  THEN WHAT HAPPENS?

19   A    I GET TO THE POINT WHERE I ASK HER ABOUT THE

20   TRAILER.  I SAID, "MA'AM, DO YOU KNOW ANYTHING

21   ABOUT THAT TRAILER IN YOUR FRONT YARD?"

22            AND SHE TILTED HER HEAD AND ASKED

23   SOMETHING TO THE EFFECT OF, "WHAT TRAILER?"

24            AND I SAID, "THAT STOLEN TRAILER IN YOUR

25   FRONT YARD THAT'S BEEN THERE FOR THREE DAYS."

1           AT THIS POINT, MR. POLLASTRINI HAD TOLD

2     ME THAT THE TRAILER -- HE HAD BEEN TOLD BY ONE OF

3     HIS FRIENDS THAT THE TRAILER HAD BEEN THERE AT

4     LEAST THREE DAYS, SO THAT'S WHY I'M ASKING HER

5     QUESTIONS ABOUT HER DRIVING OUT OF THE DRIVEWAY

6     PAST THAT HUGE TRAILER THAT'S PARKED THERE.

7     THERE'S NO WAY YOU COULDN'T SEE THAT.

8           SO NOW THAT I GET TO THE POINT WHERE I'VE

9     ASKED HER ABOUT THAT TRAILER, AND SHE TURNS TO THE

10    INSIDE -- SHE'S -- AT THIS POINT, SHE'S RELAXED

11    WITH ME.  SHE'S -- IF I MAY STAND?

12    Q    YEAH, GO AHEAD IF YOU WANT TO DEMONSTRATE.

13    A    IF THIS IS THE DOORWAY, INITIALLY WHEN SHE

14    OPENS THE DOOR, SHE'S TALKING LIKE THIS

15    (INDICATING).

16           BUT EVENTUALLY SHE GETS RELAXED TO --

17    THIS IS THE DOOR FRAME, AND SHE'S KIND OF LEANING

18    IN THE DOORWAY WITH HER HAND LIKE THIS

19    (INDICATING).

20           SO THIS FRAME OF THIS DOOR IS WHAT SHE'S

21    LEANING AGAINST HERE AND SHE'S TALKING TO ME AND

22    SHE HAS THE PHONE LIKE THIS (INDICATING).

23           AND WHEN I TELL HER ABOUT THE STOLEN

24    TRAILER, SHE KIND OF TILTS HER HEAD, AND SHE TURNS

25    TO THIS POINT, AND I THINK THIS IS A -- I THOUGHT

                                                    1003

1   IT WAS A, A CLOTHES HAMPER (INDICATING).  I

2   COULDN'T REALLY SEE BECAUSE I'M STILL STANDING DOWN

3   HERE (INDICATING).

4           SO SHE TURNS AND TELLS THE PERSON ON THE

5   PHONE SOMETHING, I CAN'T REALLY HEAR WHAT SHE SAYS,

6   BUT SHE SETS THE PHONE DOWN.  THE RECEIVER OF THE

7   PHONE IS STILL FACING UP (INDICATING).

8           SHE COMES BACK TO THE DOOR, AND WHEN SHE

9   COMES BACK, THE DOOR WAS ALMOST FULLY OPEN AT THIS

10  POINT, SHE GRABS THE DOOR AND CLOSES IT WITH HER AS

11  SHE COMES BACK (INDICATING).

12  Q   AND YOU'RE SHOWING WITH HER LEFT HAND?

13  A    WITH HER LEFT HAND.  SHE HAS NOTHING IN HER

14  LEFT HAND AT THIS POINT.  SHE HAS A PEN IN HER

15  RIGHT HAND.

16          SO SHE COMES AND CLOSES TO THE DOOR AND

17  NOW SHE'S SNUGGED IN THE DOOR TO THE DOORJAMB, JUST

18  LIKE THIS (INDICATING).

19          SO SHE CLOSES THE DOOR AND A PORTION OF

20  HER BODY IS -- IT'S -- SHE'S KIND OF LIKE THIS

21  (INDICATING).

22          BUT NOW SHE'S -- I CAN TELL SHE'S

23  BREATHING REALLY HEAVY.  SHE'S (INDICATING), AND

24  HER EYES ARE REAL BIG.  SHE HAS A REAL PANICKED

25  LOOK ON HER FACE, LIKE A WORRIED LOOK ON HER FACE

1    WHEN SHE TURNS AROUND.

2              INITIALLY WHEN SHE WENT INTO THE HOUSE TO

3    PUT THAT PHONE DOWN, I HADN'T SEEN ANY OF THIS

4    BEFORE I TOLD HER ABOUT A STOLEN TRAILER IN HER

5    FRONT DRIVEWAY.

6              SHE TURNS BACK AROUND AND COMES TO THE

7    FRONT DOOR AND RESTS IN THAT POSITION AND CLOSES

8    THE DOOR WITH HER AND SHE SAYS, "I DON'T KNOW WHAT

9    YOU'RE TALKING ABOUT.  I DON'T KNOW WHAT TRAILER

10   YOU'RE TALKING ABOUT.  I DON'T KNOW ANYTHING ABOUT

11   IT."

12             I GO, "MA'AM, I NEED" --

13   Q    LET ME INTERRUPT YOU.  DID SHE AT ANY TIME UP

14   TO THAT POINT TELL YOU THE TRAILER BELONGED TO HER

15   SON?

16   A    NO.

17   Q    OKAY.

18   A    SO SHE KEEPS SAYING, "YOU NEED TO COME BACK

19   LATER.  I'M BUSY RIGHT NOW.  YOU NEED TO COME BACK

20   LATER."

21             WELL, AT THIS POINT I HAVE A FELONY

22   THAT'S BEEN COMMITTED.  THE TRAILER IS PARKED IN

23   THE DRIVEWAY THERE, TWO FELONIES HAVE BEEN

24   COMMITTED.

25             NOW THAT I'VE SPOKEN WITH HER --

1    INITIALLY WHEN I'M SPEAKING WITH HER, I DON'T KNOW

2    IF SHE'S A SUSPECT OR NOT.  THAT TRAILER COULD VERY

3    WELL HAVE BEEN JUST DROPPED OFF THERE BY SOMEBODY.

4             BUT ONCE SHE COMES BACK TO THE DOOR AND

5    SHE SAYS SHE HASN'T SEEN A TRAILER, SHE HAS NO IDEA

6    WHAT TRAILER I'M ASKING HER ABOUT -- THE THING HAS

7    BEEN PARKED OUT IN HER FRONT YARD FOR THREE DAYS.

8    THAT'S A LONG TIME FOR SOMEBODY NOT TO NOTICE

9    SOMETHING, ESPECIALLY WHEN THEY SAID THEY'VE BEEN

10   GOING IN AND OUT OF THE HOUSE.

11            SO NOW I HAVE, INSTEAD OF REASONABLE

12   SUSPICION, I'M LOOKING INTO THE PROBABLE CAUSE PART

13   OF IT BECAUSE SHE'S SHOWING ME OUTWARD SIGNS, AND

14   I -- AND IN MY MIND SHE'S MISLEADING ME OR

15   CONCEALING THE CONDITION OR THE SITUATION ABOUT

16   THAT TRAILER NOW.

17   Q   OKAY.  WHAT DID YOU -- WHAT DID YOU DO NEXT?

18   A   WELL, SHE KEPT SAYS, "LOOK, I CAN'T TALK TO

19   YOU NOW.  YOU NEED TO COME BACK LATER."

20            AND I'D SAY, "NO, MA'AM.  YOU'RE NOT FREE

21   TO GO.  YOU'RE BEING DETAINED.  I NEED TO TALK TO

22   YOU."

23            I HAVEN'T EVEN GOTTEN AN I.D. CARD.  I

24   DON'T KNOW WHO SHE IS, NUMBER ONE.  I HAVE NO IDEA

25   WHO SHE IS.  I DON'T KNOW WHO LIVES THERE WITH HER,

1    OTHER THAN SHE SAYS HER SON.  I DON'T KNOW WHO THAT

2    PERSON IS, EITHER.

3            SHE GETS TO THIS, WHERE IT'S BECOMING --

4    SHE'S BECOMING KIND OF FRANTIC, IN A WAY, "NO, YOU

5    NEED TO COME BACK LATER."

6            SO AT THIS POINT, I TELL HER, "MA'AM,

7    YOU'RE NOT FREE TO LEAVE.  YOU'RE BEING DETAINED."

8            I'M STILL AT THE BASE OF THE STAIRS HERE.

9    THE DISTANCE FROM WHERE I'M STANDING TO WHERE SHE

10   IS IS A FEW FEET.

11           SHE HAS HER RIGHT WRIST AND HER, AND HER

12   RIGHT LEG, LIKE KNEE AREA, THEY'RE POKING OUT ON

13   THE OUTSIDE OF THIS DOORWAY.

14           I REACH UP WITH MY LEFT HAND, I'VE

15   ALREADY TRIED TO HAVE HER -- I DID ASK HER TO COME

16   OUTSIDE.  THE STAIRWAY AND EVERYTHING THERE WOULD

17   BE -- AS YOU CAN SEE, IT'S NOT A PLACE THAT'S BIG

18   ENOUGH FOR ME TO DO A LOT OF WORK WITH.

19           AND THERE MIGHT BE STILL SOMEBODY -- EVEN

20   THOUGH SHE SAYS THERE'S NOT SOMEBODY ELSE IN THE

21   HOUSE, I CAN'T TAKE HER WORD FOR THAT.  THERE MIGHT

22   BE SOMEBODY IN THE HOUSE AND THAT SOMEBODY MIGHT

23   HAVE A WEAPON AND I HAVE TO KEEP THAT IN MIND.

24           SO AT THIS POINT, I WANT HER OUT WITH ME

25   AWAY FROM THAT FATAL FUNNEL.

1    I REACH UP AT HER WRIST AND I GRAB IT AT

2    HER WRIST.  HER RIGHT ARM IS STILL STICKING OUT, SO

3    I REACH UP, MY FULL EXTENDED HAND, AND GRAB THAT

4    RIGHT WRIST AND I'M HOLDING IT, AND I GO, "MA'AM,

5    YOU'RE NOT FREE TO LEAVE, YOU'RE BEING DETAINED"

6    (INDICATING).

7    Q    COULD YOU DEMONSTRATE THAT MOVE?  I MEAN,

8    LET'S SAY THIS IS THE DOOR FRAME, AND WE'LL PUT YOU

9    OUTSIDE.  AND I'LL BE MS. FEE.

10        AND WHERE IS MS. FEE STANDING?

11   A    SHE'S STANDING -- SHE'S LEANING UP AGAINST

12   HERE (INDICATING).  SHE HAS THE DOOR CLOSED WITH

13   HER WITH THIS HAND OVER HERE (INDICATING).

14   Q    AND WHERE IS HER RIGHT HAND?

15   A    THIS WRIST IS STICKING OUTSIDE OF THE DOORJAMB

16   AND THIS KNEE IS KIND OF STICKING OUT OF THE

17   DOORJAMB ALSO.

18   Q    OKAY.

19   A    SO I'M AT THE BASE OF THE STAIRS.  I DON'T

20   WANT TO GET IN THE WAY.  I'M MORE POSITIONED OVER

21   HERE, BUT I'M DOWN (INDICATING).  AS YOU CAN SEE,

22   THIS IS A FEW FEET OF ELEVATION, SO IT'S MORE LIKE

23   THIS (INDICATING).

24        SO WHEN I REACH UP, I REACH UP AND I GRAB

25   THE WRIST HERE, AND I TELL HER:  MA'AM, YOU'RE NOT

1    FREE TO LEAVE.  I NEED TO TALK TO YOU.  I NEED TO

2    GET MORE INFORMATION ABOUT THE TRAILER, AND I NEED

3    TO GET MORE INFORMATION ABOUT YOU" (INDICATING).

4    Q    AND WHAT DOES SHE DO?  WHAT HAPPENS NEXT?

5    A    AND SHE PAUSES.  SHE -- IT'S LIKE A -- WE'RE

6    BOTH WAITING FOR THE NEXT THING TO HAPPEN.  I DON'T

7    KNOW WHAT SHE'S GOING TO DO, AND I ASSUME SHE

8    DOESN'T KNOW WHAT I'M GOING TO DO.

9         BUT EVENTUALLY WHAT HAPPENS AFTER A FEW

10   SECONDS IS SHE JERKS HER BODY INSIDE THE HOUSE

11   (INDICATING).

12        SO NOW SHE'S ON THE INSIDE OF THE HOUSE

13   WITH THIS ARM STILL -- ALL SHE'S DONE NOW, WHEN SHE

14   JERKS HER ARM, SHE PULLS IT LIKE THIS AND PULLS HER

15   BODY IN (INDICATING).  HER ARM IS JUST INSIDE THAT

16   DOORJAMB THERE.

17   Q    ARE YOU STILL HOLDING ON AT THAT POINT?

18   A    OH, I'M -- YES, I'M HOLDING ON.

19   Q    OKAY.

20   A    CONTINUE?

21   Q    YEAH, GO AHEAD.

22   A    SO I'M HOLDING HER WRIST AND SHE PULLS MY

23   WRIST JUST BEYOND THE BARRIER OF THE DOOR FRAME,

24   PULLS IT INSIDE HERE (INDICATING).

25        NOW SHE'S ABLE TO WORK HER WAY TO WHERE

1009

1    HER SHOULDER IS NOW GONE ON THE OTHER SIDE OF THE

2    DOOR, AND SHE'S USING HER BODY WEIGHT, SHE'S TRYING

3    INITIALLY TO TWIST MY HAND OFF OF HER (INDICATING).

4              AND I'M JUST HOLDING ON BECAUSE I DON'T

5    WANT HER TO GO BACK INSIDE AND MAYBE GET A FRIEND,

6    MAYBE GET A WEAPON, ANYTHING.

7              AND AT THIS POINT, SHE'S NOT FREE TO

8    LEAVE.

9              SO SHE IS CONTINUALLY DOING THIS AND

10   WORKING HER ARM BACK AND FORTH (INDICATING).

11             WELL, MY WRIST IS KIND OF RUBBING AGAINST

12   EVERYTHING.

13             EVENTUALLY SHE GETS HER SHOULDER TO WHERE

14   MY ARM IS HOLDING HER AND SHE'S RAMMING THE DOOR

15   AGAINST MY WRIST (INDICATING).

16             AND THAT GOES ON ABOUT TEN TIMES.

17             EVENTUALLY, SHE -- I GUESS SHE REALIZES

18   THAT I'M NOT LETTING GO, NO MATTER WHAT SHE'S DOING

19   WITH THAT.

20             SHE GRABS MY PINKY, SHE GRABS MY PINKY

21   AND IS PULLING IT BACK LIKE THIS AND I CAN FEEL IT

22   START TO DO THINGS THAT MY PINKY IS NOT SUPPOSED TO

23   DO (INDICATING).

24             I'VE ALREADY GONE FOR MY O.C. SPRAY

25   BECAUSE I'VE TOLD HER, "MA'AM, I'M GOING TO SPRAY

                                                      1010

1    YOU.  I'M GOING TO SPRAY YOU."

2              AS SOON AS SHE STARTS TO PULL THAT PINKY

3    BACK, IT FELT LIKE IT WAS GOING TO BREAK, AND HER

4    RAMMING THAT DOOR AGAINST MY, MY HAND THERE, I WAS

5    TELLING HER, "MA'AM, YOU'RE HURTING ME.  MA'AM,

6    YOU'RE HURTING ME.  STOP.  MA'AM, YOU'RE HURTING

7    ME" (INDICATING).

8              BUT IT WAS -- IT WAS ONLY THE FEW INCHES

9    OF THE DOOR AND HER BODY WEIGHT PUSHING AGAINST

10   THAT.

11             THAT WAS UNCOMFORTABLE, BUT NOT EXTREMELY

12   PAINFUL.

13   Q    IS THAT A CRIME?

14   A    YES.

15   Q    WHAT KIND OF CRIME IS THAT?

16   A    WELL, IT CAN BE BATTERY ON A PEACE OFFICER,

17   RESISTING ARREST, ALL THESE ARE STARTING TO ADD UP

18   NOW.

19   Q    IS BATTERY ON A PEACE OFFICER A FELONY OR A

20   MISDEMEANOR?

21   A    IT CAN BE A FELONY, DEPENDING ON THE INJURIES.

22   Q    OKAY.

23   A    SO ONCE SHE HAD MY FINGER BACK AND I HAD MY

24   O.C. OUT AND I'M TELLING HER, "MA'AM, YOU'RE

25   HURTING ME.  STOP, YOU'RE HURTING ME."

1    THE GAP IN THE DOORWAY IS ONLY THE WIDTH

2    OF MY WRIST HERE, SO WHEN SHE'S CRUSHING IT, I

3    DON'T HAVE THE ABILITY TO GET TO HER OR ANYTHING

4    (INDICATING).

5    WHEN SHE PULLED ME, SHE PULLED ME -- WHEN

6    SHE DID THIS, SHE PULLED ME UP TOWARDS HER

7    (INDICATING).

8    AND NOW I'M STUCK AT THIS POINT WHERE I

9    HAVE THE O.C. IN ONE HAND, I HAVE HER TRYING TO

10   CRUSH MY ARM OVER HERE AND NOW BENDING MY PINKY

11   BACK.

12   SO AS SOON AS SHE START DOING THAT, I

13   THOUGHT MY PINKY WAS GOING TO GET BROKEN, SO

14   WHATEVER MANEUVER I DID, I DON'T RECALL IF I

15   PUNCHED THE DOOR OR WHAT HAPPENED (INDICATING), BUT

16   I WAS JUST AFRAID OF MY PINKY BEING BROKEN, SO I

17   HAVE HER COME DOWN AND I PULL HER, PULL HER DOWN

18   THE STAIRS (INDICATING), AND SHE DOES LIKE A LITTLE

19   TWIST OUT INTO -- THERE'S A -- RIGHT OVER HERE

20   THERE'S A DIRT COURTYARD, AND OVER HERE IT'S ALL

21   CEMENT, SO THIS IS WHERE THE DIRT IS (INDICATING).

22   OFFICER VOORHEES IS SOMEWHERE OVER HERE

23   (INDICATING).

24   AND I GET HER OUT TO THE COURTYARD, I'M

25   TELLING HER, "MA'AM, STOP, STOP RESISTING.  I'M

1012

1    GOING TO SPRAY YOU.  I'M GOING TO SPRAY YOU."

2              AND SHE'S TELLING ME, "NO, NO."

3              I'D ALREADY TOLD HER AT THE DOORWAY,

4    "YOU'RE UNDER ARREST.  YOU'RE UNDER ARREST."

5              SO SHE COMES DOWN HERE (INDICATING), AND

6    I TELL HER AGAIN, "MA'AM, STOP RESISTING.  YOU'RE

7    UNDER ARREST."

8              NOW SHE'S LIKE -- I CAN ONLY LIKEN IT TO

9    A CAT ON A LEASH.  SHE'S MOVING LIKE THIS WITH ME

10   TRYING TO CONTROL HER JUMPING ALL AROUND

11   (INDICATING).

12             FINALLY I THINK TO MYSELF, THIS IS

13   GETTING TO THE POINT WHERE ONE OF US IS GOING TO

14   GET HURT BADLY.  SO I HAD TO END IT.

15             I LET HER GO AND I TELL HER -- I BACK

16   OFF, AND NOW I'M STANDING SOMEWHERE AT THE BASE OF

17   THE STAIRS AND SHE'S IN THAT DIRT AREA, THE GRASS

18   (INDICATING).

19   Q    ABOUT HOW FAR AWAY IS SHE?

20   A    LESS THAN TEN FEET.

21   Q    OKAY.

22   A    AND I TELL HER, "MA'AM, YOU'RE UNDER ARREST.

23   STOP RESISTING.  GET ON YOUR STOMACH."

24             AND SHE'S HUNKERED DOWN AT THIS POINT AND

25   SHE'S LIKE, "NO," LIKE NO, I'M NOT UNDER ARREST.

```
1              I SPRAY HER.  IT'S A TWO SECOND BURST.
2     IT COMES RIGHT ACROSS HER EYES AT THE GLASSES
3     (INDICATING).
4     Q    OKAY.  AND SHE'S WEARING GLASSES AT THE TIME?
5     A    SHE HAS GLASSES DOWN HERE (INDICATING).
6     Q    OKAY.  THEY'RE DOWN ON HER NOSE?
7     A    YEAH.
8     Q    OKAY.  NOW, WHEN YOU'RE AT THE DOOR AND YOU
9     DECIDE TO DETAIN HER AT THE DOOR AND YOU GRABBED
10    HER WRIST, WHY DO YOU HAVE TO GRAB HER WRIST TO
11    DETAIN HER?
12    A    IT'S ALREADY ESCALATED.  I'VE TRIED TO DO MY
13    PRESENCE.  YOU KNOW, YOU'RE TAUGHT AS AN OFFICER TO
14    TRY TO HANDLE THINGS IN A PROGRESSION.  SO I'VE
15    ALREADY TRIED TO, BY MY DEMEANOR, TO CONVINCE HER
16    TO COOPERATE WITH ME.
17             THEN I HAD TO -- YOU KNOW, YOU ASK.  YOU
18    ASK SOMEBODY TO DO SOMETHING, THEY DON'T.
19             YOU GET TO THE POINT WHERE YOU HAVE TO DO
20    A CONTROL HOLD TO MAKE THEM COMPLY WITH WHAT YOU'RE
21    ASKING THEM TO DO, FOR THEIR SAFETY AND MINE.
22    Q    OKAY.  AND WHEN YOU GRABBED HER WRIST, IS THAT
23    A CONTROL HOLD?
24    A    I WAS ATTEMPTING TO DO A CONTROL HOLD.
25             A CONTROL HOLD CAN BE ANY NUMBER OF
```

1    THINGS.  CONTROL HOLDS ARE BASICALLY DERIVED FROM

2    MARTIAL ARTS AND USED IN LAW ENFORCEMENT.

3              A CONTROL HOLD HERE (INDICATING), THERE'S

4    A FEW THAT YOU CAN GO INTO.  IF I GOT HER WRIST THE

5    OTHER WAY, YOU CAN DO A TWIST LOCK ARREST

6    (INDICATING).

7              BUT ON THOSE STAIRS, THAT'S UNLIKELY.

8              THERE'S ANOTHER CONTROL HOLD WHERE I PUSH

9    HER WRIST BACK THIS WAY AND MAKE HER COME OUT WITH

10   ME THIS WAY (INDICATING).

11             BUT, AGAIN, WITH THAT ONE, SHE'S FALLING

12   BACKWARDS AND WE'RE AT AN ELEVATED POSITION HERE

13   AND SHE'S LIKELY TO GET HURT.

14   Q    SO YOU DIDN'T USE THAT BECAUSE YOU DIDN'T WANT

15   HER TO GET HURT FALLING OFF THE STAIRS?

16   A    I DON'T WANT HER TO GET HURT, NO.

17   Q    OKAY.  AND YOU TALKED ABOUT THE -- ABOUT YOUR

18   CONCERN FOR YOUR OWN SAFETY AND WANTING TO CONTROL

19   THE SITUATION.

20             CAN YOU EXPLAIN THAT IN MORE DETAIL?

21   A    WELL, IF I LET HER GO IN THE HOUSE, SHE'S

22   LIKELY TO GET -- IT'S POSSIBLE FOR HER TO GET A

23   WEAPON OR TO GET -- TO CALL FOR SOMEBODY ELSE TO

24   HELP HER.

25             I ALSO HAVE A TRAINEE WITH ME WHO'S JUST

1    A FEW DAYS WITH ME THAT I'M WORRIED ABOUT WHAT'S

2    GOING ON WITH HIM AND THE FACT THAT IT'S MY

3    RESPONSIBILITY TO MAKE SURE I DO WHAT I CAN TO MAKE

4    SURE HE GETS HOME SAFELY.

5    Q    OKAY.  SO YOU'RE REACHING UP WITH YOUR LEFT

6    HAND AND HOLDING ON TO HER.

7              YOU'VE GOT SOMETHING ON YOUR LEFT WRIST.

8    WHAT IS THAT?

9    A    THAT'S MY -- THAT'S EARL SCOTT'S MEMORIAL

10   BAND.

11   Q    AND WHAT -- WHY IS THAT ON YOUR WRIST?

12   A    EARL SCOTT WAS A TRAINEE OF MINE IN 2000 OR

13   2001, AND HE WAS SHOT AND KILLED ON DUTY FOUR YEARS

14   AGO.

15   Q    IN 2006?

16   A    FOUR YEARS AGO, FEBRUARY 17TH.

17   Q    OKAY.  AND THAT'S WHAT IT SAYS ON YOUR WRIST

18   BAND?

19   A    YES.

20   Q    HOW WAS HE KILLED?

21   A    HE MADE A ROUTINE STOP ON THE SIDE OF THE

22   FREEWAY IN MODESTO EARLY IN THE MORNING.  HIS

23   PARTNER WAS FINISHING UP PAPERWORK AT THE OFFICE.

24   HE MADE AN UNFORTUNATE STOP JUST DOWN THE STREET

25   FROM THE OFFICE ON THE FREEWAY.

1           WHEN HE PULLED THE PERSON OVER AND HE WAS

2   ASKING TO GET HIS REGISTRATION, AND HE GOT SHOT

3   RIGHT IN THE FACE BEFORE HE COULD EVEN GET ANY

4   WEAPON OUT OR ANYTHING AND HE WAS DEAD.

5   Q    THERE WAS NO SUSPICION OF A FELONY OR --

6   A    IT WAS A --

7   Q    ANYTHING MISDEMEANOR, RIGHT?

8   A    IT WAS A TRAFFIC TICKET.

9   Q    OKAY.  SO THAT'S PART OF WHAT'S GOING THROUGH

10  YOUR MIND, ISN'T IT, WHEN YOU MAKE ANY TYPE OF

11  CONTACT WITH A SUSPECT OR EVEN ANY TYPE OF CITIZEN

12  IN ENFORCEMENT?

13  A    ALWAYS.

14  Q    OKAY.  AFTER YOU WERE -- WELL, HOW FAR AWAY

15  WAS MS. FEE FROM YOU WHEN YOU USED PEPPER SPRAY?

16  A    LESS THAN TEN FEET.

17  Q    CAN YOU GIVE ME A GREATER THAN RANGE?

18  A    WELL, SHE WASN'T ANY CLOSER THAN PROBABLY, I

19  DON'T KNOW -- WHATEVER THE DISTANCE IS FROM THE

20  BASE OF THE STAIRS TO THE CENTER PORTION OF THAT

21  COURTYARD.

22           I DON'T WANT TO -- I DON'T KNOW WHAT THE

23  ESTIMATE WOULD BE.  FIVE, TEN FEET.  I DON'T KNOW

24  WHAT THAT DISTANCE IS.

25  Q    OKAY.  YOU HEARD OFFICER VOORHEES'S TESTIMONY?

1    A    I DID.

2    Q    DO YOU THINK HIS RECOLLECTION IS ACCURATE?

3    A    YEAH, ABOUT THAT SAME DISTANCE.

4    Q    OKAY.

5    A    SOMEWHERE IN THAT NEIGHBORHOOD.

6    Q    CAN YOU TELL -- CAN YOU RECALL FOR CERTAIN

7    WHETHER YOU WERE -- WHETHER THE CANISTER OF PEPPER

8    SPRAY WAS ANY CLOSER THAN THREE FEET?

9    A    NEVER.

10   Q    OKAY.  AND YOU HEARD MS. FEE'S TESTIMONY THAT

11   SAID YOU PUT IT RIGHT IN HER FACE AND HELD IT THERE

12   FOR SEVERAL SECONDS.

13             MR. KOVACEVICH:  I'M GOING TO OBJECT.

14   MISSTATES THE EVIDENCE.

15             THE COURT:  YOU CAN ASK HIM WHAT HIS

16   MEMORY WAS.

17   BY MR. VINCENT:

18   Q    WELL, DO YOU RECALL MS. FEE'S TESTIMONY --

19   A    YES, I DO.

20   Q    -- ABOUT HOW THE PEPPER SPRAY WAS DEPLOYED?

21   A    YES, I DO.

22   Q    WAS THAT ACCURATE?

23   A    NOT AT ALL.

24   Q    AND YOU MENTIONED THAT WHEN SHE'S AT THE DOOR,

25   YOU DON'T USE THE PEPPER SPRAY BECAUSE THE DOOR IS

1    THERE; RIGHT?

2    A    WELL, THERE'S SEVERAL REASONS NOT TO USE IT

3    WHEN I'M AT THE DOORWAY.

4            THE FIRST REASON IS WHEN YOU USE O.C.

5    SPRAY, IT HAS A TENDENCY TO -- THERE'S A BLOW BACK.

6            THE O.C. SPRAY COMES OUT IN A STREAM AND

7    IT CAN REACH, YOU KNOW, WELL OVER TEN FEET.

8            BUT WHAT HAPPENS IS THOSE LITTLE

9    PARTICLES COME OFF, AND OFTEN TIMES WHEN YOU'RE

10   SPRAYING SOMEONE ELSE, YOU'RE ALSO SPRAYING

11   YOURSELF.

12           I MEAN, EVEN WHEN, WHEN THIS HAPPENED

13   WITH HER, I GOT A LITTLE BIT OF THE CLOUD AND

14   EVERYBODY AROUND THERE, THAT WHOLE GENERAL AREA,

15   WILL HAVE THAT CLOUD OF O.C., AND YOU COUGH AND

16   THAT TYPE OF STUFF AND YOUR EYES WILL GET

17   IRRITATED.

18   Q    YOU'VE BEEN PEPPER SPRAYED; RIGHT?

19   A    YES.

20   Q    AND THAT'S PART OF YOUR TRAINING?

21   A    CORRECT.

22   Q    IN ORDER TO CARRY THE CANISTER, YOU HAVE TO BE

23   SUBJECTED TO THE PEPPER SPRAY?

24   A    I DON'T KNOW IF IT'S AN ABSOLUTE REQUIREMENT,

25   BUT AT THE ACADEMY, IT'S HIGHLY RECOMMENDED.

1    Q    OKAY.

2    A    AND HIGHLY RECOMMENDED IS YOU DO IT.

3    Q    OKAY.  TELL ME WHAT THE EFFECTS ARE OF PEPPER

4    SPRAY.

5              AND I'M USED TO SAYING "PEPPER SPRAY" AND

6    I KNOW YOU CALL IT OLEORESIN CAPSICUM, OR O.C.

7    SPRAY.

8    A    CORRECT.  PEPPER SPRAY IS A DIFFERENT VERSION

9    OF THE SAME TYPE OF DUTY WEAPON.

10             BASICALLY WHAT, WHAT HAPPENS IS IF YOU'VE

11   EVER GONE TO A MEXICAN RESTAURANT AND YOU EAT A

12   PEPPER, YOU GET THAT STINGING SENSATION ALL AROUND

13   YOUR MOUTH AND YOUR EYES WATER AND YOUR NOSE STARTS

14   TO RUN A LITTLE BIT.

15             WELL, THIS IS A VERY EXAGGERATED VERSION

16   OF THAT.  IT'S MADE TO MAKE PEOPLE LESS LIKELY TO

17   BE ABLE TO SEE WHERE THE OFFICER IS, TO HELP THE

18   OFFICER MAINTAIN OR GAIN CONTROL OF SOMEBODY.

19             SO WITH ALL THOSE EFFECTS ARE HOPEFULLY

20   ABLE TO LET THE OFFICER GET THE UPPER HAND ON A

21   SITUATION.

22             MR. KOVACEVICH:  I'M GOING TO OBJECT.

23   NONRESPONSIVE.  THE QUESTION IS, WHAT'S THE

24   EFFECTS?

25             THE COURT:  I'LL ALLOW THE ANSWER.

1    THE WITNESS:  SO THE EFFECTS ARE A

2    BURNING OF THE EYES, COUGHING, RUNNY NOSE, STUFF

3    LIKE THAT.

4    IT LASTS, FOR ME WHEN I WAS SPRAYED,

5    ABOUT 40, 40 MINUTES, SOMEWHERE AROUND THERE, 45

6    MINUTES.

7    I THINK THE, THE EFFECTS CAN LAST UP TO

8    THAT AMOUNT OF TIME.

9    AFTER THAT IT WEARS OFF AND YOU'RE ABLE

10   TO OPEN YOUR EYES AGAIN AND --

11   BY MR. VINCENT:

12   Q    OKAY.  DID YOU OBSERVE THE EFFECT OF PEPPER

13   SPRAY ON MS. FEE?

14   A    YES, I DID.

15   Q    AND WHAT HAPPENED?

16   A    EVERYTHING I JUST DESCRIBED.  AS SOON AS I

17   SPRAYED HER, AS SOON AS THAT STUFF WENT ACROSS HER

18   EYES, IT TOOK HER -- ALMOST INSTANTANEOUSLY SHE

19   LEANED OVER AND SHE WAS SAYING "IT BURNS, IT

20   BURNS," STUFF LIKE THAT.

21   AND THEN SHE JUST MADE SPONTANEOUS

22   STATEMENTS.  IT'S -- IN REFERENCE TO THE QUESTIONS

23   I'D BEEN ASKING HER AT THE DOOR ABOUT THE TRAILER.

24   NOW SHE'S YELLING, "IT'S MY SON'S.  HE

25   BROUGHT IT HERE LAST WEEK."

1          SHE'S SAYING THIS AFTER SHE'S BEEN

2     SPRAYED OUT IN THE LITTLE COURTYARD THERE.

3               "IT'S MY SON'S.  HE BROUGHT IT HERE LAST

4     WEEK."  THESE ARE ALL SPONTANEOUS STATEMENTS SHE'S

5     SAYING AS SHE'S BASICALLY DOUBLING OVER AT HER

6     KNEES.

7               SO SHE'S LEANING OVER AT HER KNEES.

8     "IT'S MY SON'S.  HE BROUGHT IT OVER LAST WEEK."

9               SHE'S GIVING ME ANSWERS TO THE QUESTIONS

10    SHE WASN'T ANSWERING AT THE DOORWAY NOW.

11    Q    OKAY.  WHAT OTHER INFORMATION DID SHE TELL YOU

12    AT THAT POINT?

13    A    I DON'T RECALL.

14    Q    OKAY.

15    A    I DON'T KNOW WHAT YOU'RE --

16    Q    PHYSICALLY, WHAT ELSE HAPPENED TO HER?

17    A    OH, SHE SAID HER EYES WERE BURNING.  HER EYES

18    WERE BURNING AND SHE WAS -- SHE WAS HOLDING HER

19    HANDS UP TO HER EYES AND THEN BACK DOWN TO HER

20    KNEES TYPE OF THING.

21    Q    OKAY.  DID SHE EVENTUALLY GET DOWN ON THE

22    GROUND?

23    A    YES.  SHE -- ON HER OWN, SHE WENT DOWN TO ALL

24    FOURS.  BUT SHE'S STILL -- I'M GIVING HER COMMANDS

25    TO GET DOWN ON HER STOMACH, GET DOWN ON HER

1    STOMACH.

2              AT THIS POINT I'M TRYING TO GET HER IN AN

3    ARREST POSITION.  THE POSITION I'M TRYING TO SET

4    HER UP FOR IS A PRONE, A FELONY PRONE POSITION WHEN

5    YOU'D HAVE THE PERSON EXTEND THEIR ARMS OUT IN A

6    Y-SHAPE, TURN THEIR HEAD AWAY FROM YOU, AND THEIR

7    ANKLES CROSSED.

8              THAT LIMITS THEIR ABILITY TO GRAB YOU OR

9    KICK YOU OR STUFF LIKE THAT.  THAT'S THE POSITION

10   I'M TRYING TO GET HER SET UP IN SO I CAN DO AN

11   ARREST TECHNIQUE.

12             BECAUSE SHE'S YELLING -- IT'S NOT THAT

13   SHE'S NOT LISTENING TO ME.  IT'S THAT SHE'S NOT

14   DOING WHAT I'M ASKING HER TO DO BECAUSE I THINK

15   SHE'S -- SHE CAN'T -- SHE MIGHT NOT BE ABLE TO HEAR

16   ME BECAUSE SHE'S YELLING SO LOUD ABOUT ALL THIS

17   STUFF.

18             SO AT THIS POINT, SHE'S ON ALL FOURS, SO

19   I GO UP TO HER AND I TAP HER ON HER UPPER BUTTOCKS,

20   LOWER BACK AREA, AND I TELL HER, "GO DOWN TO THE

21   GROUND, GO DOWN TO THE GROUND" (INDICATING).

22   Q    AND YOU'RE DEMONSTRATING WITH YOUR RIGHT HAND;

23   CORRECT?

24   A    CORRECT.

25   Q    NOT YOUR KNEE?

                                                    1023

1    A    NO, NOT MY KNEE.

2    Q    AND THEN WHAT HAPPENED?

3    A    WELL, AS SOON AS I TAP HER LIKE THAT TO GET

4    HER TO GO DOWN TO THE GROUND (INDICATING), SHE GOES

5    DOWN TO THE GROUND.

6         WELL, THEN I WANT HER TO GET HER HANDS

7    BACK TOWARDS ME BECAUSE I'M IN A SQUATTED POSITION,

8    SHE'S LAYING ON THE GROUND AND I'M IN A SQUATTED

9    POSITION NEXT TO HER (INDICATING).

10        I ALREADY HAVE -- I GOT MY HANDCUFF OUT,

11   AND I HANDCUFFED HER LEFT HAND FIRST.  HER RIGHT

12   HAND IS STILL ON THE OTHER SIDE OF HER BODY, BUT

13   IT'S OUT TO THE SIDE, AND I'M TELLING HER TO BRING

14   THAT HAND TO ME.

15        WELL, AGAIN, SHE'S STILL TALKING ABOUT

16   HER EYES BURNING, HER EYES BURNING AND, FOR

17   WHATEVER REASON, SHE DOESN'T BRING THAT HAND TO ME.

18        I HAVE TO LEAN IN AND GRAB THE OTHER

19   HAND.  AS I LEAN IN, THE -- THIS PORTION OF MY LEG

20   TOUCHES THE SIDE OF HER LEFT SIDE (INDICATING).

21        I GRAB THAT OTHER HAND, HANDCUFF HER,

22   ADJUST THE HANDCUFFS TO MAKE SURE THEY'RE SIZED ON

23   HER, AND THEN DOUBLE LOCK.

24   Q    OKAY.  WHAT HAPPENED NEXT?

25   A    AFTER I DOUBLE LOCK HER HANDCUFFS, I LET HER

                                                    1024

1    LAY THERE BECAUSE SHE'S STILL AT THAT HEIGHTENED

2    SENSE, AND I'M CHECKING MY FINGER TO MAKE SURE IT'S

3    NOT BROKEN.

4            SO I STAND OFF IN THE CORNER AND THERE'S

5    A -- THERE'S A SMALL FENCE AT THE BACK OF THE YARD,

6    AND THEN THERE'S A LARGER FENCE THAT RUNS BETWEEN

7    HER YARD AND THE NEIGHBOR'S YARD.  SO I'M IN THAT

8    LITTLE CORNER.

9            I PUT OUT WHAT HAD HAPPENED OVER THE

10   RADIO TO OUR SERGEANT AND OUR DISPATCH CENTER, THAT

11   O.C. HAD BEEN USED, OUR SERGEANT ACKNOWLEDGED IT ON

12   THE RADIO, AND I LET HER RELAX TO WHERE NOW WE CAN

13   DO -- I CAN HAVE HER DO WHAT I NEED HER TO DO TO

14   FOLLOW MY DIRECTIONS.

15   Q    OKAY.  AND SO WHAT WAS THE NEXT STEP?

16   A    AFTER A FEW MOMENTS WE HAD TO GO GET HER EYES

17   WASHED OUT, AND I HAD TO GO SEARCH HER.

18           I GET HER -- WHEN SHE'S LAYING ON HER

19   STOMACH, SHE HAS HER HANDS BEHIND HER BACK.  WHAT

20   YOU HAVE HER DO IS ROLL OVER TOWARDS YOU, SHE ROLLS

21   OVER, THEN YOU HAVE HER SIT UP.  SHE SITS UP ON HER

22   OWN.

23           AND YOU TELL THEM, "I NEED YOU TO GET ONE

24   LEG UNDER YOU," AND YOU'RE TRYING TO GET ONE LEG

25   UNDER THEM BECAUSE I DON'T WANT TO PUT MY BACK OUT

1    TRYING TO LIFT SOMEBODY, AND I DON'T WANT TO HURT

2    HER.

3              SO SHE GETS ONE LEG UNDER HER, I THINK IT

4    WAS HER LEFT LEG, AND ALL YOU DO IS YOU GO TO THAT

5    SIDE OF BODY, YOU GRAB HER ARM, AND SHE LEANS

6    FORWARD.  WELL, BECAUSE THAT LEG IS UNDER HER,

7    SHE'S ABLE TO GET MOMENTUM TO GET SAT UP.  SO SHE

8    GETS SAT UP.

9              I'M HOLDING HER AS SHE'S STANDING UP.

10   I'M PREVENTING HER FROM FALLING FORWARD OR TO

11   EITHER SIDE.  I'M NOT PULLING HER UP.  I JUST STAND

12   HER UP.

13             WE WALK OUT TO THE PATROL CAR THAT'S IN

14   THE FRONT YARD, IN THE DRIVEWAY.

15             WE GET TO THE DRIVEWAY, I DO A, AN IN

16   CUSTODY SEARCH OF HER.  SHE'S WEARING VERY BAGGY

17   CLOTHES.  SHE'S A SUSPECT NOW FOR, IN MY MIND,

18   POSSIBLY FOR STEALING THE VEHICLE, POSSESSION OF A

19   STOLEN VEHICLE, RESISTING ARREST, AN ACCESSORY

20   AFTER THE FACT, AND POSSIBLY CONSPIRACY DEPENDING

21   ON WHAT HER, HER STATEMENT IS, OR WHAT THE

22   STATEMENT OF -- NOW THE SON THAT SHE'S GIVEN ME THE

23   NAME, SHE'S TOLD ME HER SON AND TOLD ME WHERE HE

24   WAS AND EVERYTHING.  SHE'S MAKING THESE SPONTANEOUS

25   STATEMENTS AS WE'RE GOING OUT TOWARD THE CAR.

1026

1   Q    OKAY.  AND YOU GET OUT TO THE CAR AND YOU'RE

2   INTENDING TO WASH HER EYES OUT; RIGHT?

3   A    DEFINITELY, YES.

4   Q    WHAT DO YOU DO?

5   A    I ASK HER TO REST HER BEHIND AGAINST THE CAR

6   BECAUSE SHE STILL HAS THE EFFECTS OF THE O.C. ON

7   HER.

8        SO THE CAR IS -- I WOULD LIKE HER TO HAVE

9   HER BALANCE ON THE CAR SO SHE DOESN'T HAVE TO WORRY

10  ABOUT HER BALANCE.  SHE'S LEANING AGAINST THE

11  PATROL CAR WITH HER BUTTOCKS AGAINST THE RIGHT REAR

12  QUARTER PANEL AREA.

13  Q    CAN I INTERRUPT YOU?  WE FIRST TALKED ABOUT

14  YOU PARKING ACROSS THE STREET WITH MR. POLLASTRINI.

15       AT SOME POINT BEFORE YOU WENT IN TO MAKE

16  CONTACT, DID YOU MOVE THE PATROL CAR?

17  A    YEAH, I THINK -- I DON'T RECALL WHICH ONE OF

18  US MOVED THE PATROL CAR, BUT WE DROVE IT INTO THE

19  DRIVEWAY OF HER HOUSE.

20  Q    OKAY. ALL RIGHT.  CONTINUE.

21  A    SO NOW WE'RE OUT THERE WITH HER, WE HAVE HER

22  HANDCUFFED, I SEARCH HER.

23       WE GET TO THE POINT WHERE NOW WE GET THE,

24  THE WATER OUT OF THE TRUNK OF THE CAR, AND IT'S

25  JUST A CANTEEN, I THINK IT'S LIKE A PINT SIZE, BUT

1027

1    IT'S DRINKING WATER.

2              SO I'M -- I WANT HER TO STAND SO I CAN

3    APPLY THIS TO HER, BUT SHE DOESN'T WANT TO STAND.

4    SHE JUST SITS RIGHT WHERE THE TIRE IS.

5              SO SHE SITS DOWN AT THE TIRE AND I HAVE

6    HER TILT HER HEAD BACK AND SHE'S COMPLAINING ABOUT

7    IT BURNING, AND I POUR THE WATER ON HER FOREHEAD

8    AND IT DRIZZLES DOWN HER FACE.

9              WELL, THAT SPRAY IS STILL ON HER, AND THE

10   WATER -- THE INITIAL EFFECTS OF THAT WATER BEING ON

11   THERE IS JUST WASHING A LITTLE BIT OF THAT, THE

12   RESIDUE BACK ONTO HER EYES AND STUFF, SO OF COURSE

13   IT'S GOING TO BURN.  SO HER REACTION IS TO TILT HER

14   HEAD BACK DOWN.

15             AND THEN I HAVE HER BRING HER HEAD BACK

16   UP, AND I POUR SOME MORE WATER ON HER.  I'M TRYING

17   TO GET THE WATER AWAY FROM HER EYES, THE RESIN FROM

18   THE O.C. AWAY FROM HER EYES.

19   Q    OKAY.  HOW MANY TIMES DID YOU DO THAT?

20   A    A FEW TIMES BECAUSE SHE WOULD TILT HER HEAD

21   BACK FORWARD AND COMPLAIN ABOUT IT BURNING, AND

22   THEN I'D EVENTUALLY BE ABLE TO CONVINCE HER TO TILT

23   HER HEAD BACK AGAIN SO WE COULD POUR MORE WATER ON

24   HER EYES.

25   Q    OKAY.  WHAT WAS THE EFFECT OF THAT?

1      A    WELL, EVENTUALLY AFTER, I DON'T KNOW, A FEW

2      MINUTES, MAYBE FIVE TO TEN MINUTES, SHE WAS ABLE TO

3      OPEN HER EYES AGAIN AND LOOK AROUND AND WE WERE

4      TALKING AND I ASKED HER IF SHE NEEDED AN AMBULANCE

5      AND SHE SAID NO.

6            WE'D USED UP THE WATER IN THE CANTEEN BY

7      NOW.

8      Q    OKAY.  DID SHE EVER ASK YOU TO USE THE HOSE TO

9      WASH HER FACE OFF?

10     A    NO.  THE ONLY REFERENCE TO A HOSE IN THIS

11     WHOLE SCENARIO IS THIS:  I -- I GET TO THE POINT

12     WHERE OFFICER VOORHEES IS CONTACTING THE VICTIM,

13     MR. POLLASTRINI, ABOUT THE TRAILER, BECAUSE NOW

14     THAT ALL THIS COMMOTION IS SETTLED,

15     MR. POLLASTRINI, WE DON'T WANT HIM TO MAKE WAIT ANY

16     MORE, SO HE COMES OVER AND OFFICER VOORHEES HAS TO

17     FILL OUT A BUNCH OF PAPERWORK AND GET THE TRAILER

18     RELEASED TO THE VICTIM.  WE DON'T WANT TO WASTE ANY

19     MORE OF HIS TIME.

20            SO HE'S DOING THAT PART.  I'M RUNNING ALL

21     THE INFORMATION ABOUT MS. FEE WHILE I'M SITTING IN

22     THE CAR AND SHE'S SEATED RIGHT BEHIND ME.

23            SO I HAVE THE CAR DOOR OPEN ON MY SIDE

24     AND THE PASSENGER SIDE AND SHE'S SEATED AT THE

25     RIGHT REAR TIRE.

1    SO I'M RUNNING -- WE HAVE TO -- SO WE

2    HAVE COMPUTERS IN OUR CAR THAT LET US CHECK

3    CRIMINAL HISTORY.

4         MR. KOVACEVICH:  YOUR HONOR, THAT'S

5    NONRESPONSIVE.

6         THE COURT:  I THINK THE QUESTION WAS THE

7    REFERENCE TO THE HOSE.

8         THE WITNESS:  OH, I'M SORRY.

9    BY MR. VINCENT:

10   Q    I THOUGHT WE WERE GETTING THERE.

11   A    OKAY.  THIS IS ALL LEADING TO -- OKAY.  I'LL

12   TRY TO BE DIRECT ABOUT THAT.

13        THE ONLY REFERENCE TO THE HOSE IS SHE'S

14   COMPLAINING ABOUT HER HANDCUFFS -- AND IF I MAY

15   TAKE OUT MY HANDCUFF?

16   Q    YEAH, GO AHEAD.

17   A    MS. FEE IS COMPLAINING ABOUT HER HANDCUFF.

18   SHE SAYS, "MY -- I DON'T WANT THESE HANDCUFFS ON.

19   I DON'T WANT THESE HANDCUFFS ON."

20        SO I TELL HER, "LOOK, YOU HAVE TO MAKE

21   SURE THAT YOU KEEP YOUR HANDS BACK TO BACK."

22        WHEN YOU'RE ARRESTED, THIS IS -- IT MIGHT

23   NOT BE THE MOST COMFORTABLE WAY, BUT IT'S THE WAY

24   THAT WE'RE TAUGHT AND IT'S THE WAY THAT PREVENTS

25   INJURY (INDICATING).

1              WITH RESPECT TO THAT, I'M TALKING TO HER

2     AND BENDING OVER AT HER.

3              OFFICER VOORHEES COMES BACK AROUND THE

4     SIDE AND SAYS, "DO YOU WANT ME TO GET SOME MORE

5     WATER?" TALKING ABOUT WASHING OUT HER EYES.

6              I'M LIKE, "OH, WE'RE OUT."

7              HE SAYS, "DO YOU WANT ME TO LOOK FOR A

8     HOSE."

9              WITHOUT ME MAKING A COMMENT, SHE SAYS,

10    "IF YOU UNHANDCUFF ME," BECAUSE WE WERE ALREADY

11    TALKING ABOUT THE HANDCUFFS, "IF YOU UNHANDCUFF ME,

12    I'LL GET UP AND FIND THE HOSE."

13             AND I SAID, "MA'AM, I'M NOT UNHANDCUFFING

14    YOU."

15             THERE'S NO WAY I'M GOING TO UNHANDCUFF

16    MS. FEE AFTER WHAT JUST HAPPENED.  I DON'T WANT TO

17    GET IN ANOTHER SITUATION WHERE I HAVE TO SPRAY HER

18    AGAIN.  I DON'T WANT TO GET IN A SITUATION WHERE

19    SHE'S GOING TO TRY TO RUN AWAY OR HURT ME.  I DON'T

20    WANT HER TO GET BACK IN THE HOUSE AND GET A WEAPON.

21             SO THAT'S THE ONLY REFERENCE.  WHEN SHE

22    HAD SAID THAT THE -- "IF YOU LET ME OUT OF THE

23    HANDCUFFS," AND I SAID "NO," SHE SAID, "WELL, FINE,

24    FORGET ABOUT IT."

25    Q    OKAY.  AND YOU'RE -- AND I THINK WE GOT AHEAD

1031

1    OF OURSELVES HERE ON THE HANDCUFFS.  DID SHE TELL

2    YOU THAT THE HANDCUFFS WERE HURTING?

3    A    SHE WAS COMPLAINING ABOUT THE HANDCUFFS.  WHEN

4    I LOOKED AT THEM -- WHAT HAPPENS IS THESE

5    HANDCUFFS, YOU CAN SEE HOW THEY'RE SHAPED, THEY'RE

6    SHAPED HOW YOUR WRIST IS.  IF YOU LOOK AT YOUR

7    WRIST, IT'S NOT A PERFECT CIRCLE, IT'S AN OBLONG

8    SHAPE.

9         THAT'S HOW HANDCUFFS ARE MADE, TOO.

10   THEY'RE MORE OBLONG HERE THAN THEY ARE HERE

11   (INDICATING).  SO THIS IS WIDER HERE THAN IT IS

12   HERE (INDICATING).

13        WITH PETITE LADIES, SUCH AS HER, THIS

14   HANDCUFF, WHEN I PUT IT ON YOUR WRIST -- THIS IS A

15   ONE SIZE FITS ALL TYPE THING, RIGHT, OR SUPPOSEDLY.

16        SO WHEN I PUT MY WRIST IN THERE, IT'S

17   GOING TO BE SNUG.  WELL, IF A SMALLER FRAME FEMALE

18   PUTS IT IN THERE, HER WRIST IS NOT VERY BIG.

19        SO THE HANDCUFFS HAVE A TENDENCY, IF THE

20   PERSON MOVES THEIR ARMS AROUND, OR TRIES TO MOVE

21   THEIR ARMS AROUND, THEY'LL MOVE THEIR WRISTS WHERE

22   IT'S IN THE ELONGATED POSITION IN THE WRONG SPOT

23   (INDICATING).

24        SO THAT'S WHAT WAS GOING ON WITH MS. FEE.

25   I KEPT TELLING HER, "MA'AM, YOU HAVE TO KEEP YOUR

1    HANDS BACK TO BACK," JUST LIKE I DO WITH ALL MY

2    SUSPECTS OR IN CUSTODIES.

3            YOU DON'T WANT THEM TO HURT THEMSELVES.

4    SO YOU JUST HAVE THEM TWIST THEIR -- YOU REITERATE

5    THE FACT THAT IT WON'T HURT AS MUCH, BECAUSE IF YOU

6    MOVE YOUR WRIST TO THE RIGHT POSITION, IT WON'T

7    HURT.

8    Q    OKAY.  AFTER YOU TOLD HER HOW TO HOLD HER ARMS

9    SO THE HANDCUFFS WOULDN'T HURT, DID SHE MAKE ANY

10   OTHER COMPLAINTS ABOUT THE HANDCUFFS?

11   A    NOT THAT I RECALL.

12   Q    OKAY.  AND WHEN YOU PUT THEM ON THE FIRST TIME

13   AND DOUBLE LOCKED THEM, HOW DID YOU SIZE THEM?

14   A    WELL, YOU WANT TO MAKE SURE THAT THERE'S A, AT

15   LEAST ONE FINGER AND SOMETIMES A TWO FINGER GAP.

16           BUT WITH HER, BECAUSE IT WAS A SMALLER

17   WRIST, YOU JUST WANT TO MAKE SURE THAT THE PRESSURE

18   OF THE, THE SINGLE BAR, WHICH IS THIS SIDE, IS

19   NOT -- OR THE OTHER SIDE, THE DOUBLE BAR, IS NOT,

20   IS NOT MAKING PRESSURE AGAINST THEIR HAND

21   (INDICATING).  SO IT'S JUST ON THERE.

22           THESE AREN'T WRENCHED DOWN ON PEOPLE'S

23   WRIST.  THAT WOULD BE PAINFUL.  THEY ACTUALLY SHOW

24   US THAT AT THE ACADEMY.  THEY TEACH YOU, THIS IS

25   WHAT HAPPENS IF YOU, IF YOU WRENCH THINGS DOWN ON

1   PEOPLE'S WRISTS.

2           AND WE'RE HANDCUFFED.  WE'RE HANDCUFFED

3   FOR SEVERAL MINUTES, 15, 20 MINUTES AT A TIME WHILE

4   WE'RE DOING SEARCHES.

5           SO THEY SHOW US, THIS IS WHY YOU DON'T

6   WANT TO DO IT.  AND IF YOU DO IT WRONG, IT COULD BE

7   PAINFUL.

8   Q    OKAY.  WHEN YOU -- LET'S GO BACK TO WHEN YOU

9   HAD HER STAND UP.

10          DID YOU PULL ON HER ARM?

11  A    NO.

12  Q    OKAY.  WHEN YOU TALKED ABOUT HER STRUGGLING

13  WITH YOU, WAS SHE USING HER LEFT ARM TO TRY TO PULL

14  YOUR RIGHT ARM OFF?

15  A    YES.  SHE WAS DIGGING AT MY FINGERS AND

16  EVENTUALLY GOT TO MY PINKY.

17  Q    OKAY.  SO SHE'S STILL ON THE GROUND.  HOW DOES

18  SHE GET TO THE PATROL CAR?

19  A    I'M SORRY?

20  Q    I THINK YOU STOPPED WHEN SHE'S STILL ON THE

21  GROUND AND YOU'VE RINSED HER FACE OFF.

22          WHAT HAPPENS NEXT?

23  A    WHEN WE'RE EVENTUALLY GOING TO BE LEAVING THE

24  SCENE?

25  Q    RIGHT.

1034

1    A    WE JUST HAVE HER LEAN FORWARD AND SHE STANDS

2    UP.  SAME MANNER.  I'M JUST HOLDING TO GUIDE HER.

3    WE SEAT HER IN THE BACK SEAT OF THE PATROL CAR.

4    Q    OKAY.  DID SHE SAY ANYTHING ON THE WAY IN THE

5    PATROL CAR?

6    A    ON THE WAY DOWN THERE, SHE WAS JUST -- I DON'T

7    KNOW ANY EXACT STATEMENTS.  THERE WAS CONVERSATIONS

8    GOING ON, BUT I DON'T KNOW WHAT WAS SAID.

9    Q    DID YOU ASK HER IF SHE WANTED TO GO TO THE

10   DOCTOR?

11   A    YES.

12   Q    WHAT DID SHE -- WHAT EXACTLY DID YOU SAY?

13   A    WELL, BECAUSE OF THE O.C. SPRAY, "MA'AM, DO

14   YOU WANT TO GO TO DOMINICAN HOSPITAL TO GET CHECKED

15   OUT BY A DOCTOR?"

16        AND SHE SAID NO.

17   Q    OKAY.  HOW LONG DID IT TAKE FROM THE TIME YOU

18   ARRESTED HER TO THE TIME YOU GOT TO THE JAIL?

19   A    IN THE NEIGHBORHOOD OF 35, MAYBE 40 MINUTES.

20   Q    OKAY.  AND WAS SHE HAVING ANY TROUBLE

21   BREATHING AT THAT TIME?

22   A    DOWN AT THE JAIL?

23   Q    AND -- WELL, YOU DESCRIBED THE EFFECTS OF

24   PEPPER SPRAY.  I DON'T KNOW -- I DON'T EVEN

25   REMEMBER NOW IF YOU SAID IT CAUSED YOU TO HAVE

1    TROUBLE BREATHING.

2    A    IT MAKES YOU COUGH, YES.  AND INITIALLY SHE

3    WAS COUGHING AND HAVING ALL THOSE, I GUESS YOU

4    WOULD CALL THEM SIDE EFFECTS, I GUESS.

5            BUT EVENTUALLY WHEN WE GET DOWN TO THE

6    JAIL, ALL THAT STUFF IS OVER WITH.  ALL IT IS IS

7    LIKE I CAN SEE A RED BAND WHERE THE PEPPER SPRAY

8    TOUCHED DIRECTLY.  SHE DOESN'T HAVE THE MUCOUS TYPE

9    STUFF OUT OF HER NOSE.  SHE'S ABLE TO OPEN HER EYES

10   AND CARRY ON A CONVERSATION.

11   Q    OKAY.  ANYTHING ELSE THAT HAPPENED -- WELL,

12   WHAT -- YOU GET TO THE JAIL.  WHAT HAPPENS?  WHAT

13   DO YOU DO?

14   A    WELL, WE STILL HAVE TO DO PAPERWORK, AND IT

15   TAKES A LITTLE BIT LONGER BECAUSE WE'RE -- I'M

16   TRAINING, I'M NOT JUST DOING.

17           SO HE'S DOING -- OFFICER VOORHEES IS

18   DOING THE PAPERWORK FOR THE, THE ARREST PORTION TO

19   GET HER BOOKED INSIDE.

20           I'M DOING FOLLOW-UP ON THE INFORMATION

21   SHE GAVE US NOW ABOUT HER SON TO TRY TO SEE IF WE

22   CAN LOCATE HIM.

23   Q    OKAY.  AND DID YOU EVENTUALLY LOCATE HER SON?

24   A    YES.

25   Q    AND WHAT'S HIS NAME?

1    A    MR. BUSTICHI.

2    Q    OKAY.  WHERE DID YOU FIND HIM?

3    A    WE EVENTUALLY FOUND HIM IN THE AFTERNOON OFF

4    OF PLAYA BOULEVARD, WHICH IS A TOWN MAYBE 30

5    MINUTES SOUTH OF WHERE WE CONTACTED MS. FEE.

6    Q    OKAY.  AND HAD YOU RETURNED TO THE HOUSE

7    BEFORE YOU CONTACTED MR. BUSTICHI?

8    A    YES.

9    Q    CAN YOU DESCRIBE -- WHY DID YOU GO BACK TO THE

10   HOUSE?

11   A    WELL, WE'RE TRYING TO SEE IF WE COULD FIND

12   MR. BUSTICHI, TRY TO SEE IF HE RETURNED, BECAUSE

13   FOR SOME REASON -- I DON'T KNOW IF SHE, IF MS. FEE

14   HAD SAID SOMETHING ABOUT HER SON SHOULD BE HOME ANY

15   TIME SOON OR SOMETHING, BUT WE WENT BACK TO THE

16   ADDRESS TO SEE IF WE COULD SEE -- SHE DESCRIBED HIM

17   DRIVING A PICKUP.

18        SO WE DROVE TO THE SCENE AND, SURE

19   ENOUGH, NOW THERE'S A PICKUP IN THE DRIVEWAY OF THE

20   RESIDENCE, AND MY INITIAL IMPRESSION WAS THIS MIGHT

21   BE MR. BUSTICHI.

22   Q    OKAY.  DID YOU MAKE CONTACT WITH ANYONE AT THE

23   RESIDENCE?

24   A    YES.  HIS NAME ESCAPES ME FOR THE MOMENT.  THE

25   GENTLEMAN SEATED BACK THERE.

1    Q    MR. CARRINGTON?

2    A    MR. CARRINGTON, THANK YOU.

3    Q    AND HOW DID YOU MAKE CONTACT WITH HIM?

4    A    HE WAS IN THE SIDE YARD WHERE WE'D CONTACTED

5    MS. FEE TALKING ON A PHONE.  I COULD HEAR HIM AS WE

6    WERE MAKING THE APPROACH.

7         SO WE WENT THROUGH THE SAME GATE THAT WE

8    WENT THROUGH INITIALLY AND HE WAS STANDING BACK

9    THERE ON THE PHONE.

10        AND WE TOLD HIM WHAT HAD -- BASICALLY

11   WHAT HAD TRANSPIRED.

12        HE SAID THAT, YEAH, HE WAS -- HE WAS ON

13   THE PHONE WITH MR. BUSTICHI AT THAT TIME ALREADY.

14   HE WAS ALREADY TALKING TO MS. FEE'S SON.

15   Q    OKAY.  WHAT DID HE SAY?  WHAT DID HE TELL YOU?

16   A    WELL, WHEN I TOLD HIM WHY WE WERE THERE, HE

17   SAYS, "WELL, I HAVE HIM ON THE PHONE RIGHT NOW,"

18   AND HE HANDED ME THE PHONE AFTER TELLING

19   MR. BUSTICHI THAT, "HEY, THE HIGHWAY PATROL WANTS

20   TO TALK TO YOU," SOMETHING TO THE EFFECT OF "THE

21   POLICE ARRESTED YOUR MOTHER BECAUSE OF SOMETHING

22   YOU DID," AND GAVE ME THE PHONE.

23   Q    OKAY.  YOU WERE STANDING IN THE VICINITY OF

24   THIS DOOR WHEN YOU WERE TALKING TO MR. CARRINGTON

25   (INDICATING)?

1    A    THERE'S A -- THAT CEMENT COURTYARD AREA AT

2    THE -- THERE'S THE PATH THAT LEADS IN FROM THE

3    GATE, AND THEN IT OPENS UP.  SO THAT'S WHERE

4    MR. CARRINGTON WAS STANDING AND THAT'S WHERE WE ALL

5    TALKED.

6    Q    OKAY.  AND WHAT TIME OF DAY WAS THAT?

7    A    EARLY AFTERNOON.  I'D HAVE TO LOOK TO SEE THE

8    EXACT TIME.

9    Q    WAS THERE ANY SMELL OF PEPPER SPRAY IN THE

10   AREA STILL?

11   A    I THINK THERE WAS ON THE, JUST IN THE GENERAL

12   AREA BY THE GRASS.

13   Q    OKAY.  WAS THERE ANY RESIDUE ON THE DOOR OR

14   DOOR FRAME?

15   A    THERE WOULDN'T BE ANY RESIDUE ON THE DOOR OR

16   DOOR FRAME.

17   Q    OKAY.  BUT IF YOU'D SPRAYED IT ON THE DOOR,

18   WOULD THERE BE RESIDUE?

19   A    IF I'D SPRAYED IT ON THE DOOR, YES.

20   Q    OKAY.  AND IF YOU SPRAYED IT AT THE OPEN DOOR,

21   THERE WOULD HAVE BEEN PEPPER SPRAY IN THE HOUSE AS

22   WELL?

23   A    IT WOULD HAVE SMELLED LIKE -- IT WOULD HAVE

24   SMELLED LIKE PEPPER SPRAY IN THE HOUSE FOR SURE.

25   Q    WHEN YOU CONTACTED MR. BUSTICHI, DID HE TELL

1    YOU THAT HE WAS RESPONSIBLE FOR THE TRAILER?

2            THE COURT:  COULD I SEE COUNSEL FOR A

3    SECOND?

4            (SIDE-BAR DISCUSSION OFF THE RECORD.)

5    BY MR. VINCENT:

6    Q    LET'S STRIKE THAT QUESTION, OFFICER RIOUX.

7            DID YOU, AFTER THIS INCIDENT, EVER SEE

8    MS. FEE AGAIN PRIOR TO THIS COMING TO COURT HERE?

9    A    NO.

10   Q    DID YOU EVER PARK YOUR CAR ACROSS THE STREET

11   FROM HER RESIDENCE?

12   A    NO.

13   Q    ARE YOU FAMILIAR WITH THE BEATS THAT THE CHP

14   PATROLS IN SANTA CRUZ COUNTY?

15   A    AT THAT TIME, YES.  I'M IN A DIFFERENT OFFICE

16   NOW.  I DON'T KNOW IF THINGS HAVE CHANGED.

17   Q    OKAY.  GRAHAM HILL ROAD, WAS THAT A REGULAR

18   BEAT THAT OFFICERS PATROLLED?

19   A    YES.  THAT'S AN ACTUAL ASSIGNED BEAT.  AND

20   GRAHAM HILL ROAD IS NOT VERY LONG.  IT'S JUST

21   SEVERAL MILES LONG.

22   Q    WOULD IT BE UNUSUAL, IN YOUR MIND, TO SEE A

23   CAR IN THAT TURN OUT ACROSS THE STREET FROM

24   MS. FEE'S HOUSE?

25   A    IT WOULD NOT BE UNUSUAL TO SEE AN OFFICER IN

1    THAT AREA AT ALL.  IT'S AN ACTUAL ASSIGNED BEAT,

2    LIKE 17 WOULD HAVE AN OFFICER ASSIGNED THERE,

3    GRAHAM HILL ROAD, HIGHWAY 9.  THERE ARE OFFICERS

4    ASSIGNED TO THOSE BEATS.

5    Q    DID YOU EVER SUGGEST TO YOUR SERGEANT OR

6    ANYONE IN THE SANTA CRUZ OFFICE THAT THEY SHOULD

7    KEEP AN EYE ON THAT HOUSE?

8    A    NOT AT ALL.

9    Q    DID YOU EVER SEE MS. FEE BEFORE THE INCIDENT?

10   A    NO.

11   Q    HOW TALL ARE YOU?

12   A    I'M 6 FOOT 4.

13   Q    AND HOW MUCH DID YOU WEIGH IN 2007?

14   A    IN 2007, I WEIGHED IN 220 POUNDS.

15   Q    YOU LOOK BIGGER THAN THAT, BUT THERE'S A LOT

16   OF PADDING, ISN'T THERE, ON YOUR UNIFORM?

17   A    RIGHT NOW I WEIGH I THINK 228 POUNDS, AND I DO

18   HAVE A VEST ON.

19   Q    AND THAT ADDS A LOT OF BULK TO YOU?

20   A    MINE IS AN OLDER STYLE VEST AND IT'S QUITE

21   THICK.

22   Q    AND DO YOU RECALL WHERE OFFICER VOORHEES WAS

23   STANDING IN RELATION TO YOU WHILE YOU WERE TALKING

24   WITH MS. FEE AT THE DOOR?

25   A    I WAS AWARE OF HIM BEING OFF TO MY LEFT.  I

1    DON'T KNOW EXACTLY WHERE HE WAS.  I WASN'T PAYING

2    ATTENTION TO WHERE HE WAS.

3    Q    OKAY.  WHEN YOU DID YOUR IN CUSTODY SEARCH OF

4    MS. FEE, DID YOU FORCE HER DOWN OVER THE HOOD OF

5    THE CAR?

6    A    NO.

7    Q    WHERE WAS SHE?  HOW WAS SHE STANDING WHEN YOU

8    DID THAT?

9    A    BASICALLY SHE'S STANDING AT THE REAR PORTION

10   OF THE PATROL CAR WHERE WE'D DIRECTED HER.  IT'S

11   THE RIGHT REAR FENDER AREA BY THAT TIRE.  SO IT'S

12   JUST A STANDING SEARCH.

13   Q    OKAY.  WE'VE BEEN HERE IN THIS COURTROOM FOR,

14   I GUESS, SEVEN DAYS NOW OVER A PERIOD OF TWO WEEKS

15   AND YOU'VE COME AND GONE MANY TIMES.

16        HAVE YOU SEEN MS. FEE IN THE HALLWAY?

17   A    YES.

18   Q    CAN YOU DESCRIBE HER DEMEANOR WHEN YOU SEE HER

19   IN THE HALLWAY?

20   A    IT VARIES.  SOMETIMES SHE LOOKS SERIOUS, BUT

21   JUST BEFORE THE JURORS CAME BACK IN, SHE WAS

22   SMILING AND LAUGHING OUT LOUD WITH THE -- I DON'T

23   KNOW WHAT THE LADY'S NAME IS HERE, BUT THEY WERE

24   SMILING AND JOKING AND LAUGHING OUT LOUD.

25   Q    DID SHE SEEM TO REACT WHEN YOU WALKED BY?

1042

1    A    NO.

2              MR. VINCENT:  ALL RIGHT.  THANK YOU.

3              THE WITNESS:  THANK YOU.

4              THE COURT:  MR. KOVACEVICH, DO YOU HAVE

5    QUESTIONS?

6              MR. KOVACEVICH:  YES.

7                    **CROSS-EXAMINATION**

8    BY MR. KOVACEVICH:

9    Q    OFFICER RIOUX, WHEN MS. FEE FIRST CAME TO THE

10   DOOR, DID YOU BELIEVE YOU HAD PROBABLE CAUSE TO

11   ARREST HER?

12   A    NOT AT THAT TIME, NO.

13   Q    TAKE A LOOK AT THAT (HANDING).  I'M GOING TO

14   POINT SOME PAGES OUT FOR YOU.

15   A    OKAY.

16   Q    WELL, LET ME ASK YOU WHAT YOU MEANT BY THIS,

17   THEN.  IF YOU COULD LOOK AT PAGE 45 OF YOUR

18   DEPOSITION TESTIMONY -- ACTUALLY, YOU HAVE TO GO

19   BACK BECAUSE WE HAVE TO HAVE ALL THE QUESTION.

20   PAGE 44, LINE 18 TO 45:5.  NO, I'M SORRY, COLON 17.

21   OKAY.

22              MR. VINCENT:  I'M CONFUSED.  WHERE ARE WE

23   STARTING?

24              MR. KOVACEVICH:  IT JUST KEEPS CHANGING.

25   SORRY.  44:15 TO 45:17.

1          MR. VINCENT:  44:18, THE QUESTION IS,

2     "DID YOU EVER -- OKAY, STRIKE THAT."  IS THAT WHERE

3     YOU'RE STARTING?

4          MR. KOVACEVICH:  WELL, 19.

5          MR. VINCENT:  OKAY.

6          THE COURT:  ANY OBJECTION?

7          MR. VINCENT:  THERE'S AN OBJECTION THAT

8     CALLS FOR LEGAL CONCLUSION.

9          THE COURT:  DO YOU WANT TO MAKE THAT

10    OBJECTION?

11         MR. VINCENT:  YEAH, I WANT TO MAKE THAT

12    OBJECTION.

13         THE COURT:  OKAY.  I'M GOING TO HAVE TO

14    SEE A COPY OF THE DEPOSITION.

15         MR. KOVACEVICH:  JUDGE, MAY I APPROACH?

16         THE COURT:  SURE.

17         MR. KOVACEVICH:  THAT'S 44 --

18         THE REPORTER:  I'M SORRY, COUNSEL.  I

19    DIDN'T HEAR THAT.

20         MR. KOVACEVICH:  I FORGOT WHAT I SAID TO

21    THE JUDGE.

22         44:19, YOUR HONOR.

23         (PAUSE IN PROCEEDINGS.)

24         THE COURT:  YOU WANT TO STOP READING

25    WHERE?

1           MR. KOVACEVICH:  17 ON THE NEXT PAGE,

2    LINE 17.

3           (PAUSE IN PROCEEDINGS.)

4           MR. VINCENT:  I THINK IT'S OUT OF CONTEXT

5    UNTIL YOU GET TO 46:3.

6           THE COURT:  DO YOU HAVE OBJECTION TO

7    READING TO 46:3?

8           MR. KOVACEVICH:  NO.

9           THE COURT:  IS THAT ALL RIGHT THEN?

10          MR. VINCENT:  I STILL HAVE THE OBJECTION

11   THAT HE'S ASKING FOR A LEGAL CONCLUSION WITHOUT

12   PROBABLE CAUSE.

13          THE COURT:  WELL, WHETHER OR NOT THERE'S

14   PROBABLE CAUSE IS AN OBJECTIVE STANDARD THAT HAS TO

15   BE DETERMINED BASED ON WHAT THE SITUATION APPEARED

16   TO A REASONABLE OFFICER ON THE SCENE, NOT WHAT IT

17   SUBJECTIVELY APPEARED TO -- OR WHAT THE OFFICERS

18   INVOLVED THOUGHT.

19          BUT I THINK THE QUESTION IS RELEVANT TO

20   SHOW WHY HE TOOK THE ACTION HE DID OR -- AND WHY HE

21   WAS WHERE HE WAS.

22          SO I'LL ALLOW IT, BUT THERE WILL BE

23   INSTRUCTIONS ON PROBABLE CAUSE FOR THE JURY.

24          MR. KOVACEVICH:  OKAY.

25   Q    SO IT STARTS OFF, "LET ME ASK YOU THIS:  NOW,

                                              1045

1    AS YOU WERE GOING INTO THE BACKYARD" --

2              THE COURT:  DON'T READ THE OBJECTIONS AND

3    THE RESPONSES.

4              MR. KOVACEVICH:  THANK YOU.  I'LL EDIT

5    IT.

6              "NOW, AS YOU WERE GOING INTO THE BACKYARD

7    OR THE SIDE YARD, I'M SORRY, DID YOU BELIEVE YOU

8    HAD PROBABLE CAUSE TO ARREST AN OCCUPANT OF THE

9    HOUSE?

10             "ANSWER:  IT WAS DEPENDENT ON THE

11   FOLLOWING INFORMATION:  AT THAT TIME IF SOMEBODY IS

12   ON THAT PROPERTY, YES.  IF SOMEBODY IS ON THAT

13   PROPERTY THAT DOES NOT GIVE INFORMATION, THAT GIVES

14   ME AN ALTERNATIVE AVENUE IN THE INVESTIGATION, THEN

15   YES.

16             "QUESTION:  SO AT THE TIME YOU WERE GOING

17   THROUGH THE GATE, ARE YOU TELLING ME YOU DIDN'T

18   HAVE PROBABLE CAUSE TO ARREST?

19             "ANSWER:  I DID HAVE.  THAT WAS THE WHOLE

20   BASIS.  I DID HAVE PROBABLE CAUSE TO BE BACK THERE

21   TO CONTACT THE OWNER OF THE PROPERTY, AND JUST THE

22   FACT THAT THEY HAD POSSESSION OF STOLEN PROPERTY ON

23   THEIR PROPERTY LEADS ME TO BELIEVE THAT THEY MAY BE

24   INVOLVED, YES, SIR.

25             "QUESTION:  SO YOU FEEL YOU COULD HAVE

1046

1    ARRESTED MS. FEE WHEN SHE CAME TO THE DOOR?

2              "QUESTION:  BASED ON PROBABLE CAUSE?

3              "ANSWER:  BASED ON PROBABLE CAUSE WITHOUT

4    ANY OTHER INFORMATION RECEIVED."

5              MR. VINCENT:  I'M GOING TO OBJECT TO

6    COUNSEL'S INFLECTION.

7              MR. KOVACEVICH:  I'M SORRY.

8              "BASED ON PROBABLE CAUSE WITHOUT ANY

9    OTHER INFORMATION RECEIVED."

10             "QUESTION:  DID YOU BELIEVE WHEN YOU WENT

11   THROUGH THE GATE THAT YOU HAD A BASIS TO DETAIN THE

12   OCCUPANT?

13             "ANSWER:  YES.

14             "QUESTION:  AT WHAT POINT -- WELL, I --

15   WELL, SO I'M STILL TRYING TO FIGURE OUT WHEN

16   MS. FEE CAME TO THE DOOR, WAS IT YOUR STATE OF

17   MIND" --

18             WHAT LINE DID YOU WANT ME TO READ TO?

19   I'M SORRY.

20             MR. VINCENT:  JUST TO 3.

21             THE COURT:  46:3.

22             MR. KOVACEVICH:  OH, OKAY.  I GOT THERE.

23   Q   NOW, OFFICER RIOUX, IS IT FAIR TO SAY YOUR

24   INTENTION IN MAKING CONTACT WITH THE OCCUPANT WAS

25   TO GATHER INFORMATION ABOUT WHO RESIDED THERE, WHO

                                              1047

1    MAY HAVE DROPPED OFF THE TRAILER, AND TO SEE IF THE

2    HOME OWNER WAS ACTUALLY INVOLVED OR NOT?

3    A    YES.

4    Q    ALL RIGHT.  AT THE TIME YOU KNOCKED ON THE

5    DOOR, DID YOU HAVE ANY INTENTION OF DETAINING

6    WHOEVER RESPONDED?

7              MR. VINCENT:  OBJECTION.  VAGUE.

8              THE WITNESS:  NO.

9              THE COURT:  I'LL ALLOW THE QUESTION.

10             THE WITNESS:  NO.  IT -- MY INTENTION --

11   MY SOLE INTENTION AT THAT POINT WAS JUST TO SEE --

12   JUST TO GATHER MORE INFORMATION.

13   BY MR. KOVACEVICH:

14   Q    OKAY.  IF MS. FEE HAD TOLD YOU EARLY ON IN THE

15   INTERCHANGE THAT IT WAS HER SON'S TRAILER, WOULD

16   YOU HAVE SIMPLY GOTTEN HER INFORMATION, RUN HER

17   THROUGH THE SYSTEM, AND YOU COULD HAVE -- AND YOU

18   WOULDN'T HAVE ARRESTED HER BECAUSE YOU COULD ALWAYS

19   FILE SOMETHING AS A COMPLAINT TO BE FILED?

20   A    THAT IS A POSSIBILITY, YES.

21             MR. VINCENT:  OBJECTION.  COMPOUND.

22   BY MR. KOVACEVICH:

23   Q    AT WHAT POINT DID YOU ASCEND THOSE STAIRS IN

24   THIS SEQUENCE THAT YOU DESCRIBED FOR US?

25   A    IN ASCENDING, YOU'RE JUST TALKING ABOUT

1    GETTING ON A STEP OR ON A STAIR, OR WHAT ARE YOU

2    REFERRING TO?

3    Q    WELL, WHY DON'T YOU TELL ME HOW YOU APPROACHED

4    ONCE YOU STARTED TO GO UP THE STAIRS.

5    A    AT WHICH TIME, SIR?

6    Q    DID YOU GO UP ONCE OR MULTIPLE TIMES?

7    A    WELL, WHEN I'M KNOCKING, I REACH UP AND HAVE

8    TO KNOCK, SO I DON'T KNOW THE GENERAL AREA I'M IN.

9    SO --

10   Q    YOU DIDN'T GO UP THE STAIRS AT ALL, DID YOU,

11   IN THAT INSTANCE?

12   A    I DON'T RECALL, SIR.

13   Q    DO YOU RECALL TESTIFYING IN YOUR DEPOSITION

14   THAT YOU DIDN'T DO THAT?

15   A    I DON'T RECALL.

16   Q    ALL RIGHT.  WELL, LET'S GO THROUGH IT THEN, IN

17   A LITTLE MORE DETAIL.

18          SO YOU KNOCK, KNOCK, AND SHE ANSWERS THE

19   DOOR.

20          WHEN SHE ANSWERED THE DOOR, DID YOU GO UP

21   THE STAIRS?

22   A    NOT INITIALLY, NO.

23   Q    ALL RIGHT.  AND THEN YOU HAVE THIS LITTLE

24   INTERCHANGE VERBALLY.

25          BEFORE YOU GRASP HER, DID YOU GO UP THE

1    STAIRS?

2    A    I DON'T KNOW EXACTLY WHERE I AM, BUT I'M

3    WITHIN THE, THE ARM REACH IF I JUST LEAN FORWARD

4    (INDICATING).  WHATEVER DISTANCE THAT IS --

5    Q    SO ARE YOU -- CAN YOU TELL US THAT YOU WEREN'T

6    AT THE TOP STAIR WHEN YOU GRABBED HER?

7    A    THAT'S CORRECT, I WAS NOT AT THE TOP STAIR.

8    Q    WHY WOULDN'T YOU GO UP TO THE TOP STAIR IF

9    YOU'RE GOING TO TAKE HOLD OF SOMEBODY?

10   A    THAT'S JUST --

11              MR. VINCENT:  ARGUMENTATIVE.

12              THE COURT:  I'M SORRY.  YOU'RE GOING TO

13   HAVE TO SPEAK UP.

14              MR. VINCENT:  OBJECTION.  ARGUMENTATIVE.

15              THE COURT:  I'LL ALLOW THAT QUESTION.

16              GO AHEAD.

17              THE WITNESS:  WELL, THAT IS -- THAT'S THE

18   FATAL FUNNEL.  I'M AT THE BOTTOM OF THE STAIRS.  IT

19   APPEARS TO ME THAT SHE'S GETTING TO THE POINT WHERE

20   SHE'S GOING TO RETREAT IN THE HOUSE, AND MY

21   QUICKEST RESPONSE ISN'T TO RUN UP THE STAIRS AND

22   THEN GRAB HER.  IT'S TO GET HER RIGHT THERE AND

23   THEN.

24   BY MR. KOVACEVICH:

25   Q    OKAY.  WELL, THEN, HOW LONG -- TELL ME WHAT

1    HAPPENED BETWEEN YOU FIRST GRABBING HER BEING TWO

2    AND A HALF TO THREE FEET AWAY FROM HER, ARM'S

3    LENGTH, AND WHEN YOU FINALLY -- WELL, DID YOU EVER

4    GET UP TO THE TOP STEP?

5    A    EVENTUALLY SHE PULLED ME UP.

6    Q    OH.  SO SHE PULLED YOU TO GET UP THERE?

7    THAT'S HOW YOU GOT UP THERE?

8    A    UP TO THE TOP OF THE THING WHEN SHE YANKED

9    BACK IN.  THAT'S WHAT GETS ME UP THERE, YES.

10   Q    OKAY.  NOW, YOU'VE GOT HER STANDING IN THE

11   THRESHOLD TO SOME EXTENT; RIGHT?

12   A    SHE'S IN THE DOORWAY MOST OF THAT TIME.

13   Q    IN THE DOORWAY.  NOW, YOU DID A DECLARATION IN

14   REGARDS TO THIS CASE, DIDN'T YOU?

15   A    YES, WITH MR. VINCENT.

16   Q    HE PREPARED IT, RIGHT?

17           MR. VINCENT:  OBJECTION.

18           THE WITNESS:  I DON'T KNOW WHAT YOU MEAN

19   BY THAT, SIR.

20   BY MR. KOVACEVICH:

21   Q    WELL, WHAT DO YOU MEAN MR. VINCENT?

22   A    YOU'RE CONFUSING ME, SIR.  I'M SORRY.

23   Q    WELL, I ASKED YOU IF YOU DID A DECLARATION IN

24   THIS CASE, AND I THOUGHT YOU JUST SAID MR. VINCENT.

25           MR. VINCENT:  THAT MISSTATES HIS

1    TESTIMONY.  OBJECTION.

2            MR. KOVACEVICH:  WELL, I'M SORRY, THEN.

3    Q    WHAT DID YOU SAY?

4            THE COURT:  WHY DON'T WE CLEAR IT UP.

5            WHY DID YOU DO THE DECLARATION, OR WHO

6    DID YOU DO IT FOR?

7            THE WITNESS:  I BELIEVE I DID A

8    DECLARATION WITH MR. VINCENT.

9    BY MR. KOVACEVICH:

10   Q    OH, YOU SAID "WITH MR. VINCENT.  MAYBE I

11   MISHEARD YOU.  I'M SORRY.

12           OKAY.  IN YOUR -- IN THAT DECLARATION,

13   DID YOU EVER SAY ANYTHING ABOUT HER BEING IN THE

14   DOORWAY LIKE YOU DESCRIBED?

15   A    I DON'T REMEMBER THAT DECLARATION, SIR.

16   AND --

17   Q    OKAY.  WELL, LET ME SHOW IT TO YOU (HANDING).

18           SO I WANT YOU TO LOOK THIS OVER.  I WOULD

19   DIRECT YOU TO 13-14 BECAUSE I THINK THAT'S WHERE

20   THE SEQUENCE OF EVENTS BASICALLY ARE.

21           AND IF YOU COULD TELL ME IF YOU SAY

22   ANYTHING IN THERE ABOUT HER BEING IN THE THRESHOLD,

23   A FOOT BEYOND IT, OR HER WRIST BEYOND IT OR

24   ANYTHING LIKE THAT.

25           MR. VINCENT:  I'M GOING TO OBJECT TO THE

1    RELEVANCE OF THIS.  IT'S NOT -- IT'S NOT IMPEACHING

2    IF HE DIDN'T SAY IT.

3            THE COURT:  WELL, CAN I SEE THE

4    DECLARATION THAT YOU'RE -- LET ME LOOK AT IT.

5            THE WITNESS:  YES, SIR (HANDING).

6            THE COURT:  THE PROBLEM I HAVE WITH THE

7    QUESTION IS THERE'S NO INDICATION THAT HE WAS ASKED

8    TO DESCRIBE THE PARTICULAR LOCATION.

9            MR. KOVACEVICH:  CAN WE APPROACH THE

10   BENCH, THEN?

11           THE COURT:  ALL RIGHT.

12           (SIDE-BAR DISCUSSION OFF THE RECORD.)

13   BY MR. KOVACEVICH:

14   Q    YOU HEARD OFFICER VOORHEES DESCRIBE THAT YOU

15   HELPED HIM WRITE YOUR REPORT, OR THE REPORT IN THIS

16   CASE?

17   A    I'M GOING TO -- AS A TRAINING OFFICER, HE

18   WRITES THE REPORT.

19   Q    WELL, MY QUESTION IS, DID YOU HEAR WHAT HE

20   SAID?

21   A    ABOUT WHICH PART, SIR?

22   Q    ABOUT YOU ASSISTING IN WRITING THE REPORT.

23   A    CORRECT.

24   Q    OKAY.  DO YOU HAVE ANY DISPUTE WITH THAT?

25   A    NOT IN WRITING THE REPORT.  IT'S -- I'M THE

1    ARM THAT EXISTS BETWEEN OFFICER VOORHEES AS A BRAND

2    NEW TRAINEE AND A SERGEANT THAT REVIEWS REPORTS.

3            MY RESPONSIBILITY IS TO GIVE HIM A

4    GUIDELINE OF HOW GENERAL REPORTS ARE WRITTEN.

5            THIS REPORT IS NOT THAT COMPLEX OF A

6    REPORT, SO JUST GIVE HIM AN OUTLINE OF, OKAY, YOU

7    HAVE TO START OUT WITH CONTACTED SO AND SO, YOU

8    WENT HERE, THIS IS WHAT HAPPENED.

9            BUT THE IMPORTANT PART ABOUT A REPORT IS

10   THE REPORT IS FOR THAT -- FOR THE OFFICER WHO

11   WRITES THAT REPORT, THAT'S WHO THAT REPORT IS FOR,

12   AS WELL AS GETTING CHARGES FILED.

13           BUT IT'S FOR OFFICER VOORHEES'S MEMORY A

14   COUPLE YEARS DOWN THE ROAD.  HE'S THE INVESTIGATING

15   ARRESTING OFFICER, IN THIS CASE IN PARTICULAR.

16           THAT REPORT IS SUPPOSED TO BE CONCISE AND

17   TO THE POINT FOR EASE OF REVIEW FROM ATTORNEYS, AND

18   FOR OFFICER VOORHEES TO REMEMBER.

19           MY POINT IS THAT I'M NOT WRITING THIS

20   REPORT WITH OFFICER VOORHEES.  I'M ASSISTING HIM IN

21   MAKING IT INTO A REPORT THAT OUR AGENCY WOULD

22   GENERALLY SUBMIT TO GO FORWARD.

23   Q    WELL, IF SOMETHING IMPORTANT IN THE CASE WAS

24   MISSING, WOULD YOU HAVE CALLED HIS ATTENTION TO

25   THAT?

1054

```
1      A    WELL, OF COURSE.

2            BUT THIS REPORT IS WRITTEN -- HE HAS TO

3    WRITE THIS REPORT FROM HIS PERSPECTIVE, HIS POINT

4    OF VIEW.  I CAN'T HAVE HIM WRITE IN THINGS THAT HE

5    MIGHT NOT HAVE SEEN.  THIS IS HIS REPORT.

6            IF I HAVE HIM WRITE SOMETHING THAT I SEE

7    OR SOMEBODY ELSE SEES, THAT'S IMPROPER.  THAT'S

8    INAPPROPRIATE.

9            YOU JUST LIST THOSE PEOPLE AS A WITNESS

10   IN THE CASE AND YOU LET THEM TESTIFY OR GO ABOUT

11   MAKING THE CLAIM OR THE STATEMENT THEY HAVE.

12   Q    YOU MEAN -- YOU MEAN OFFICERS DON'T

13   COLLABORATE WHEN A REPORT'S BEING WRITTEN AS TO

14   MAKING SURE THAT IT HAS ALL THE DETAILS?

15   A    I WOULDN'T USE THE WORD "COLLABORATE."

16   Q    WHAT WOULD YOU USE?

17   A    JUST -- WE'RE JUST ENSURING AT THIS POINT, AND

18   I -- FOR THIS REPORT IN PARTICULAR -- DO YOU WANT

19   TO TALK ABOUT THIS REPORT OR IN A GENERAL SENSE AS

20   AN FTO TRAINEE, AS A SERGEANT?  IT VARIES

21   THROUGHOUT HOW OFFICERS WRITE REPORTS.

22           IT -- THIS REPORT IS, LIKE I SAID, MADE

23   FOR OFFICER VOORHEES TO REMEMBER FROM HIS

24   PERSPECTIVE.

25           I CAN'T INPUT THINGS IN HIS REPORT THAT
```

1    HE MIGHT NOT HAVE SEEN.

2    Q    OKAY.  BUT YOU CAN WRITE YOUR OWN; RIGHT?

3    A    CORRECT.

4    Q    AND YOU DIDN'T; RIGHT?

5    A    IT'S VERY UNCOMMON FOR TWO OFFICERS TO WRITE

6    REPORTS ABOUT THE SAME INCIDENT.

7             WHAT YOU WOULD DO IN THAT CASE IS LOG

8    DOWN THE D.A.'S FOR THEM TO REVIEW, BECAUSE

9    SOMETIMES THERE ARE 15, 20 OFFICERS THAT GO TO ONE

10   SCENE.  CAN YOU IMAGINE HAVING 15 OR 20 REPORTS

11   HAVING TO BE WRITTEN, REVIEWED, SENT TO THE D.A.?

12             YOU'RE MAKING A LOT OF PAPERWORK FOR A

13   VERY SIMPLE INCIDENT THAT COULD BE EXPLAINED BY

14   WITNESSES COMING IN AND TESTIFYING TO WHAT HAD

15   HAPPENED.

16   Q    OKAY.  DID YOU LOOK AT THIS REPORT TO REFRESH

17   YOUR MEMORY BEFORE TESTIFYING?

18   A    SURE I DID.

19   Q    OKAY.  SO YOU USED IT AS WELL; RIGHT?

20   A    CORRECT.

21   Q    ALL RIGHT.  AND YOU'RE SUPPOSED TO PUT DETAILS

22   OF WHAT HAPPENED IN THE REPORT; RIGHT?  YOU'RE

23   SUPPOSED TO COVER EVERYTHING; RIGHT?

24   A    NO, NO, NO.

25   Q    NO?  HM.

                                                    1056

1    A    DETAILS -- THAT'S WHAT I'M REFERRING TO.  IF

2    YOU WERE TO PUT DETAILS, THIS IS -- THIS IS JUST MY

3    VERSION RIGHT HERE.  THIS IS MY STATEMENT OF WHAT

4    HAPPENED HERE (INDICATING).

5              AND WE HAVE THE OPPORTUNITY TO HAVE A

6    LADY LIKE THIS LADY SITTING WITH ME AND TYPING THIS

7    THE ENTIRE TIME.

8              DETAILS ARE IMPORTANT.  BUT YOU HAVE TO

9    WEIGH DETAILS WITH THE ABILITY FOR AN OFFICER TO DO

10   ALL OF HIS JOB.

11             MY JOB -- IF I WAS TO DO THIS

12   (INDICATING), MY JOB WOULD BE HER JOB.

13             MY JOB IS TO BE OUT THERE ON THE ROAD AND

14   MAKE SURE THAT PEOPLE GET SERVICE.  I HAVE MAJOR

15   INJURY COLLISIONS TO GO TO, FATALS, DRUNK DRIVERS

16   TO ARREST TO PREVENT THEM FROM CREATING OTHER

17   FATALS.

18             IF YOU WERE TO BOG DOWN A D.A.'S OFFICE

19   WITH ONE -- MIND YOU, THIS IS JUST ME -- IF YOU

20   LOOK AT ALL THOSE BOXES THEY HAVE, THOSE ARE

21   DETAILS.

22             THIS IS WHAT AN OFFICER WRITES

23   (INDICATING).  I MEAN IF AN OFFICER WAS TO WRITE

24   THIS (INDICATING), YOU WOULDN'T HAVE OFFICERS.

25   YOU'D HAVE TYPISTS.

1    Q    OKAY.  SO THE DETAILS THAT YOU JUST TOLD US

2    HERE ABOUT WHERE HER FOOT WAS, WHERE HER SHOULDER

3    WAS ARE NOT IN YOUR REPORT, IN THAT REPORT, ARE

4    THEY?

5    A    IN WHICH REPORT, SIR?

6    Q    THE REPORT.  THERE'S ONLY ONE REPORT?

7    A    THE ARREST REPORT.  I DON'T KNOW WHAT YOU -- I

8    GUESS THIS IS A DEPOSITION.  YOU'RE RIGHT.  SORRY.

9    Q    OKAY.  LET'S GET OUR NOMENCLATURE STRAIGHT

10   HERE.

11        IT'S NOT IN THERE (INDICATING); RIGHT?

12   A    IN THE REPORT, NO.

13   Q    OKAY.

14   A    WELL, I TAKE THAT BACK.

15        IN THE LATTER PORTION OF THE REPORT, JUST

16   BEFORE THE ARREST, IT DOES SAY "SANDRA FEE WAS

17   REMOVED FROM THE DOORWAY," AND THAT'S A -- IT'S

18   A -- THAT'S PRETTY SPECIFIC TO ME.

19   Q    DO YOU HAVE YOUR REPORT WITH YOU?

20   A    YEAH.

21   Q    OKAY. LET'S LOOK AT THAT REFERENCE.  PAGE 5.

22   PAGE 6, I'M SORRY, LINE 33.

23        IT ACTUALLY READS, "RIOUX REMOVED FEE

24   FROM INSIDE THE DOORWAY," DOESN'T IT?

25   A    NO.  THAT'S NOT THE SECTION I'M REFERRING TO,

```
 1    SIR.  IT MAY TAKE ME A MINUTE.  I DIDN'T HIGHLIGHT

 2    IT OR ANYTHING.

 3              BUT IT DOES SAY IN HERE, WHEN IT TALKS

 4    ABOUT THE ACTUAL ARREST, THAT SHE WAS IN THE

 5    DOORWAY.  THAT'S THE SUMMARY YOU'RE LOOKING AT.

 6              THE ARREST HAS A QUICK SUMMARY FOR THE

 7    D.A. TO LOOK AT, AND THEN IT HAS THE ACTUAL REPORT

 8    ATTACHED.  SO THAT'S -- YOU'RE GETTING INTO MORE

 9    DETAIL.

10    Q   WELL, SHOW ME WHERE.  I'VE GOT WHAT I WAS TOLD

11    IS YOUR REPORT.  SHOW ME.  SHOW ME WHERE IT IS IN

12    THE REPORT.

13    A   IF YOU CAN JUST GIVE ME A COUPLE MINUTES.

14              WELL, IT MIGHT TAKE A LITTLE BIT LONGER.

15              (PAUSE IN PROCEEDINGS.)

16              THE WITNESS:  IT'S ON PAGE 6, LINE 33,

17    AND IF YOU'D LIKE ME TO READ THAT TOWARDS THE END

18    THERE, BEGINNING WITH "RIOUX."

19    BY MR. KOVACEVICH:

20    Q   OKAY.

21    A   "RIOUX REMOVED FEE FROM INSIDE THE DOORWAY AND

22    INSTRUCTED FEE TO STOP RESISTING."

23    Q   RIGHT.

24    A   YEAH.

25    Q   BUT YOU SAID SHE WAS IN THE DOORWAY.
```

1    A    YEAH.  SIR, THIS IS -- WE'RE JUST REGULAR

2    COPS.  WE'RE NOT GOING TO -- THIS IS JUST HOW IT'S

3    WRITTEN.

4    Q    OKAY.

5    A    BUT IT SAYS RIGHT THERE "DOORWAY."  IT DOESN'T

6    SAY "INSIDE THE HOUSE."

7    Q    BUT EARLIER IN THE REPORT, IT ALSO SAYS, ON

8    LINE 22, "RIOUX AND I CONTACTED ONE FEMALE INSIDE

9    THE RESIDENCE."  RIGHT?

10   A    INITIALLY SHE WAS INSIDE THE RESIDENCE, YES,

11   SIR.

12   Q    OKAY.  AND THEN IT SAYS, HE BLOCKED --

13   RIOUX -- ON LINE 26, "RIOUX BLOCKED FEE FROM

14   CLOSING THE DOOR AND DIRECTED HER TO STEP OUTSIDE

15   AND TALK TO US ABOUT THE TRAILER."  RIGHT?

16   A    THAT'S WHAT IT SAYS, YES.

17   Q    OKAY.  AND THEN ON LINE 31, IT SAYS "RIOUX

18   REMOVED HIS O.C. SPRAY FROM ITS CASE AND INSTRUCTED

19   FEE TO COME OUTSIDE."  RIGHT?

20   A    CORRECT.

21   Q    OKAY.

22   A    AGAIN, JUST THE TERM, COME OUT AS IN OUT WITH

23   US, NOT ON THE STAIRS.

24   Q    ALL RIGHT.  NOW, IS THERE ANYTHING IN YOUR

25   REPORT ABOUT YOUR PINKY?

1    A    THAT'S NOT -- THIS ISN'T MY REPORT.  THIS IS

2    OFFICER VOORHEES'S REPORT.

3    Q    IF I MISSTATE THAT, I'M SORRY.  THE REPORT.

4         IS THERE ANYTHING IN THE REPORT ABOUT

5    YOUR PINKY?

6    A    IT SAYS STRUGGLING WITH OFFICER RIOUX.

7    Q    WELL, IS THAT A YES OR NO TO MY QUESTION,

8    THEN?

9    A    YES, IT DOES SAY THAT -- THAT'S CONTAINED IN

10   THAT.  IT DOESN'T REFER SPECIFICALLY TO A PINKY,

11   BUT --

12   Q    BUT OFFICER RIOUX?

13   A    STRUGGLING.

14   Q    IF THIS MAN HAS TO WRITE IT AND YOU CAN'T

15   WRITE IT, HOW DO YOU KNOW THAT'S WHAT IT REFERS TO,

16   THEN?

17   A    WELL, IT'S ALL INCLUSIVE, SIR.

18   Q    DO YOU KNOW THAT HE SAW YOUR PINKY GETTING

19   HURT OR BENT?

20   A    OBVIOUSLY -- OBVIOUSLY HE DIDN'T TESTIFY TO

21   THAT.

22   Q    THAT'S RIGHT.

23   A    CORRECT.

24   Q    SO THEN HOW ARE YOU DRAWING THE CONCLUSION

25   THAT HE INCLUDED IT IN HIS REPORT?

1    A    WELL, YOU'RE ASKING ME.

2              MR. VINCENT:  OBJECTION.  ARGUMENTATIVE.

3              THE COURT:  THAT'S NOT WHAT HE'S SAYING.

4              MR. KOVACEVICH:  WELL, I THOUGHT HE SAID

5    IT'S ALL ENCOMPASSED WITHIN THAT ONE PHRASE.

6              THE COURT:  THAT'S HOW HE READS THE

7    REPORT.

8    BY MR. KOVACEVICH:

9    Q    SO THAT'S HOW YOU READ THAT REPORT IS THAT

10   THAT SPEAKS TO YOUR PINKY?

11   A    THAT SPEAKS TO EVERYTHING THAT OCCURRED WITH

12   THE STRUGGLING, YES, SIR.

13   Q    ALL RIGHT.  SO WERE YOU IN DANGER AS YOU WERE

14   GOING THROUGH THESE MOTIONS WITH MS. FEE OF GETTING

15   HURT?

16   A    YES, I WAS IN DANGER.

17   Q    YEAH.  YOU WERE REAL CONCERNED YOU WERE GOING

18   TO GET A BROKEN FINGER AT THE MINIMUM; RIGHT?

19   A    AT THE END THERE.  BUT I CAN SEE HOW

20   OFFICER VOORHEES COULD, AS A --

21   Q    NO, I'M NOT ASKING YOU ABOUT THAT.

22             THE COURT:  THE QUESTION IS WHETHER OR

23   NOT YOU WERE CONCERNED THAT YOU WERE GOING TO GET

24   HURT.

25             THE WITNESS:  YES, I WAS CONCERNED I WAS

1    GOING TO BE HURT.

2    BY MR. KOVACEVICH:

3    Q    OKAY.  WHAT WAS THE LEVEL OF CONCERN?

4    A    WELL, ONCE SHE GOT THAT PINKIE, EXTREME.

5    Q    DID YOU CALL OUT -- HOW DO YOU ADDRESS HIM

6    WHEN YOU WERE --

7    A    VOORHEES.

8    Q    YOU ADDRESS HIM WHEN YOU'RE IN THE CAR WITH

9    HIM AS VOORHEES?

10   A    I'LL -- I WOULD SUSPECT THAT MOST POLICE

11   OFFICERS REFER TO EACH OTHER AS LAST NAMES BECAUSE

12   EVERYBODY IS NAMED BRIAN OR TOM OR TIM.

13   Q    OKAY.  SO YOU -- DID YOU CALL OUT, "HEY,

14   VOORHEES, COME HERE, I NEED HELP"?

15   A    NO.  AS SOON AS SHE STARTED BENDING THAT

16   FINGER BACK, THERE WAS NO TIME FOR THAT.  I WAS

17   AFRAID SHE WAS GOING TO BREAK THAT FINGER.  IT WAS

18   IMMEDIATE.

19         I PULLED HER OUTSIDE OF THE HOUSE.  THERE

20   WAS NO NEED FOR ME TO YELL TO VOORHEES AT THAT

21   TIME, AND THERE WASN'T ENOUGH TIME.  I JUST DID

22   WHAT I NEEDED TO DO TO MAKE SURE THAT MY FINGER

23   DIDN'T GET BROKEN.

24   Q    OKAY.  I NEED TO FIGURE THIS ONE OUT.

25         THE COURT:  LET'S NOT MAKE THE COMMENTS.

1    YOU CAN ASK QUESTIONS, BUT --

2    BY MR. KOVACEVICH:

3    Q    YOU GRAB HER WRIST, SHE PULLS YOU UP THE

4    STAIRS, PULLS YOU, YOUR WRIST, BEYOND THE PLANE OF

5    THE DOOR FRAME; RIGHT?

6    A    JUST INSIDE, YES.

7    Q    AND THEN SHE IS STRUGGLING WITH YOU IN SOME

8    WAY?

9    A    EVERY WAY I JUST MENTIONED.

10   Q    WELL, TELL ME, WHAT WAS THAT?

11   A    WELL, SHE'S TWISTING HER ARM BACK AND FORTH

12   (INDICATING), YANKING ON THE DOOR (INDICATING),

13   HITTING THE DOOR LIKE THIS (INDICATING), CRUSHING

14   IT AGAINST MY HAND, EVERYTHING THAT WAS ALREADY

15   TESTIFIED TO (INDICATING).

16   Q    AND WHEN SHE'S HITTING THE DOOR LIKE THIS

17   (INDICATING), WHERE'S THE DOOR?

18   A    I'M SORRY?

19   Q    WELL, YOU WERE MOTIONING WITH YOUR FOREARM,

20   SHE'S HITTING THE DOOR LIKE THIS (INDICATING).

21   WHERE'S THE DOOR AT THAT TIME?

22   A    HER SHOULDER IS -- THE DOOR IS ON THE INSIDE

23   OF HER SHOULDER NOW.  AFTER SHE'S ALREADY PULLED MY

24   HAND INSIDE, SHE'S THRUSTING HER SHOULDER AND BODY

25   INTO THE DOOR WHILE SHE HAS MY HAND ON THE INSIDE

1    (INDICATING).

2    Q    I SEE.  AND THEN SHE'S USING HER LEFT SHOULDER

3    TO PUSH THE DOOR IN?

4    A    YES.

5    Q    AND THEN SHE USES WHICH HAND TO TRY AND PRY

6    YOUR PINKY OFF?

7    A    SHE GIVES UP TRYING TO DO THE DOOR AND SHE

8    USES HER LEFT HAND TO TRY TO GET MY FINGERS OFF AND

9    EVENTUALLY GETS MY PINKY PULLED OFF AND BENT IT

10   BACK (INDICATING).

11   Q    OKAY.  DID YOU EVER -- AND HOW WIDE OPEN WAS

12   THE DOOR AT THAT POINT?

13   A    AT WHICH POINT, SIR?

14   Q    WHEN SHE'S PRYING THE PINKY BACK.

15   A    IT OPENED BACK UP A BIT NOW.  INITIALLY IT'S

16   CLOSING BETWEEN, YOU KNOW, LESS THAN A FOOT,

17   CLOSING IN.

18   Q    IF YOU TESTIFIED AT YOUR DEPOSITION FIVE

19   INCHES OR SO --

20   A    THAT'S WHAT I'M GETTING TO, SIR.  MAYBE THE

21   DISTANCE OF MY WRIST HERE (INDICATING).

22   Q    OKAY.  AND SHE'S REALLY JAMMING IT UP AGAINST,

23   WHAT, THE DOORJAMB AND THE END OF THE DOOR?

24   A    JAMMING WHAT?

25   Q    YOUR WRIST.

1    A    YEAH.  IT'S -- MY WRIST IS BEING CRUSHED

2    BETWEEN THE DOORJAMB AND THE DOOR WITH HER WEIGHT

3    BEHIND IT.

4    Q    OKAY.  SO WHAT WAS YOUR CONCERN ABOUT DAMAGE

5    TO YOUR WRIST?  DID YOU HAVE ANY?

6    A    WELL, I TOLD HER SHE WAS HURTING ME, BUT IT

7    WASN'T -- IT WAS SUCH A SMALL GAP THAT SHE'S

8    BOUNCING ON THAT, QUITE FRANKLY, IT WAS

9    UNCOMFORTABLE AND PAINFUL, BUT I DIDN'T THINK I WAS

10   GOING TO BE BADLY HURT BY THAT.

11        IN FACT, I REMAINED CALM, TELLING HER,

12   "MA'AM, STOP RESISTING."  I USED A STERN VOICE,

13   "STOP RESISTING, COME OUTSIDE."

14        I'M TRYING TO, AT THIS POINT, GET HER TO

15   JUST RELAX, COME OUTSIDE AND NOT LET IT ESCALATE

16   ANY FURTHER.

17   Q    I UNDERSTAND.  SO AFTER SHE RELEASES HER

18   SHOULDER FROM THE DOOR AND SHE DIVERTS HER LEFT

19   HAND TO YOUR LEFT HAND, SHE'S TRYING TO PRY THE

20   PINKY OFF, THE DOOR OPENS UP THEN?

21   A    YEAH, THE DOOR OPENS UP A BIT.

22   Q    YOU SAID A BIT.  HOW MUCH IS A BIT?

23   A    I DON'T KNOW.  I CAN SEE HER COMPLETE BODY

24   NOW.

25   Q    DO YOU CONSIDER, IN REGARD TO WHAT ACTIONS YOU

1    TOOK HERE IT, HAVING ANY SIGNIFICANCE AS TO WHERE

2    HER BODY WAS IN RELATION TO THE DOORWAY?

3    A    PERSONALLY?

4    Q    WELL, FROM THE PROPRIETY OF YOUR ACTIONS IN

5    THIS CASE.

6            MR. VINCENT:  OBJECT.  IT CALLS FOR LEGAL

7    CONCLUSION.

8            THE COURT:  AT THE TIME OF THE INCIDENT?

9            MR. KOVACEVICH:  AT THE TIME OF THE

10   INCIDENT.

11           MR. VINCENT:  I'M -- YOUR HONOR, I --

12   THIS IS VAGUE.  I DON'T KNOW WHETHER HE'S ASKING

13   HIM WHAT HE'S THINKING NOW --

14           THE COURT:  YEAH, I THINK THAT'S FAIR.

15           I THINK THE QUESTION, AT LEAST I

16   UNDERSTOOD IT, THAT WAS BEING ASKED WAS, AT THE

17   TIME YOU WERE AT THE RESIDENCE, DID YOU FEEL IT WAS

18   SIGNIFICANT THE LOCATION OF YOU AND MS. FEE?

19           IS THAT FAIR?

20   BY MR. KOVACEVICH:

21   Q    IN RELATION TO THE DOORWAY.

22   A    WITH HER BEING IN THE DOORWAY, I WASN'T

23   CONCERNED.

24   Q    PARDON?

25   A    WITH HER AT THE DOORWAY, I WASN'T -- IT WASN'T

1    A CONCERN AT THE TIME, NO.

2    Q    OKAY.  AND SUBSEQUENT TO THAT, HAVE YOU HAD A

3    CONCERN ABOUT WHO WAS WHERE?

4              MR. VINCENT:  I OBJECT.  IT CALLS FOR

5    LEGAL CONCLUSION.

6              THE COURT:  I'LL SUSTAIN THAT.  I THINK

7    THE QUESTION IS THE STATE OF MIND AT THE TIME OF

8    THE INCIDENT.

9              MR. KOVACEVICH:  WELL, IN TERMS OF --

10             THE COURT:  I'M GOING TO SUSTAIN IT.

11             GO AHEAD.

12             MR. KOVACEVICH:  OKAY.

13   Q    DID YOU EVER TELL MR. ZWICKEY THAT YOU USED

14   THE O.C. SPRAY AT HER WHEN YOU WERE AT THE DOORWAY?

15   A    NO.

16   Q    ALL RIGHT.  AND DO YOU KNOW IF A CALIFORNIA

17   HIGHWAY PATROL REPORT 268 WAS PREPARED IN THIS

18   CASE?

19   A    SERGEANTS ARE RESPONSIBLE FOR FILING THOSE.

20   OUR DUTY IS TO INFORM THE SERGEANT WHAT HAPPENED.

21             THE SERGEANT ACKNOWLEDGED ON THE RADIO AT

22   THE TIME, AND SERGEANT CERVANTES REVIEWED THE

23   REPORT.

24             SO I DON'T KNOW IF ONE WAS FILED OR NOT.

25   Q    AND WHAT IS THE MINIMUM DISTANCE WHICH YOU

1    SHOULD BE FROM A PERSON WHEN YOU DISCHARGE THE

2    SPRAY?

3    A    THERE IS NO MINIMUM DISTANCE.  IT'S ALL

4    DEPENDENT ON THE SITUATION.

5              HOWEVER, OUR GUIDELINES ARE 3 TO 12 FEET

6    IS AN OPTIMUM RANGE.  THAT'S FOR THE BEST --

7    Q    IS THERE A POTENTIAL HARM IF YOU'RE CLOSER

8    THAN 3 FEET?

9              MR. VINCENT:  OBJECTION.  CALLS FOR

10   SPECULATION AND CALLS FOR EXPERT OPINION.

11             THE COURT:  HE CAN ANSWER THE QUESTION AS

12   TO HIS UNDERSTANDING.

13             THE WITNESS:  WELL, DEFINITELY.  THE

14   SPRAY COMES OUT IN A STREAM.  IF YOU WERE TO PUT IT

15   DIRECTLY INTO SOMEBODY'S EYE, IT COULD POTENTIALLY

16   HURT THEM.

17   BY MR. KOVACEVICH:

18   Q    WHAT ABOUT A FOOT FROM THE EYE?

19   A    SIR, I DON'T -- THAT'S EXPERT.

20   Q    OKAY.

21   A    I DON'T KNOW.

22   Q    BUT IT COMES OUT WITH SOME FORCE; RIGHT?

23   A    YEAH, IT'S PROPELLED.  IT HAS A PROPELLANT IN

24   THERE.

25   Q    OKAY.  DID YOU -- AT THE TIME DURING THIS

1    STRUGGLE, ONCE YOU HAD A PHYSICAL HOLD OF HER FROM

2    THE BEGINNING, DID YOU LOSE CONTROL OF HER

3    PHYSICALLY AT ANY POINT IN TIME?

4    A    I'M SORRY.  REPEAT THE QUESTION.

5    Q    ONCE YOU GRABBED HER, FROM THAT POINT FORWARD

6    UNTIL AFTER YOU GOT HER OUT, DID YOU LOSE ACTUAL

7    CONTROL OF HER PHYSICALLY AT ANY POINT IN TIME?

8              MR. VINCENT:  OBJECTION.  MISSTATES THE

9    TESTIMONY.

10             THE COURT:  HE'S ASKING WHETHER OR NOT HE

11   EVER LOST CONTROL.  HE CAN SAY WHETHER HE DID OR

12   DIDN'T.

13             YOU CAN ANSWER.

14             THE WITNESS:  FROM THE TIME THAT I

15   GRASPED HER HAND AND SHE PULLED IT BACK IN TO THE

16   TIME THAT WE GOT DOWN THE STEPS AGAIN AND I

17   RELEASED THE O.C. TO HER, NO.

18             MR. KOVACEVICH:  OKAY.  52:11 TO 21.

19             MR. VINCENT:  I DON'T THINK -- I THINK

20   THE ANSWER ISN'T COMPLETE THERE.

21             THE COURT:  DO YOU WANT HIM TO READ

22   FURTHER?

23             MR. VINCENT:  YES, ALL THE WAY TO 53:6.

24             THE COURT:  DO YOU HAVE ANY OBJECTION TO

25   THAT?

1    MR. KOVACEVICH:  NO.

2    THE COURT:  OKAY.  GO AHEAD.

3    MR. KOVACEVICH:  OKAY.  "AND THEN NEXT --

4    AGAIN REPEAT, YOU KNOW, TO SOME EXTENT WHAT YOU

5    ALREADY TESTIFIED TO WHEN YOU GAVE YOUR LONG

6    ANSWER, WHICH I'M NOT BEING CRITICAL OF, SHE'S

7    DOING THAT WITH THE DOOR AND YOU'RE PUSHING AGAINST

8    IT AND THEN WHAT?

9    "ANSWER:  EVENTUALLY I LET GO BECAUSE I

10   REALIZED THAT BECAUSE OF THE ANGLE I'M AT AND HOW

11   THINGS ARE, I CAN'T" FIND "THE WEIGHT OF HER BODY

12   SLAMMING" -- "I CAN'T FIGHT," I'M SORRY.

13   THE WITNESS:  THANK YOU.

14   MR. KOVACEVICH:  -- "THE WEIGHT OF HER

15   BODY SLAMMING AGAINST THE DOOR ON MY WRIST.

16   "SO I PULL OUT MY O.C. SPRAY, AND I TELL

17   HER, 'MA'AM, YOU'RE BEING DETAINED.  STOP RESISTING

18   OR I WILL SPRAY YOU.'

19   "AND SHE IS STRUGGLING.  'NO, NO.'  SHE'S

20   PULLING BACK IN, SLAMMING THE DOOR ON MY WRIST.

21   "WE GET TO THE POINT WHERE WE HAVE ARGUED

22   BACK AND FORTH.  I GET THE DOOR OPEN AND PULL HER

23   OUTSIDE AND SHE TWIRLS INTO THIS COURTYARD.  SHE'S

24   STILL STANDING.

25   "I TELL HER AGAIN, 'YOU ARE UNDER ARREST.

1    LAY DOWN AND PUT YOUR HANDS TO YOUR SIDES.'

2            "AND SHE SAYS 'NO' AND I SPRAY HER.  ONCE

3    I SPRAY HER, SHE GOES RIGHT DOWN TO THE GROUND ON

4    HER FOURS."

5            THE WITNESS:  IS THAT A QUESTION?  I

6    DON'T -- I MUST HAVE MISSED THE QUESTION, SIR.

7    BY MR. KOVACEVICH:

8    Q    NO.  I JUST READ IT INTO THE RECORD.

9    A    THAT -- AND FOR THAT, I'M NOT REFERRING TO

10   THE --

11           THE COURT:  THERE'S NOT A QUESTION

12   PENDING.

13           MR. VINCENT:  YOUR HONOR, I'M GOING TO

14   MOVE TO STRIKE THE READING OF THAT TRANSCRIPT SINCE

15   IT DIDN'T --

16           THE COURT:  HE CAN USE THE DEPOSITION OF

17   A PARTY FOR ANY PURPOSE.  HE CAN READ IT IN, AND IF

18   YOU HAVE QUESTIONS ABOUT IT, YOU CAN ASK THEM.

19           MR. VINCENT:  OKAY.

20   BY MR. KOVACEVICH:

21   Q    IS THERE ANY MENTION IN THE POLICE REPORT

22   ABOUT YOU PUSHING THE DOOR IN?

23   A    YES.

24   Q    OKAY.  I THINK YOU HAVE MY COPY OF THE REPORT,

25   DON'T YOU?

1    A    THIS IS MY COPY OF THE ACTUAL REPORT, SIR.

2    Q    OKAY.

3    A    I HAVE YOUR DEPOSITION.

4    Q    I'M SORRY.  OH, YOU'RE RIGHT.  I GAVE YOU THE

5    DECLARATION.

6         CAN YOU FIND THAT FOR ME?

7    A    THE REFERENCE -- THERE'S SEVERAL REFERENCES.

8    I DON'T KNOW WHICH ONE YOU WANT TO LOOK AT, SIR.

9    Q    WELL, SHOW ME THE FIRST ONE.

10        (PAUSE IN PROCEEDINGS.)

11        THE COURT:  WHY DON'T WE TAKE A RECESS AT

12   THIS TIME UNTIL 11:30.  SO WE'LL BE IN RECESS UNTIL

13   THEN.

14        (WHEREUPON, A RECESS WAS TAKEN.)

15        THE COURT:  ALL RIGHT.  YOU MAY CONTINUE.

16   BY MR. KOVACEVICH:

17   Q    OFFICER RIOUX, WAS ANOTHER CONCERN OF YOURS

18   FOR MS. FEE GOING BACK INTO THE RESIDENCE THAT SHE

19   MIGHT DESTROY EVIDENCE?

20   A    NO.

21   Q    YOU RE-ENTERED MS. FEE'S HOUSE AFTER YOU

22   ARRESTED HER AND TOOK HER OUT TO --

23        MR. VINCENT:  OBJECTION.  BEYOND THE

24   SCOPE OF THE DIRECT EXAMINATION.

25        THE COURT:  WHAT -- I'M NOT SURE WHAT

1073

1   YOU'RE -- LET HIM FINISH THE QUESTION BECAUSE I'M

2   NOT SURE I UNDERSTAND THE QUESTION.

3   BY MR. KOVACEVICH:

4   Q    YOU ENTERED MS. FEE'S HOUSE AFTER YOU HAD

5   ARRESTED HER AND ESCORTED HER TO THE FRONT OF HER

6   PROPERTY, DID YOU NOT?

7            MR. VINCENT:  OBJECTION.

8            THE COURT:  THIS IS BEFORE THEY LEFT THE

9   PROPERTY?

10           MR. KOVACEVICH:  RIGHT.

11           MR. VINCENT:  THIS WAS NOT COVERED IN THE

12  DIRECT EXAMINATION.

13           THE COURT:  I'LL ALLOW THE QUESTION.  I

14  THINK IT'S WITHIN THE SCOPE.

15           GO AHEAD.

16           THE WITNESS:  SHE HAD ASKED US TO

17  RETRIEVE HER KEYS FOR HER CAR WHEN WAS PARKED IN

18  THE GARAGE.

19  BY MR. KOVACEVICH:

20  Q    DID SHE ASK YOU DIRECTLY?

21  A    YEAH, SHE ASKED ME TO GO GET THE KEYS.

22  Q    OKAY.  YOU HEARD HER TESTIFY THAT SHE DIDN'T

23  GIVE YOU THAT PERMISSION, RIGHT, OR ASK YOU THAT?

24           MR. VINCENT:  OBJECTION.  MISSTATES THE

25  TESTIMONY.

1074

1              THE COURT:  OVERRULED.

2              I MEAN SUSTAINED.

3              I THINK YOU CAN ASK HIM WHAT HE

4     REMEMBERS, BUT ASKING HIM TO --

5     BY MR. KOVACEVICH:

6     Q    DO YOU RECALL WHAT SHE TESTIFIED TO IN THAT

7     REGARD?

8              MR. VINCENT:  OBJECTION.

9              THE COURT:  I'LL SUSTAIN THE OBJECTION.

10    YOU CAN ASK HIM WHAT HE RECALLS OF THE EVENTS, BUT

11    ASKING A WITNESS, ALTHOUGH I'VE ALLOWED IT A COUPLE

12    TIMES, TO RECALL SOMEBODY ELSE'S TESTIMONY I REALLY

13    DON'T THINK IS PROPER.

14             MR. KOVACEVICH:  ALL RIGHT.

15    Q    DID YOU CHARGE HER WITH BATTERY ON A POLICE

16    OFFICER?

17    A    NO.

18             MR. KOVACEVICH:  OKAY.  THANK YOU.

19    THAT'S ALL I HAVE.

20             THE COURT:  OKAY.  ANYTHING FURTHER,

21    MR. VINCENT?

22             MR. VINCENT:  YES, YOUR HONOR.

23                  **REDIRECT EXAMINATION**

24    BY MR. VINCENT:

25    Q    MR. KOVACEVICH ASKED YOU A QUESTION ABOUT,

1    FROM YOUR DEPOSITION, AND YOU READ THE -- HE READ

2    THE STATEMENT THAT SAYS "EVENTUALLY I LET GO

3    BECAUSE I REALIZED THAT BECAUSE OF THE ANGLE I'M AT

4    AND HOW THINGS ARE, I CAN'T FIGHT THE WEIGHT OF HER

5    BODY SLAMMING AGAINST THE DOOR ON MY WRIST."

6         WHAT DO YOU MEAN WHEN YOU SAY YOU LET GO?

7    A    I LET GO OF THE DOOR.  I HAD CONTROL OF HER

8    HAND.  I JUST COULDN'T FIGHT THE WEIGHT OF HER BODY

9    SLAMMING AND ME ON THE STAIRS WITH MY ARM, SO

10   THAT'S WHAT I WAS REFERRING TO, NOT MY HAND.

11   Q    AND WHEN YOU SAY YOU HAD CONTROL OF HER HAND,

12   DID YOU FEEL THAT YOU HAD TOTAL CONTROL OF HER AT

13   THAT TIME?

14   A    I DIDN'T HAVE TOTAL CONTROL BECAUSE SHE WAS

15   ALL OVER THE PLACE.  I WAS MERELY TRYING TO

16   MAINTAIN WHAT CONTROL I HAD.

17   Q    OKAY.  SO WHEN HE ASKED YOU DID YOU EVER LOSE

18   CONTROL OF HER, HE'S ASSUMING YOU HAD COMPLETE

19   CONTROL OF THE SITUATION AT THAT TIME, I BELIEVE

20   IS -- WELL, FORGET WHAT I THINK.

21        HOW DID YOU UNDERSTAND THE QUESTION?

22   A    JUST CONTROL OF THAT SPECIFIC PORTION OF HER

23   BODY IS HOW I UNDERSTOOD IT, THE HAND, THE ARM.

24        IN THE QUESTIONING, I DON'T KNOW WHAT

25   YOU'RE REFERRING TO, CONTROL OF THE DOOR OR

1   CONTROL -- I DON'T HAVE THE PAPERWORK IN FRONT OF

2   ME.

3   Q    WELL, THE QUESTION WAS, DID YOU EVER LOSE

4   CONTROL OF HER FROM THE TIME YOU GRABBED HER HAND

5   TO THE TIME THAT YOU WERE DOWN ON THE GROUND?

6   A    I ONLY HAD CONTROL OF THAT HAND.  EVERYTHING

7   ELSE WAS WORKING ON ITS OWN DOING WHATEVER SHE

8   WANTED IT TO DO.

9   Q    OKAY.  AND MR. KOVACEVICH ASKED YOU ABOUT HER

10  PULLING YOU UP THE STAIRS.

11          DID SHE ACTUALLY HAVE THE STRENGTH TO

12  PULL YOU ALL THE WAY UP THE STAIRS?  OR WHAT

13  HAPPENED?

14  A    WELL, IF YOU LOOK AT THE STAIRS -- I WEAR A

15  BIG SHOE HERE.  I WEAR A SIZE 16.  ALL MY FOOT DOES

16  NOT -- ALL MY FOOT DOESN'T FIT ON THAT STEP.

17          WHEN SHE'S PULLING -- WE'RE TAUGHT TO

18  STAND AT A POSITION OF ADVANTAGE, WHICH IS YOUR

19  LEFT FOOT FORWARD AND RIGHT FOOT BACK.

20          WHEN SHE'S PULLING, THAT'S A LONG

21  DISTANCE FROM THE BOTTOM OF THE STAIRS ALL THE WAY

22  TO THE TOP.

23          SHE'S PULLING, AND BECAUSE -- WHEN SHE'S

24  PULLING, I'M FALLING.  I'M -- I DON'T HAVE COMPLETE

25  BALANCE BECAUSE OF WHERE I AM ON THE, AT THE BOTTOM

1    THERE.

2            AND WHEN SHE DOES THAT, I SHOULD HAVE

3    EXPECTED SOMETHING, BUT I GUESS I DIDN'T, AND,

4    YEAH, SHE WAS MORE THAN STRONG ENOUGH TO GET ME UP

5    THERE.  THAT'S FOR SURE.

6    Q    DO YOU -- DID YOU STUMBLE?

7    A    YES.

8    Q    DO YOU KNOW WHERE YOUR FEET ENDED UP WHEN YOU

9    STUMBLED?

10   A    TOWARDS THE TOP OF THE STEP SOMEPLACE, SOME

11   OTHER AREA.  I'M NOT PAYING ATTENTION TO WHERE --

12   AT THAT POINT I'M NOT PAYING ATTENTION TO WHERE MY

13   FEET ARE OR ANYTHING ELSE.

14           I'M PAYING ATTENTION TO MY WRIST BEING

15   CAUGHT IN THE DOORJAMB AND ALL THAT STUFF.

16           MR. VINCENT:  OKAY.  THANK YOU.

17           THE COURT:  ALL RIGHT.  I THINK YOU'RE

18   CONCLUDED.

19           MR. KOVACEVICH:  DID YOU --

20           THE COURT:  OH, I'M SORRY.

21                  **RECROSS-EXAMINATION**

22   BY MR. KOVACEVICH:

23   Q    DID YOU TELL MR. ZWICKEY THAT YOU LOST SOME

24   MOMENTARY PHYSICAL CONTROL OF HER?

25   A    EVENTUALLY, YES, WHEN WE WERE OUT IN THE

```
 1    COURTYARD.

 2    Q    NO, I MEAN WHEN YOU WERE AT THE DOOR.

 3    A    NO.

 4            MR. KOVACEVICH:  OKAY.  THANK YOU.

 5            THE COURT:  OKAY.  IS THAT IT?

 6            MR. VINCENT:  THAT'S ALL, YOUR HONOR.

 7            THE COURT:  OKAY.  YOU MAY STEP DOWN.

 8            THE WITNESS:  THANK YOU, SIR.

 9            THE COURT:  FURTHER WITNESSES?

10            MR. VINCENT:  NO FURTHER WITNESSES, YOUR

11    HONOR.

12            THE COURT:  ALL RIGHT.  MR. KOVACEVICH --

13    I'VE HAD SO MUCH TROUBLE PRONOUNCING YOUR NAME, I

14    APOLOGIZE.

15            MR. KOVACEVICH:  YOU'RE NOT A LONE

16    RANGER.  IT'S KOVACEVICH.

17            THE COURT:  THAT'S WHAT I'VE TRIED TO

18    SAY, BUT IT'S KIND OF COME OUT GARBLED SOMETIMES.

19            MR. KOVACEVICH:  I KNOW.  MR. ZWICKEY.

20            MR. VINCENT:  YOUR HONOR, MY

21    UNDERSTANDING IS THAT THIS WITNESS IS BEING OFFERED

22    FOR REBUTTAL TESTIMONY ONLY.

23            THE COURT:  THAT'S CORRECT.

24            MR. VINCENT:  AND I THINK WE NEED TO

25    DISCUSS WHAT THE PARAMETERS OF THE QUESTIONS ARE,
```

1    IF WE COULD DO THAT AT SIDE-BAR.

2            THE COURT:  SURE.  IF YOU WANT TO COME

3    UP, YOU MAY.

4            (SIDE-BAR DISCUSSION OFF THE RECORD.)

5            THE WITNESS:  GOOD MORNING.

6            THE COURT:  RAISE YOUR RIGHT HAND.

7                    **JARED ZWICKEY,**

8    BEING CALLED AS AN ADVERSE WITNESS ON BEHALF OF THE

9    PLAINTIFF, HAVING BEEN FIRST DULY SWORN, WAS

10   EXAMINED AND TESTIFIED AS FOLLOWS:

11           THE WITNESS:  I DO.

12           THE CLERK:  WOULD YOU HAVE A SEAT,

13   PLEASE.

14           THE WITNESS:  THANK YOU.  GOOD MORNING,

15   YOUR HONOR.

16           THE CLERK:  WOULD YOU STATE YOUR NAME,

17   PLEASE, AND SPELL IT.

18           THE WITNESS:  YES.  IT'S JARED ZWICKEY,

19   J-A-R-E-D, Z-W-I-C-K-E-Y.

20               **AS-ON CROSS-EXAMINATION**

21   BY MR. KOVACEVICH:

22   Q    MR. ZWICKEY, YOU PROVIDED SOME CONSULTATIVE

23   SERVICES FOR THE DEFENSE IN THIS CASE; CORRECT?

24   A    I DID, YES, SIR.

25   Q    ALL RIGHT.  AND IN THE PROCESS OF THAT, YOU

1    HAD A TELEPHONE CONVERSATION WITH OFFICER RIOUX;

2    CORRECT?

3    A    I DID.

4    Q    AND APPROXIMATELY WHEN WAS THAT CONVERSATION?

5    A    I BELIEVE THE TELEPHONE CALL WAS ON THE 19TH

6    OF FEBRUARY.

7    Q    ALL RIGHT.

8    A    OF THIS YEAR.

9    Q    AND IN THE CONVERSATION WITH HIM, YOU -- I

10   JUST WANT TO FOCUS ON ONE ASPECT OF IT.

11        SO AT ONE POINT, DID -- YOU UNDERSTOOD

12   THAT HE HAD TAKEN SOME PHYSICAL CONTROL OF MS. FEE;

13   RIGHT?

14   A    YES, SIR, I DID.

15   Q    OKAY.  AND DID HE EVER INDICATE TO YOU WHETHER

16   HE'D LOST CONTROL OF HER AT ANY POINT IN TIME

17   PHYSICALLY WHEN THEY WERE AT THE DOORWAY?

18   A    YOU KNOW, I THOUGHT THERE WAS -- WE HAD A VERY

19   BRIEF DISCUSSION, BUT I BELIEVE THERE WAS SOME

20   DISCUSSION REGARDING WHEN HIS FINGERS WERE BEING

21   PULLED BACK THAT HE WOULD HAVE LOST HIS GRIP ON

22   HER, YES.

23   Q    OKAY.  AND THEN AS TO WHERE HE PEPPER SPRAYED

24   HER, DID YOU HAVE ANY INFORMATION, IN TALKING TO

25   HIM, THAT HE PEPPER SPRAYED HER WHEN HE WAS AT THE

1    DOORWAY?

2    A    YOU KNOW, I WENT BACK OVER MY NOTES AND I --

3    AND I WENT BACK OVER MY REPORT, BUT I DON'T RECALL

4    SPECIFICALLY WHERE HE SAID HE DID THAT.

5            I KNOW I TESTIFIED IN MY DEPOSITION THAT

6    IT WAS AT THE DOOR, BUT IT'S -- THAT'S

7    INCONSISTENT, SO I DON'T KNOW EXACTLY WHERE HE SAID

8    THAT HE HAD SPRAYED HER.

9    Q    OKAY.  SO WHEN DID YOU TESTIFY?

10   A    OH, I THINK IT WOULD HAVE BEEN -- YOU'RE

11   TALKING ABOUT MY DEPOSITION TESTIMONY, SIR?

12   Q    YES.

13   A    I BELIEVE IT WAS AUGUST IF I'M NOT MISTAKEN.

14   Q    ALL RIGHT.  SO AT THAT TIME YOUR RECOLLECTION

15   WAS THAT HE HAD TOLD YOU SOMETHING TO THE EFFECT OF

16   PEPPER SPRAYING HER AT THE DOOR; RIGHT?

17   A    AT THE TIME THAT I GAVE THAT TESTIMONY, YES,

18   SIR, IT WAS.

19            MR. KOVACEVICH:  OKAY.  THAT'S ALL I

20   HAVE.

21            THE COURT:  OKAY.  QUESTIONS?

22            MR. VINCENT:  NO QUESTIONS, YOUR HONOR.

23            THE COURT:  ALL RIGHT.  THAT WAS QUICK.

24   YOU'RE FREE TO GO.

25            THE WITNESS:  THANK YOU, YOUR HONOR.

1              MR. KOVACEVICH:  THANK YOU.

2              THE COURT:  ALL RIGHT.  I DO HAVE ONE

3    LEGAL ISSUE I NEED TO TAKE UP WITH THE ATTORNEYS,

4    SO I'M GOING TO EXCUSE YOU FOR A FEW MINUTES WHILE

5    I DO THAT.

6              I THINK WE WILL PROBABLY COMPLETE THE

7    EVIDENCE TODAY, BUT I NEED TO TALK WITH THE

8    ATTORNEYS FOR A SHORT PERIOD, SO I'LL GIVE YOU

9    ANOTHER RECESS.

10             (WHEREUPON, THE FOLLOWING PROCEEDINGS

11   WERE HELD OUT OF THE PRESENCE OF THE JURY:)

12             THE COURT:  ALL RIGHT.  WOULD ONE OF YOU

13   TELL ME THAT YOU UNDERSTAND THE ISSUE IN DISPUTE

14   IS?

15             MR. VINCENT:  WELL, YOUR HONOR, I THINK

16   PLAINTIFF HAS RESTED AND I BELIEVE HE'S INTENDING

17   TO MAKE A MOTION TO REOPEN.

18             THE COURT:  HE CAN CALL HER IN REBUTTAL.

19             MR. VINCENT:  WELL, THEN I GUESS THAT'S

20   WHAT WE NEED TO KNOW, WHETHER THIS IS REBUTTAL

21   TESTIMONY AND WHAT THE OFFER OF PROOF IS, OR

22   WHETHER IT IS HIS INTENT TO REOPEN.

23             THE COURT:  WHAT IS THE REBUTTAL?

24             MR. KOVACEVICH:  DO YOU WANT ME TO GO

25   THROUGH IT ALL?

1           THE COURT:  WELL, JUST IN GENERAL.

2           MR. KOVACEVICH:  TO REBUT PRACTICALLY

3    EVERYTHING THAT DR. KERAM -- OR EXPLAIN SOME OF THE

4    CIRCUMSTANCES SURROUNDING SOME OF THE TESTIMONY OF

5    DR. KERAM.

6           MR. VINCENT:  THERE'S NO REBUTTAL.  SHE'S

7    ALREADY TESTIFIED AS TO WHAT HER -- WE ALREADY HAD

8    SOME OTHER WITNESSES.

9           THE COURT:  WAIT A MINUTE.  IF THERE ARE

10   SOME FACTUAL MATTERS THAT -- ARE YOU TALKING ABOUT

11   CIRCUMSTANCES WHERE SOMETHING TOOK PLACE, OR --

12          MR. KOVACEVICH:  YOUR HONOR -- LET ME SEE

13   HERE -- ABOUT THE HOTEL ROOM.

14          THE COURT:  WHAT, THE PHYSICAL LAYOUT OF

15   THE HOTEL?

16          MR. KOVACEVICH:  YEAH.

17          THE COURT:  OKAY.  SHE CAN TESTIFY AS TO

18   THAT.

19          MR. KOVACEVICH:  SITTING IN THE

20   COURTROOM.  I MEAN, THIS IS MY NOTES TO MYSELF, BUT

21   HAVING TO DO WITH MS. KERAM'S OBSERVATION ABOUT HER

22   IN THE COURTROOM.

23          MR. VINCENT:  I DON'T THINK THERE'S ANY

24   REBUTTAL TO THE FACT THAT SHE'S SITTING IN THE

25   COURTROOM IN THE POSITION SHE'S SITTING, WHICH IS

1    ALL THAT DR. KERAM TESTIFIED TO.

2              THE COURT:  HOW -- WHAT IS IT THAT YOU

3    WANT TO REBUT?

4              MR. KOVACEVICH:  WELL, FIRST OF ALL, SHE

5    TESTIFIED THAT TYPICAL PTSD PATIENTS, LIKE SHE GAVE

6    AN EXAMPLE OF PEOPLE WITH THE DOOR, THEY WANT TO BE

7    NEAR THE DOORWAY, THEY WANT TO SEE WHO'S COMING,

8    WHO'S GOING.

9              THE COURT:  RIGHT.

10             MR. KOVACEVICH:  THAT THEY WOULD BE

11   LOOKING OVER THEIR SHOULDER.

12             THE COURT:  RIGHT.

13             MR. KOVACEVICH:  AND I JUST THINK THE

14   IMPLICATIONS THERE, YOUR HONOR --

15             THE COURT:  BUT WHAT IS IT THAT MS. FEE

16   COULD --

17             MR. KOVACEVICH:  WELL, SHE'S SITTING HERE

18   BECAUSE I PUT HER HERE WITH HER BACK TO THEM, FIRST

19   OF ALL, SO SHE'S NOT FACING THEM.

20             SECONDLY, SHE CAN'T REALLY LOOK AT THEM.

21             AND SO THAT'S WHY SHE'S NOT, YOU KNOW,

22   LOOKING OVER HER SHOULDER.

23             THE COURT:  SHE CAN EXPLAIN WHY SHE'S

24   SITTING THE WAY SHE IS.

25             MR. VINCENT:  THAT DOESN'T REBUT DR. --

1           THE COURT:  SURE IT DOES.  DR. KERAM HAD

2     SAID THAT THIS WAS TYPICAL -- THAT HER CONDUCT WAS

3     ATYPICAL OF SOMEONE WITH PTSD, AND I THINK THAT

4     ALLOWS HER TO EXPLAIN WHY SHE'S SAT THE WAY SHE'S

5     SAT.

6           MR. VINCENT:  WELL, WHAT SHE SAID -- MY

7     UNDERSTANDING OF WHAT SHE SAID WAS THAT IF SHE --

8     IF YOU -- IS THAT THEY WOULD NOT SIT IN THAT

9     POSITION, AND IF THEY WERE FORCED TO SIT IN THAT

10    POSITION, WHICH IS WHAT MR. KOVACEVICH IS SAYING

11    SHE'S GOING TO TESTIFY TO, THEY WOULD BE TURNING

12    AROUND AND LOOKING.

13          SO -- AND SO HER, HER OPINION WAS BASED

14    ON THE FACT THAT SHE OBSERVED HER SITTING THERE IN

15    THAT POSITION AND NOT TURNING AROUND AND LOOKING.

16          THERE'S NO -- THERE'S NOTHING -- HER

17    TESTIMONY DOESN'T REBUT THAT FACT.  THE FACTS ARE

18    THERE.

19          THE COURT:  I'M GOING TO ALLOW THAT.  YOU

20    CAN CROSS-EXAMINE IF YOU WANT TO.

21          MR. KOVACEVICH:  AND THE CIRCUMSTANCES

22    REGARDING THE BMW.  MS. KERAM -- DR. KERAM

23    INDICATED SHE BASICALLY HAD TO GIVE IT UP BECAUSE

24    SHE DIDN'T HAVE THE MONEY, AND MS. FEE WILL TESTIFY

25    AS TO WHY SHE DIDN'T RENEW THE LEASE ON THAT BMW,

1    WHICH IS NOT WHAT DR. KERAM ASSUMED.

2              WITH RESPECT TO THE SON, YOU KNOW, SHE

3    DID ADDRESS HER SON -- EXCUSE ME -- ON DIRECT, BUT

4    I DON'T THINK I'M LIMITED TO REBUTTING WHEN

5    SOMEBODY ELSE COMES IN AND --

6              THE COURT:  JUST TELL ME WHAT YOU WANT TO

7    DO.

8              MR. KOVACEVICH:  OKAY.  THAT SHE -- THIS

9    DID NOT DISTURB HER BEYOND JUST THE FACT THAT IT'S

10   HER SON BECAUSE BASICALLY HER AND HER EX-HUSBAND

11   AGREED THAT BASICALLY HE HAD TO JUST TAKE WHATEVER

12   MEDICINE WAS GOING TO BE GIVEN TO HIM.  SO THEY

13   DETERMINED THEY WEREN'T GOING TO BAIL HIM OUT, THEY

14   WEREN'T GOING TO HELP HIM IN ANY RESPECT.

15             THE COURT:  SHE HAD SPECIFICALLY

16   TESTIFIED TO THAT.

17             MR. KOVACEVICH:  ALL OF THAT?

18             THE COURT:  I THINK SO.

19             MR. VINCENT:  THAT'S BEEN COVERED.

20             MR. KOVACEVICH:  THE BAIL?

21             THE COURT:  YEAH, I THINK SHE

22   SPECIFICALLY SAID THEY DECIDED, OR SOMEBODY DECIDED

23   THEY DECIDED TO JUST LEAVE HIM THERE BECAUSE HE

24   NEEDED TO TAKE THE MEDICINE.

25             MR. VINCENT:  YEAH.  THAT WAS THE BEST

1    THING FOR HIM IS WHAT SHE SAID.

2              MR. KOVACEVICH:  EX-HUSBANDS, SHE WOULD

3    TALK ABOUT HER ONE HUSBAND WAS AN ABUSER AND SHE --

4    THAT'S WHY SHE DIVORCED HIM.  THE OTHER HUSBAND,

5    THEY'RE SOCIAL FRIENDS.

6              MR. VINCENT:  SHE --

7              THE COURT:  WAIT A MINUTE, MR. VINCENT.

8              MR. KOVACEVICH:  THEY'RE SOCIAL FRIENDS.

9              THIS GOES TO DR. HARRIS TALKING ABOUT SHE

10   HAS THIS TYPE OF PERSONALITY.  HE CITED THE FACT

11   THAT SHE DIVORCED, HAD DIVORCES IN HER BACKGROUND,

12   SO I THINK SHE SHOULD BE ABLE TO EXPLAIN THOSE.

13             MR. VINCENT:  YOUR HONOR, IN HER

14   DEPOSITION, SHE CITED NO HISTORY OF ABUSE.

15             IF SHE'S GOING TO TESTIFY AS TO ABUSE,

16   THEN MY EXPERT NEEDS TO TAKE THAT INTO

17   CONSIDERATION.  SHE'S CONTRADICTING HER DEPOSITION

18   TESTIMONY ON A SIGNIFICANT AREA THAT WOULD HAVE

19   BEEN RELEVANT TO HER -- TO THE OPINIONS OF THE

20   EXPERT.

21             THE COURT:  DID SHE TESTIFY AT DEPOSITION

22   THAT SHE WAS NOT THE SUBJECT OF --

23             MR. KOVACEVICH:  I DON'T REMEMBER THAT.

24             THE COURT:  OKAY.  WHAT ELSE DO YOU WANT

25   TO GO INTO?

                                                    1088

1          MR. KOVACEVICH:  THE PLASTIC SURGERIES TO

2     EXPLAIN THOSE.

3          AND I DON'T KNOW THAT I COVERED THE

4     ACTUAL, THE ACTUAL DATES, AND I'M SORRY, I DON'T

5     REMEMBER, IN TERMS OF THE MOTHER, WHEN SHE WAS

6     DIAGNOSED, WHEN SHE DIED.  I THINK I PROBABLY

7     COVERED THAT.

8          THE COURT:  I THINK THAT'S BEEN COVERED.

9          MR. KOVACEVICH:  WELL -- AND THEN --

10    WELL, SEE, THE PROBLEM IS THE DIAGNOSIS OF DEMENTIA

11    IS AFTER THIS INCIDENT.  I DON'T THINK I EVER ASKED

12    HER ABOUT THE DATE OF DIAGNOSIS.

13         THE COURT:  I COULDN'T SWEAR TO IT, BUT I

14    THOUGHT THAT WAS COVERED, BUT I MAY BE WRONG ON

15    THAT.

16         MR. KOVACEVICH:  AND THEN THE NIECE WAS

17    DIAGNOSED IN 2006.  I DON'T THINK I COVERED WHEN

18    SHE WAS DIAGNOSED.  I ONLY COVERED WHEN SHE DIED.

19         AND MS. FEE WOULD TESTIFY, YOU KNOW, I

20    MEAN, THEY KNEW THAT FOR A LONG TIME.

21         AND I'M GOING TO ASK HER THAT AFTER THESE

22    THINGS, YOU KNOW, AFTER THE DIAGNOSIS, DID SHE HAVE

23    TO TAKE MEDICATION FOR ANY, YOU KNOW, MENTAL OR

24    EMOTIONAL SYMPTOMOLOGY.

25         AND IN TERMS OF, YOU KNOW, WHAT SPECIFIC

1    IMPROVEMENTS SHE FEELS HAVE TAKEN PLACE WITH HER

2    SINCE DR. KERAM SAW HER, BECAUSE DR. KERAM TALKED,

3    LIKE, FOR THREE YEARS SHE HADN'T CHANGED, SO --

4              MR. VINCENT:  I DON'T THINK THAT REBUTS

5    DR. KERAM'S TESTIMONY.

6              THE COURT:  OKAY.  WOULD YOU WAIT UNTIL

7    HE'S FINISHED?

8              MR. KOVACEVICH:  SO I THINK I SHOULD HAVE

9    THE RIGHT TO BE ABLE TO TRY AND DATE DR. KERAM'S --

10   WELL, OR SHOW THAT DR. KERAM IS WRONG IN TERMS OF

11   ANY PROGRESS, BECAUSE, YOU KNOW, I MEAN, LISTEN,

12   SHE WAS PRETTY CRITICAL OF DIANE COHAN AND SOMEWHAT

13   OF MY CLIENT, SO --

14             THE COURT:  OKAY.

15             MR. KOVACEVICH:  SO I WANT TO GO INTO

16   THAT.

17             AND THEN IN THAT REGARD, YOU KNOW,

18   LASTLY, WE DO HAVE THE ISSUE OF THE IMPACT ON HER

19   AND HER, YOU KNOW, AND HER RECOVERY OF THE

20   INFORMATION OF -- THAT SHE GAINED ABOUT

21   OFFICER RIOUX.

22             THE COURT:  NONE OF THE EXPERTS

23   CONSIDERED THAT OR WERE TOLD THAT; RIGHT?

24             MR. VINCENT:  THAT'S CORRECT, YOUR HONOR,

25   AT LEAST AS FAR AS THE DEFENSE EXPERTS.

1           MR. KOVACEVICH:  I DON'T KNOW.  I MEAN,

2     MR. VINCENT WAS WANTING TO KEEP IT ALL

3     CONFIDENTIAL, SO MAYBE HE DIDN'T.

4           THE COURT:  I THOUGHT WHEN WE FIRST CAME

5     UP AND WE DISCUSSED IT SOME MONTHS AGO THAT, AND MY

6     MEMORY MAY BE WRONG, THAT THE EXPERTS HAD BEEN

7     DEPOSED AND NOBODY TALKED ABOUT THAT.

8           MR. VINCENT:  THAT'S CORRECT.  AND THEY

9     DIDN'T TESTIFY REGARDING IT IN THIS COURTROOM.

10          THE COURT:  WHAT IS IT THAT YOU WANT TO

11    BRING OUT ON THAT?

12          MR. KOVACEVICH:  WELL, YOUR HONOR, I --

13    IF YOU WOULD LET ME JUST HAVE MY CLIENT GIVE YOU

14    THE OFFER OF PROOF, I MEAN, I -- BASICALLY SHE WAS

15    EXTREMELY, EXTREMELY AFFECTED IN A NEGATIVE WAY.

16          THE COURT:  BY?

17          MR. KOVACEVICH:  HE SCARED THE HOLY HECK

18    OUT OF HER.  HER FEARS MOUNTED GREATLY.

19          YOU KNOW, I MEAN, I DON'T HAVE HER

20    CONDITION.  I CAN'T EXPLAIN WHY.  BUT THAT'S

21    BASICALLY WHAT IT IS.

22          AND THIS, THIS HAS PERSISTED FOR A LONG

23    TIME.  SHE FELT EVEN MORE FEARFUL TO BE AROUND AND

24    OUT AND ABOUT.

25          THE COURT:  AND THIS IS BECAUSE SHE

1    LEARNED OF --

2               MR. KOVACEVICH:  OF THE VIOLENT NATURE OF

3    THE INCIDENT INVOLVING OFFICER RIOUX'S BROTHER AND

4    SHE BELIEVED THIS INDIVIDUAL, OFFICER RIOUX, WAS

5    VIOLENT TOWARDS HER, THAT HE COMES FROM A FAMILY

6    WHERE THERE'S SOME SERIOUS VIOLENCE AND SHE FELT

7    EVEN MORE THREATENED AND FEARFUL.

8               THE COURT:  CAN YOU -- IS THAT IT?

9               MR. KOVACEVICH:  YES, YOUR HONOR.

10              THE COURT:  OKAY.  CAN YOU SHOW ME WHERE

11   MS. FEE, IN HER DEPOSITION, DENIED ANY ABUSE?

12              MR. VINCENT:  I COULD.  I CAN'T DO IT

13   INSTANTANEOUSLY.

14              THE COURT:  DO YOU HAVE AN INDEX OR

15   SOMETHING?

16              MR. VINCENT:  I HAVE AN INDEX.

17              THE COURT:  WOULD YOU SEE IF YOU CAN FIND

18   IT?

19              MR. VINCENT:  BUT I THINK THE POINT I

20   WANT TO ADDRESS IS THAT THE INCIDENT INVOLVING

21   OFFICER RIOUX'S BROTHER HAD NOTHING TO DO WITH HIM

22   AND HAD NOTHING TO DO WITH THE PLAINTIFF.

23              THE COURT:  THAT'S NOT WHAT I'M ASKING

24   YOU FOR AT THIS POINT.  I TEND -- I THINK I'M GOING

25   TO AGREE WITH YOU ON THAT IF IT GIVES SOME COMFORT.

1            MR. VINCENT:  OKAY.  LET ME TAKE A FEW

2    MINUTES AND LOOK THROUGH THE DEPOSITION AND SEE IF

3    I CAN FIND IT.

4            MR. KOVACEVICH:  YOUR HONOR, I LOOKED UP

5    THE WORD "ABUSE" IN THE INDEX AND I FOUND ONLY ONE

6    REFERENCE ON PAGE 40 WHICH WAS ASKING ABOUT THE --

7    ABOUT HER SON AND SAID "DO YOU KNOW IF HIS DRUG

8    ABUSE HAD ANY CONNECTION TO THE REASONS FOR HIS

9    DIVORCE?"

10            BUT I ONLY LOOKED UP THE WORD "ABUSE."

11            THE COURT:  HOW ABOUT LOOKING AT THE WORD

12   "DIVORCE" AND SEEING IF THERE'S ANY DISCUSSION

13   ABOUT THAT.

14            (PAUSE IN PROCEEDINGS.)

15            MR. VINCENT:  YOUR HONOR, I BELIEVE IT

16   MAY HAVE BEEN IN THE DEPOSITION OF DIANE COHAN.

17            DIANE COHAN TESTIFIED THAT MS. FEE HAD

18   TOLD HER THAT SHE HAD NEVER SUFFERED ANY PHYSICAL

19   ABUSE BY EITHER OF HER TWO HUSBANDS.

20            AND I DON'T -- I DON'T SEEM TO BE ABLE TO

21   FIND ANY REFERENCE TO THAT IN GOING THROUGH

22   MS. FEE'S DEPOSITION, AND I'VE GOTTEN TO THE PART

23   WHERE I'VE ASKED HER ABOUT HER DIVORCES.

24            BUT I BELIEVE MY UNDERSTANDING OF HER

25   DENYING ANY ABUSE CAME FROM MS. COHAN'S DESCRIPTION

1    OF THE TREATMENT THAT SHE, THAT SHE RECEIVED AND

2    WHAT MS. FEE'S DESCRIPTION OF HER PRIOR

3    RELATIONSHIPS WAS.

4            SO --

5            THE COURT:  WELL, BASICALLY I'M GOING TO

6    DO THIS.  I'M GOING TO ALLOW THE AREAS THAT

7    MR. KOVACEVICH WANTS TO GET IN, WITH THE EXCEPTION

8    OF THE TESTIMONY CONCERNING OFFICER RIOUX'S BROTHER

9    AND WHAT HAPPENED WITH RESPECT TO HIM.

10           IT SEEMS TO ME THAT NO EXPERT AT THIS

11   POINT HAS MENTIONED IT.  ITS PREJUDICIAL EFFECT I

12   THINK FAR OUTWEIGHS ITS PROBATIVE VALUE.

13           AND I THINK THE SITUATION AS TO MS. FEE'S

14   MENTAL STATE HAS BEEN GONE INTO IN DEPTH BY A

15   NUMBER OF EXPERTS.

16           NONE OF THEM -- OR THERE'S NO INDICATION

17   TO ME DURING THE TRIAL THAT ANY OF THOSE EXPERTS

18   FELT THAT THAT WAS A SIGNIFICANT MATTER, AND THERE

19   WAS NO REQUEST TO ALLOW THEM TO GET INTO THE AREA

20   BECAUSE THEY THOUGHT IT WAS IMPORTANT.

21           WITH RESPECT TO THE ONE AREA THAT -- I'VE

22   FORGOTTEN WHAT IT WAS NOW -- THAT I MENTIONED THAT

23   I INDICATED YOU HAD COVERED BEFORE, I DON'T WANT

24   YOU TO GET INTO THAT.  HOPEFULLY YOUR NOTES ARE

25   BETTER THAN MY MEMORY AS TO THAT AREA.

1           MR. KOVACEVICH:  THE SON, I THINK, ABOUT

2    THE SON.

3           THE COURT:  YEAH, ABOUT THE SON AND HIS

4    MEDICINE, YEAH.  THAT WAS GONE INTO.

5           SO OTHER THAN THAT, YOU CAN COVER THE

6    AREAS.

7           MR. KOVACEVICH:  OKAY.  THANK YOU.

8           THE COURT:  AND THAT'S IT FOR EVIDENCE;

9    RIGHT?

10           MR. KOVACEVICH:  YES.

11           MR. VINCENT:  YES, YOUR HONOR.

12           THE COURT:  OKAY.  BRING IN THE JURY.

13           OH, BEFORE YOU DO, LET ME JUST COVER A

14    COUPLE QUICK THINGS.

15           DO YOU WANT ME TO INSTRUCT -- WE'RE

16    OBVIOUSLY NOT GOING TO DO THAT TODAY, BUT DO YOU

17    WANT ME TO INSTRUCT BEFORE OR AFTER ARGUMENT?

18           MR. VINCENT:  WELL --

19           MR. KOVACEVICH:  I THINK BEFORE.

20           MR. VINCENT:  I THINK IT'S GOING TO BE

21    HARD TO ARGUE THE CASE UNLESS WE KNOW WHAT THE

22    INSTRUCTIONS ARE.

23           THE COURT:  YOU'LL KNOW WHAT THE

24    INSTRUCTIONS ARE.  I JUST WANT TO KNOW WHETHER YOU

25    WANT ME TO GIVE THEM BEFORE YOU ARGUE.

1           MR. VINCENT:  YES.

2           THE COURT:  OKAY.

3           MR. VINCENT:  AND I HAVE A MOTION, TOO,

4    AT THE CLOSE OF THE EVIDENCE.

5           THE COURT:  OKAY.  HOW LONG DO YOU THINK

6    YOUR CLOSINGS WILL TAKE?

7           MR. KOVACEVICH:  WE'RE NOT TIMED ON THAT,

8    RIGHT?

9           THE COURT:  THAT'S CORRECT.

10          MR. KOVACEVICH:  OKAY.

11          THE COURT:  YOU'RE WELL WITHIN THE TIME

12   REGARDLESS OF WHICH COMPUTATION YOU USE.

13          MR. KOVACEVICH:  AN HOUR, HOUR AND A

14   HALF.

15          THE COURT:  MR. VINCENT, HOW LONG DO YOU

16   THINK?

17          MR. VINCENT:  ONE HOUR AT THE MOST.

18          THE COURT:  OKAY.  SO I THINK I'LL HAVE

19   THE JURY COME IN PROBABLY ABOUT 9:30 TOMORROW,

20   BECAUSE THE INSTRUCTIONS IN THIS CASE ARE HARDER

21   THAN MOST CASES OF THIS TYPE AND I WANT TO MAKE

22   SURE YOU HAVE AN OPPORTUNITY TO SEE WHAT I INTEND

23   TO GIVE AND MAKE YOUR OBJECTIONS.

24          MR. KOVACEVICH:  SO WHEN WILL THAT BE DO

25   YOU THINK APPROXIMATELY, YOUR HONOR?

1          THE COURT:  YOU MAY NOT GET THEM UNTIL

2     TONIGHT SOMETIME.

3          MR. KOVACEVICH:  ALL RIGHT.  AND CAN WE

4     PUT THE JURY BACK A LITTLE BIT LATER?

5          THE COURT:  A LITTLE BIT LATER IN THE

6     MORNING?

7          MR. KOVACEVICH:  YEAH, BECAUSE THAT -- I

8     MEAN, WE'VE JUST GOT TO GET THEM OUT BEFORE --

9          THE COURT:  1:00 O'CLOCK.

10          MR. KOVACEVICH:  YEAH.  OH, I SEE.  YEAH,

11     WITH THE ARGUMENTS.

12          MR. VINCENT:  WELL --

13          THE COURT:  OR THE OTHER POSSIBILITY

14     WOULD BE JUST TO HAVE THEM COME BACK ON FRIDAY, BUT

15     THAT KIND OF GUARANTEES THAT THEY DON'T DELIBERATE

16     UNTIL NEXT WEEK, AND I DON'T THINK YOU WANT THAT.

17          MR. VINCENT:  NOPE.  NEXT TUESDAY.

18          THE COURT:  RIGHT.

19          MR. KOVACEVICH:  WELL, THIS IS A CRAZY

20     QUESTION PROBABLY, YOUR HONOR, BUT, I MEAN, DO

21     YOU -- I DON'T KNOW.  I MEAN, DO YOU THINK WE'RE

22     GOING TO HAVE MUCH ISSUE WITH THEM?  IS THAT WHAT

23     YOU COME UP WITH?

24          THE COURT:  NORMALLY I HAVE VERY LITTLE

25     ISSUE RAISED WITH MY INSTRUCTIONS, BUT --

1      MR. KOVACEVICH:  NO, THIS IS A LITTLE BIT

2    MORE COMPLICATED.  I APPRECIATE THAT.

3          THE COURT:  RIGHT.

4          MR. KOVACEVICH:  WELL, I GUESS THE

5    THING -- THE PROBLEM I HAVE IS I THINK THOSE COULD

6    AFFECT CONSIDERABLY THE WAY THE ARGUMENT'S

7    CONSTRUCTED.

8          THE COURT:  RIGHT.  WELL, I WILL

9    CERTAINLY MAIL THEM TO YOU TONIGHT.

10          MR. KOVACEVICH:  BUT WHAT I'M -- WHAT I

11    MEAN IS THAT MEANS, THEN, WE JUST HAVE TO TAKE OFF

12    AFTER THAT TO START, YOU KNOW, ADAPTING OR

13    PREPARING OR MODIFYING.

14          THE COURT:  RIGHT.  WE'LL DO THE BEST WE

15    CAN.

16          MR. KOVACEVICH:  OKAY.

17          THE COURT:  OKAY.  LET'S BRING THEM BACK.

18          AND I'LL HAVE THEM COME AT 9:30 AND THEN

19    WE CAN TALK ABOUT IT FURTHER TODAY.

20          MR. KOVACEVICH:  OH, OKAY, YEAH.

21          THE COURT:  OKAY.  YOU WANT TO BRING THEM

22    IN.

23    ///

24    ///

25